Dockets.Justia.com

# EXHIBIT A



# SERVICES AGREEMENT

This Agreement and all exhibits attached hereto, which are incorporated in their entirety by reference, (collectively, the "Agreement") is entered into by and between Market America, Inc., a North Carolina corporation, whose principal office is located at 1302 Pleasant Ridge Road, Greensboro, NC 27409 ("Client"), and LTech Consulting, LLC, a New Jersey limited liability company ("LTech") whose principal office is located at 4000 Route 66, Suite 110, Tinton Falls, NJ 07753, and is effective as of __February 1___, 2008 ("Effective Date").   This Agreement governs the services provided under this Agreement.  The December 12, 2007 agreement still controls the services performed under that agreement.

By executing this Agreement, LTech and Client agree to be bound by the terms and conditions set forth below.

1. LTech Services. LTech shall perform the services set forth in the Statement of Work attached as Exhibit A ("LTech Services").   All work will be performed professionally and in accordance with industry standards.

2. Term of Agreement.   This Agreement shall remain in effect until terminated by its terms.

3. Compensation.   Client shall pay LTech the compensation as set forth in the Statement of Work attached as Exhibit A.

4. Independent Contractor Status.   Both Client and LTech agree that LTech will act as an independent contractor in the performance of its duties under this Agreement.

5. Assignment.   Neither party may assign this Agreement without the written consent of the other party, except that either party may assign this Agreement in conjunction with the sale of substantially all assets of the assigning party or a controlling ownership interest in the assigning party after 10 days advance written notice to the other party.   This prohibition against assignment does not preclude the use of contractors by LTech.

6. Confidentiality.

a. "Confidential Information" Defined.   "Confidential Information" means any data, materials or information that is not generally known to the public and that is owned or possessed by either party ("Disclosing Party") and is disclosed to the other party ("Receiving Party"), whether in oral, written, digital or other form of disclosure.  Confidential Information also includes any third party information which Disclosing Party is required to keep confidential ("Third Party Confidential Information").   Without limitation of the foregoing, the parties agree that the terms of this Agreement constitute Confidential Information (yet the fact that the parties have entered into the agreement and the general nature of the relationship between the parties is not confidential).  This agreement may be disclosed by the Receiving Party in proper due diligence processes in business transactions in accordance with industry standards.

b. "Trade Secrets" Defined.   "Trade Secret" shall mean information owned or possessed by Disclosing Party,

without regard to form, that is disclosed by Disclosing Party to Receiving Party, including but not limited to, technical or non-technical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers, in any form or format, which is not commonly known by or available to the public and which: (i) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secrets specifically include any Confidential Information satisfying the above criteria.

c. Excluded From "Confidential Information."   Confidential Information does not include any data or information which Receiving Party can demonstrate: (i) was already known to Receiving Party at the time of disclosure; (ii) was independently developed by Receiving Party without reference to Disclosing Party's Confidential Information; (iii) is in the public domain through no fault of the Receiving Party; or (iv) was rightfully disclosed to Receiving Party by a third party without obligation of confidentiality.

d. Prohibition Against Disclosure and Use of Confidential Information & Trade Secrets.   During the term of this Agreement, and indefinitely thereafter, Receiving Party will not, except as otherwise expressly directed by Disclosing Party, use, copy, or disclose, or permit any unauthorized person access to, any of Disclosing Party's Trade Secrets, except as expressly permitted herein and necessary for accomplishment of activities required hereby.   During the term of this Agreement and for a period of two (2) years after termination hereof, Receiving Party will not use, copy, or disclose, or permit any unauthorized person access to, Disclosing Party's Confidential Information, except as expressly directed by such party or as permitted herein. Receiving Party agrees to comply with any confidentiality agreements or the like to which Disclosing Party is a party to the extent Disclosing Party notifies Receiving Party of such agreements and obligations in writing prior to execution of this Agreement.

2/1/2008

**e.** <u>Confidential Information & Trade Secrets Disseminated Only on Need to Know Basis.</u> Receiving Party agrees that it will disclose Confidential Information or Trade Secrets to its employees or agents only as necessary for the performance of Receiving Party's obligations under this Agreement. Prior to disclosing Confidential Information or Trade Secrets to such employees or agents, Receiving Party will verify with Disclosing Party that such employees or agents are subject to appropriate confidentiality agreements.

**f.** <u>Safeguards Against Disclosure.</u> Receiving Party agrees to use at least the same degree of care to avoid and prevent disclosure of Disclosing Party's Confidential Information and Trade Secrets as Receiving Party uses to prevent disclosure of its own Confidential Information and Trade Secrets, or Receiving Party shall exercise a commercially reasonable degree of care, whichever degree of care is higher.

**g.** <u>Equitable Relief.</u> Receiving Party acknowledges and agrees that the misappropriation, unauthorized use or disclosure of Confidential Information or Trade Secrets would cause irreparable harm to the Disclosing Party. In the event of any breach of any part of this Section by Receiving Party, Disclosing Party shall be entitled to equitable relief, including but not limited to a temporary restraining order, temporary injunction and/or a permanent injunction. The rights of Disclosing Party under this Section are in addition to the rights that Disclosing Party may have under this Agreement, common law or statutory law.

**7.** <u>Nonrecruitment/Nonhire.</u>   During the term of this Agreement and for twelve (12) months from the termination of this Agreement for any reason, Client shall not: (1) recruit or encourage, directly or indirectly, any LTech employees, agents or independent contractors to leave LTech's employ or discontinue doing business with LTech, or (2) hire any LTech employee, agent or contractor with whom Client had material contact under this Agreement during the 12 month period prior to termination of this Agreement to perform services for Client similar to the services performed by such employee, agent or contractor for LTech while employed or retained by LTech.

**8.** <u>Notices.</u> All notices, requests and demands given or made pursuant to this Agreement shall be sent by certified mail, registered mail, or private carrier such that the notifying party can prove both delivery of notice and that the recipient received the notice (or refused to receive) and the respective dates thereof. Notices shall be sent to the address above or to any successor address provided by either party.

**9.** <u>Intellectual Property Rights.</u>

**a.** <u>Ownership of Intellectual Property.</u>   As between the parties, LTech shall own all property (and all rights in registrations and applications related to such property)

which is created by LTech (whether alone or jointly with Client or a third party) pursuant to this Agreement or any statements of work hereunder ("Created Works"), including but not limited to, property subject to protection by intellectual property laws (relating to patents, trademarks and copyrights), laws pertaining to trade secrets or unfair competition, similar laws protecting intangible property (database or information protection laws) and information not protectable by the preceding laws yet otherwise protectable (all of such property being referred to herein as "Intellectual Property").   Additionally, LTech retains all rights to works created prior to the execution of this Agreement or created independently of this Agreement and all adaptations or derivative works therefrom ("Pre-Existing Works"), subject the license to Pre-Existing Works provided by LTech herein.   Software code (source, object or compiled) provided by LTech pursuant to this Agreement may include existing software (the "Existing Software") that was developed prior to execution of this Agreement or has been independently developed or is otherwise owned by LTech ("LTech Existing Software") or a third party ("Third Party Existing Software"). As an illustration, and not a limitation, the following constitute Pre-Existing Works:   Existing Software, Third Party Existing Software.

**b.** <u>Equitable Relief.</u>   The parties acknowledge and agree that the misappropriation of, unauthorized use of or infringement of Intellectual Property would cause irreparable harm to the owner thereof. In the event of any breach of any part of this Section by either party, the other party shall be entitled to equitable relief, including but not limited to a temporary restraining order, temporary injunction and/or a permanent injunction.   The rights of the parties under this Section are in addition to the rights that such parties may have under this Agreement, common law or statutory law.

**c.** <u>License to Created Works, Pre-Existing Works, Existing Software, and LTech Existing Software.</u>   Any Created Works, Pre-Existing Works, Existing Software, and LTech Existing Software which is provided to Client hereunder is provided in accordance with the License below. Any Third Party Existing Software will be provided to Client in accordance with the terms of a separate software license or agreement that Client shall enter into with said third party, at LTech's sole expense.   The "License" is a worldwide, nonexclusive, perpetual, fully paid, royalty free license to use, reproduce, display, distribute, perform, and prepare derivative works from the Created Works, Pre-Existing Works and LTech Existing Software without any duty to account to LTech, yet such license is limited to the purpose of Client's internal use to further its business.   Client may not sublicense its rights to the Created Works, Pre-Existing Works or LTech Existing Software, and Client may not assign its rights to such Created Works. Pre-Existing Works or LTech Existing Software except in conjunction with the sale of substantially all assets or ownership of Client.

**d.** <u>Contingency to Grant of Intellectual Property & License.</u> Notwithstanding any term to the contrary in this Agreement,

all grants of ownership under this Section or licenses granted under this Section are contingent upon payment. If Client has paid for a portion of the LTech Services, then Client's license for that portion of the LTech Services and all related Created Works, Pre-Existing Works and Ltech Existing Software shall be fully paid and irrevocable as soon as the payment has been made.

e.   Escrow.   Upon Client's request and at Client's sole expense, LTech will escrow all Created Works, Pre-Existing Works and LTech Existing Software provided, created or intended for Client with a third party escrow agent mutually agreeable to the parties and pursuant to a three party escrow agreement. LTech will keep the deposit current with the then-most-current copies of the source code for such Created Works, Pre-Existing Works and LTech Existing Software, including any and all updates, enhancements and releases (the "Source Code"). The Source Code shall be released from escrow to Client in the event that:

(i)      LTech materially breaches an obligation under this or any other Agreement in effect between the parties;

(ii)      LTech (a) admits in writing its inability to pay its debts generally as they become due; (b) institutes proceedings to be adjudicated a voluntary bankrupt or consents to the filing of a petition of bankruptcy against it; (c) is adjudicated by a court of competent jurisdiction as being bankrupt or insolvent; (d) seeks reorganization under any bankruptcy act, or consents to the filing of a petition seeking such reorganization; or (e) has a decree entered against it by a court of competent jurisdiction appointing a receiver, liquidator, trustee or assignee in bankruptcy or insolvency, covering all or substantially all of LTech's property (which appointment is not vacated within sixty (60) days of the entry of the order of appointment) or providing for the liquidation of LTech's property or business affairs; or

(iii)      LTech or its successor discontinues the distribution of any Created Works, Pre-Existing Works or LTech Existing Software.

10. Indemnity.

a.   Mutual Indemnity.   Each party ("Indemnifying Party") agrees to indemnify and hold the other party, its officers, directors, attorneys, employees and agents ("Indemnified Party") harmless from any and all claims, losses, damages, expenses, judgments or other liabilities (including but not limited to reasonable attorneys' fees which are incurred prior to, during or after trial, bankruptcy proceeding or any alternative dispute mechanism, and including but not limited to tax liability, interest and penalties) for which Indemnified Party becomes obligated to pay due to (1) any material breach of this Agreement by Indemnifying Party, its employees or agents, (2) property damage or personal injury caused by the negligent or willful acts or omissions by Indemnifying Party, its employees or agents, or (3) illegal

acts or omissions by Indemnifying Party, its employees or agents.

b.   Indemnity for Intellectual Property Infringement.   LTech shall defend, indemnify and hold harmless, at its own expense, Client and its officers, directors, employees, agents and affiliates, from and against any claim of infringement of a U.S. patent, U.S. copyright, or U.S. trademark asserted against Client by a third party based upon i) Client's use of the LTech Services, or any portion thereof; or ii) Client's use of the Google 8008 Products, purchased from LTech, or any portion thereof, to the extent such claim arises out of or relates to the combination of use of the Google 8008 Products with the LTech Services. If Client's use of all or any part of the LTech Services or the Google 8008 Products is, or in LTech's opinion is likely to be, enjoined due to the type of infringement specified above, or if required by settlement, LTech shall: (i) substitute for the Google 8008 Products or the LTech Services, as the case may be, substantially functionally similar products and programs; (ii) procure for Client the right to continue using the Google 8008 Products and the LTech Services; or if (i) and (ii) are commercially impracticable, (iii) terminate the Agreement and pay to Client a full refund of all fees paid to Ltech by Client for the LTech Services and the Google 8008 Products.

11. Entire Agreement & Modification.   This Agreement represents the entire agreement between the parties as to the matters referenced herein and is not subject to change or modification except by written agreement signed by both parties.

12. Dispute Resolution. The parties will attempt in good faith to resolve any issue, dispute, or controversy arising out of or relating to this Agreement. If any controversy or claim arising out of, or in any way related to, this Agreement is not resolved in a reasonable manner, at the request of either party, the matter will be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration will take place in Delaware. The arbitration award will be valid and binding upon the parties, and judgment thereon may be entered and enforced as a final judgment in any court of competent jurisdiction. However, claims for injunctive relief or other equitable relief may be filed in the state or federal courts of New Jersey for an order effective until the conclusion of the arbitration and enforcement of the arbitration award. Furthermore, notwithstanding the foregoing, for claims qualifying for small claims court in New Jersey, either party may sue in small claims court in New Jersey if the good faith effort to resolve the issue/dispute fails after a reasonable time (which reasonable time for the purpose of a small claims court action is no later than 10 days from the date the complainant sends a detailed letter to the other party identifying the complaint and an acceptable solution/cure).   The arbitrator and court shall award attorney's fees, costs and expenses to the prevailing party in any arbitration or court proceeding (including small

LTECH

claims court). The parties agree to initiate arbitration in lieu of appealing any small claims court judgment.

13. Severability. The covenants set forth in this Agreement shall be considered and construed as separate and independent covenants. Should any part or provision of any covenant be held invalid, void or unenforceable in any court of competent jurisdiction, such invalidity, voidness or unenforceability shall not render invalid, void or unenforceable any other part or provision of this Agreement.

14. Termination. Except to the extent provided in any Statement of Work, this Agreement may be terminated by Client, with or without cause, upon not less than 30 days written notice of termination to the other party. In the event Client fails to make any timely payment under this Agreement, LTech may cease performing Services or terminate this Agreement effective upon not less than 30 days written notice to Client, provided such failure is not cured within such 30 day period.

15. Survivability. The terms and conditions of this Agreement that, by their sense and context, are intended to survive the termination, performance or completion of this Agreement shall so survive.

16. Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to the conflict of laws provisions thereof, and the state and federal courts located in that state shall have exclusive jurisdiction of the parties for the purposes of adjudicating all disputes that may arise under this Agreement. The parties hereby waive all objections to venue and personal jurisdiction in those forums for such disputes and agree that service of process may be made by in accordance with the notice provision of this Agreement.

17. Waiver. No waiver, amendment or modification of any provision of this Agreement or any agreements in connection with such waiver, amendment, or modification shall be valid unless in writing duly executed by both parties. No delay or failure by either party to exercise or enforce at any time any right or provision of this Agreement will be considered a waiver thereof or of such party's right thereafter to exercise or enforce each and every right and provision of the Agreement. No single waiver will constitute a continuing or subsequent waiver.

18. Limitation on Warranties and Cap on Liability.

FOR A PERIOD OF SIX (6) MONTHS FOLLOWING COMPLETION OF THE SERVICES, THE SERVICES AND ALL CREATED WORKS, PRE-EXISTING WORKS AND LTECH EXISTING SOFTWARE PROVIDED TO CLIENT WILL BE IN COMPLETE CONFORMITY WITH (I) THE SOW AND (II) ANY OTHER SPECIFICATIONS MUTUALLY AGREED UPON IN WRITING IN THE FORM OF CHANGE ORDERS EXECUTED BY EXECUTIVES OF CLIENT AND LTECH.. IN THE EVENT OF ANY BREACH OF THIS WARRANTY, LTECH'S SOLE RESPONSIBILITY, AND CLIENT'S SOLE REMEDY, IS FOR LTECH TO PROMPTLY AND DILLIGENTLY REMEDY ANY DEFECTS AT NO COST TO CLIENT. LTECH FURTHER WARRANTS THAT IT ROUTINELY USES AND WILL CONTINUE TO USE INDUSTRY STANDARD PROCESSES TO CHECK ALL SOFTWARE PROVIDED TO CLIENT FOR, WITHOUT LIMITATION, VIRUSES, TROJAN HORSES, WORMS, AND ANY OTHER SOFTWARE ROUTINES OR CODE DESIGNED TO (I) PERMIT UNAUTHORIZED ACCESS BY THIRD PARTIES, OR (II) DISABLE, ERASE, OR OTHERWISE HARM THE SOFTWARE, DATA, OTHER SOFTWARE OR HARDWARE (COLLECTIVELY, "MALICIOUS CODE") AND THAT SUCH SOFTWARE, WHEN DELIVERED TO CLIENT, CONTAINS NO MALICIOUS CODE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, LTECH FURTHER REPRESENTS AND WARRANTS THAT SUCH SOFTWARE, WHEN DELIVERED TO CLIENT, WILL NOT INCLUDE, WITHOUT LIMITATION, KEYS, FAIL CODE, PASSWORDS, SOFTWARE ROUTINES, DISABLING CODE, INSTRUCTIONS, HARDWARE COMPONENTS OR ANY COMBINATION OF THE FOREGOING WHICH IS DESIGNED TO INTENTIONALLY DISABLE, PREVENT THE USE OF OR OTHERWISE REPOSSESS THE SOFTWARE BY ELECTRONIC OR OTHER MEANS. OTHER THAN AS STATED HEREIN, LTECH MAKES NO REPRESENTATIONS, WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED, WITH RESPECT TO THE DELIVERABLES OR SERVICES PROVIDED PURSUANT TO THIS AGREEMENT, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

EXCEPT WITH RESPECT TO AMOUNTS SUBJECT TO INDEMNIFICATION PURSUANT TO SECTION 10 ABOVE, THE MAXIMUM LIABILITY OF LTECH OR ITS EMPLOYEES, AGENTS OR CONTRACTORS (AND CLIENT'S MAXIMUM REMEDY) WITH RESPECT TO SERVICES OR GOODS PROVIDED OR TO BE PROVIDED UNDER THIS AGREEMENT OR WITH RESPECT TO ANY CLAIM OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL IN NO EVENT EXCEED THE TOTAL FEES PAID. IN NO EVENT SHALL LTECH, CLIENT OR THEIR RESPECTIVE EMPLOYEES, AGENTS OR CONTRACTORS BE LIABLE (AND COMPANY SHALL HAVE NO REMEDY) (I) UNDER ANY THEORY INCLUDING CONTRACT OR TORT (INCLUDING NEGLIGENCE AND STRICT PRODUCTS LIABILITY) FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES.

19. Testing and Acceptance. Client shall have no less than TEN (10) days following delivery of each Created Work or other deliverable specified in the applicable Statement of Work to test and accept or reject such Created Work or other



deliverable.  All such tests shall be conducted on Client's site and equipment in order to determine whether the Created Work or other deliverable performs according to the Statement of Work and all applicable written specifications and to ensure, among other things, that the Created Work or other deliverable can be effectively utilized in Client's operating business environment, is capable of running a variety of data without failure, and meets the runtimes required by Client.  If the Created Work or other deliverable does not conform to the applicable Statement of Work or other written specifications,

Milestone completion and acceptance will be determined by the following protocol:

- LTech will notify Client that milestone has been deemed complete.

- Client will have ten (10) business days to confirm milestone is complete, or deliver in writing, via mail, fax, or letter,  a denial of milestone completion with a detailed

description of all outstanding issues to the contrary.  Only issues that are related to requirements listed in the Statement of Work can be considered an outstanding issue for the denial of milestone completion.

- If Client does not respond, the milestone will be deemed accepted.

- If client responds with a denial of milestone completion, LTech will provide client with a schedule for prompt remediation and will re-deliver the Created Work or other deliverable to Client.  Client shall have the right to test and accept or reject the Created Work or other deliverable according to the same procedure set forth in this section for testing the initial delivery.

20.  **Force Majeure**.  Neither party shall be liable for any delay or non-performance of any covenant contained herein nor shall any such delay or non-performance constitute a default hereunder, or give rise to any liability or damages if such delay or non-performance is caused by an event of "force majeure."  The term "force majeure" means events beyond the reasonable control of such party.  All parties shall make a good faith effort to effectuate this Agreement where there is an occurrence of a force majeure during and after the occurrence to the extent commercially reasonable.

MARKET AMERICA, INC.

By:_____
   (sign here)

Name:_____

Title:_____

LTECH CONSULTING, LLC.    Ed Laczynski

By:_____  2008.02.01 11:10:40
   (sign here)               -05'00'

Name:___Ed Laczynski_____

Title:_____CTO_____

LTECH

Address for and designation of individual(s) to receive notices on behalf of Client:

_____

_____

Attention:_____

e-mail:_____

with a copy to:_____

e-mail: _____

Address for and designation of individual(s) to receive notices on behalf of Consultant:

4000 Route 66, Suite 110_____

Tinton Falls, NJ  07753_____

Attention: Ed Laczynski_____

e-mail: ed@ltech.com_____

with a copy to: Russell Young_____

e-mail: ryoung@ltech.com_____



<u>**EXHIBIT A**</u>

# NUMBER: MA0801-A                     DATED: February 1st, 2007

This Statement of Work is between Market America, Inc., a North Carolina corporation, whose principal office is located at 1302 Pleasant Ridge Road, Greensboro, NC 27409 ("Client"), and LTech Consulting, LLC, a New Jersey limited liability company ("LTech") whose principal office is located at 4000 Route 66, Suite 110, Tinton Falls, NJ 07753, and is effective as of the later of ("Effective Date") (a) the date above if the parties have executed a Services Agreement, and (b) the effective date of the Services Agreement.

The terms and conditions of this Statement of Work shall govern to the extent they conflict with the terms and conditions of the Services Agreement or, if no such agreement has been entered into as of yet, the Services Agreement to be entered into by the parties.

For good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, the parties agree as follows and is effective as of the SOW Effective Date.

| |
|---|
| Client Name ("**Client**"): Market America, Inc. |
| Address: 1302 Pleasant Ridge Road, Greensboro, NC 27409 |
| Project manager: Chris Diggs |
| Telephone: 336.544.6373 |
| Email: chrisd@marketamerica.com |
| Fax. |

| |
|---|
| LTECH project manager: Jason Keicher |
| Telephone: 732-481-2281 |
| Email: jason@ltech.com |

## 1. SERVICES

**SERVICES PERIOD.**  Unless otherwise terminated earlier in accordance with the terms of this Agreement, the Services will end on the completion of the Services by LTech, which is estimated to be June 15th, 2008

**SERVICES LOCATION.**  LTECH will provide the Services at LTech corporate offices, located at 4000 Route 66, Tinton Falls, NJ, USA.

## 2.  CLIENT RESPONSIBILITIES

Client will provide all technical expertise and assistance for LTech perform its services in a timely fashion.  Client will provide all design, styling, formatting, and graphic assets in a "web-ready" format (i.e. HTML, CSS, JPG/GIF/PNG) for integration into the solution.  Client will provide one lead project manager that will be LTech's key contact for the project.  Client will provide technical resources to contribute and lead specific components, as described below in the solution.



## 3.  MARKET AMERICA NEXT GENERATION SEARCH AND MERCHANDISING SOLUTION

The Market America Next Generation Search and Merchandising Solution ("NextGen") will be designed and developed by LTech, in concert with MarketAmerica's technology and business teams.  The goal of NextGen is to provide a fast, comprehensive, and user-friendly search and merchandising experience for MarketAmerica's customers and administrators. The solution will leverage the speed and power of the Google Search Appliance (GSA) platform to deliver relevant search results in a variety of formats and zones to empower MarketAmerica users with up-to-date and on-target product information.  The GSA will generally serve search responses in sub one-second time frame.

Development efforts will be made keep Internationalization functionality (multi-language and multi-country) of each system in mind as it is developed.  This will include content, labels, data, etc. LTech will make best efforts to review, propose, and implement a Proof of Concept (POC) for multi-language and multi-country functionality with out materially effecting the time frame for delivery of Phase 1.

NextGen will be comprised of the following modules:

1.  DataHub

2.  Product Content Service

3.  Merchandising Service

4.  Administration Application

5.  GSA Feed Application

6.  GSA Bridge

7.  MarketAmerica Website

### 3.1  Software Architecture

LTech proposes the following architecture for the solution:

1.  **DataHub**

    - **Description**:  The DataHub Is a robust persistence layer designed to merge, mash, and normalize all Market America product data.  It is designed to be queryable, and extendable to allow for the evolution of  categorization and product attributes.

    - **Software**: C# console application, scheduled via Automate (from Network Automation)

    - **Persistence**: SQL Server 2005 on dedicated hardware

    - **Configuration**: XML based configuration, deployed in development, staging, and production environments

2.  **Product Content Service**

    - **Description**: The Product Content Service provides a single point-of-contact for any product consumer application (in this solution, the GSA Feed Application).  It will be a read-only service.

    - **Software**: C# XML web application, with on-demand access

    - **Persistence**: via DataHub

    - **Configuration**: XML based configuration, deployed in development, staging, and production environments

3.  **Merchandising Service**

    - **Description**: The Merchandising Service provides a single point-of-contact for any merchandising configuration (i.e. Zone Management, Best Sellers, comparison shopping, etc).  It will be a read-write service.

2



- Software: C# XML web application, with on-demand access
- Persistence: SQL Server 2005, same instance as DataHub
- Configuration: XML based configuration, deployed in development, staging, and production environments

4. **Administration application**

- Description: The Administration application provides an interface for the administration of feeds and merchandising. It also allows the viewing and querying of product content from any source. For Phase I, the application will be comprised of a simple interface that will allow for basic CRUD (Create Read Update Delete) functionality only.
- Software: C# ASP.NET web application, with on-demand access
- Persistence: Via Services
- Configuration: XML based configuration, deployed in development, staging, and production environments

5. **GSA Feed application**

- Description: The GSA feed application manages the scheduling, updating, and deleting of product content from the GSA(s) used in the solution.
- Software: C# console application, scheduled via AutoMate
- Persistence: Via Services
- Configuration: XML based configuration, deployed in development, staging, and production environments, in addition to GSA configuration

6. **GSA Bridge**

- Description: The GSA bridge provides the interface for the MarketAmerica website to query for search results, zone data, comparison-shopping, etc.
- Software: Java / CFM
- Persistence: Via Services
- Configuration: dependent on current MarketAmerica configuration standards

7. **MarketAmerica Website**

- Description: Changes will be made on the MarketAmerica.com website to incorporate the GSA Bridge. The current Mercado system will be eliminated, replaced with the NextGen Solution. There will be five contact points for change/integration with the GSA Bridge. Market America will be responsible for integration into other sites
    1. Search Results Content Zone
    2. Search Result Faceted Search (GSA counts) Page
    3. Merchandising Zones
    4. Product Comparison Page
    5. Product Detail Page.
- Software: Java / CFM
- Persistence: via Bridge, preexisting architecture
- Configuration: dependent on current MarketAmerica configuration standards.

**3.1.1 Architecture Diagrams**

3



- On Following Pages:



## Market America DataHub

| Prepared By LTech Consulting | 2008 |

**Raw Data Feeds**

UniVerse
Market America Products

Partner & Affiliate Products
XML, CSV, Flat Files

Process Ingests Data In Raw Format
Responsible for client scheduling management
Raw Segmentation By Vendor
Raw Data in Generic Product Format TBD

Raw Data

Data Processed into Normalized Optimized format
**Product Categorization performed**
Product Comparison data setup
Uniqueness Freshness
Chain of Data Transformers for expansion

MarketAmerica DataHub

Scheduled Process

SQL Server 2005

Normalized Data

**MarketAmerica DataHub**

Normalized Product Data

Merchandizing Data

Normalized/ Optimized Datastore
Flexible Attribute System
Persistent/ Qeuryable/ Extendable

### Product Content Service

| Merchandising Service | GSA Feed | | Admin Application |

### GSA Bridge

MarketAmenca.com

5



# Market America Product Content Service

| Prepared By LTech Consulting | 2008 |
|---|---|

MarketAmerica DataHub





# Market America GSA Bridge

| Prepared By LTech Consulting | 2008 |
|---|---|



7





## 3.2 Requirements Specification

Based on the initial kickoff meeting and follow-on conversations, LTech has identified the following requirements to be in scope for this Phase I of NextGen, or to be capable of future development in subsequent phases:

# Phase 1

| Req Id | Description |
|---|---|
| | **DataHub Raw Data Manager** |
| DH001 | **DataHub Raw Data Manager (File Drop Trigger)**<br>- Configure Automate to respond to time triggers and file drop triggers to process files<br>- System will assume separate folders for each partner in production system and process files in a folder, then move to archive. |
| DH002 | **DataHub Raw Data Manager (FTP Trigger)**<br>- Configure Automate to FTP (Get) files from partners |
| DH003 | **DataHub Raw Data Manager (HTTP Trigger)**<br>- Configure Automate to HTTP download files from partners |
| DH004 | **DataHub Raw Data Manager (Main)**<br>- Develop C# *Multithreaded* console application that will be called from Automate with a Feed Type to Ingest the appropriate Data In Raw Format.<br>- C# .Net 2.0 console application, scheduled via Automate (from Network Automation) |
| DH005 | **DataHub Raw Data Manager (Zip)**<br>- Must support unzipping of files |
| DH006 | **DataHub Raw Data Manager (Doc Count)**<br>- Phase 1 up to 10 million products to coincide with Phase 1 GSA purchase |
| DH007 | **DataHub Raw Data Manager**<br>- must support multiple languages<br>- GSA supports this<br>- Data model will use Unicode encoding to support this. |
| | **DataHub Data Processor** |
| DH101 | **DataHub Data Processor (Main)**<br>- Develop C# *Multithreaded* console application that will be called from Automate to process all waiting raw data<br>- C# .Net 2.0 console application, scheduled via Automate (from Network Automation) |
| DH102 | **DataHub Data Processor (Uniqueness/Freshness Transformer)**<br>- uniqueness / freshness determined for optimized feeds to GSA<br>- "Push to GSA" flag will be set during processing |
| DH103 | **DataHub Data Processor (Categorizer Transformer)**<br>- Phase 1 – Categorizing will be performed by mapping Vendor categories into MA master categories<br>- Master category mapping to be supplied by MA.<br>- Phase 1 functionality will be a 1 to 1 mapping from Vendor category to MA category.<br>- Categories/mapping exceptions will be stored for later querying |
| DH104 | **DataHub Data Processor (Categorizer Transformer – Exception Report)**<br>- Phase 1 – store results of product categorization to be reported on. (Exception report)<br>**Exception Report**<br>--------------<br>    Exception reporting needs to show:<br>1.   New or Missing Categories<br>2.   New or Missing Brand<br>3.   New or Missing Store<br>4.       Missing pricing |



|  | 5.  Missing buy URL<br>6.  Missing Cross reference<br>7.  Missing Image URL |
|---|---|
| **DH105** | **DataHub Data Processor (Category Counts)**<br>- Develop process to build and cache master category counts nightly.<br>- 2 possible solutions: 1- build counts during Data processing. 2- separate process to build counts and store results. |
| **DH106** | **DataHub Data Processor (Product Comparison Transformer)**<br>- Phase 1- Simple product comparisons<br>- UPC code<br>- Brand + ProductID<br>- Manufacturer + Manufacturing part# |
|  | **Data Model / Database** |
| **DM201** | **Setup and Configure Clustered SQL Server 2005 Enterprise Edition for Production**<br>- Setup database to accommodate data and performance requirements |
| **DM202** | **Setup and Configure Additional SQL Server 2005 Enterprise Edition for Dev, Stage, QA, etc as needed**<br>- Setup database for different environments as needed |
| **DM203** | **Design and Implement ER Model for MarketAmerica DataHub**<br>- Design ER model to store data in various stages defined in requirements above<br>- Performance tune DB to handle expected volume of data |
| **DM204** | **ER Model -  Product / Banner Rules**<br>- Design structure and queries to represent Product and Rule based structure |
| **DM205** | **ER Model -  Dynamic Category Tree**<br>- Design structure and queries to represent Dynamic Category Tree<br>- Phase 1 Master Category tree delivered by Otto of MA on 1/17/08<br>- related to DH103 |
| **DM206** | **ER Model - Vendor Category Mapping**<br>- Design structure and queries to represent Vendor/Partner <-> MA Master Category mapping<br>- will be used during Categorization process<br>- related to DH103 |
| **DM207** | **ER Model – Product Comparison Data**<br>- Design structure and queries to represent Product Comparison Data<br>- Volume of products makes caching of product comparisons necessary |
| **DM208** | **ER Model – Exception Reporting / Logging**<br>- Design structure and queries to represent Processing Exceptions<br>- Design structure and queries to represent Search Tracking |
| **DM209** | **XML Schema – Full MA Search Result Set**<br>- Design XML Schema to define the MA Search Result Data payload<br>- base schema will be GSA resultset<br>- additions to handle Zones, product manipulation, guided nav, etc.<br>- SEE [GB803] |
| **DM212** | **ER Model – Multiple Site Support**<br>- All Merchandising rules in the system will be marked with a  "Country" and "Site" and "Language" tags to differentiate them among the various MA properties.<br>- Product data itself will be available to any consumers of the PCS |
|  | **GSA Feed** |
| **GF301** | **GSA Feed Application**<br>Develop System to Feed Formatted / Categorized Product data into the GSA on a scheduled basis<br>- C# .Net 2.0 console application, scheduled via Automate (from Network Automation) |
| **GF302** | **GSA Feed Application (New Products)**<br>- App will accept "New" flag to query and push all "new" products to GSA |
| **GF303** | **GSA Feed Application (Updated Products)**<br>- App will accept "Update" flag to query and push all "updated/changed" products to GSA |



| GF304 | **GSA Feed Application (Deleted Products)**<br>- App will accept "Deleted" flag to query and push all "deleted" products to GSA (to be deleted from GSA) |
|---|---|
| GF305 | **GSA Feed Application (Per Vendor Products)**<br>- App will accept "Vendor + Vendor Id" flag to query and push all products from the Vendor to GSA.<br>- used for manual pushes of certain feeds to GSA |
| GF306 | **GSA Feed Application (Per Category Products)**<br>- App will accept "Category + Category Id" flag to query and push all products from the Category to GSA.<br>- used for manual pushes of certain feeds to GSA |

## Product Content Service

| PC401 | **Product Content Service**<br>Develop Application Service to broker product data to various systems and components<br>- C# .Net 2.0 XML web application – SOAP or REST |
|---|---|
| PC402 | **Product Content Service (CRUD)**<br>- Basic Product CRUD (Create, Update, Delete)<br>- Includes category, title, descriptions, keywords, stores, (all the fields in DB)<br>- There will be no versioning of live data.<br>- When a product is updated manually, a "do not overwrite" flag will be set so the processor /feed will not overwrite the changes. |
| PC403 | **Product Content Service (Query Bridge)**<br>- Basic Product Retrieval<br>- By Vendor, By Category, By date ranges, By "Load Request" etc.<br>- Used from GSA Feed, Content Browser, etc. |
| PC404 | **Product Content Service (Product Comparisons)**<br>- Product comparisons will be done by GSA through GSA bridge. |

## Merchandising Service

| MS501 | **Merchandising Service**<br>Develop Application Service to broker merchandising data and rules to various systems and components<br>- Zone Data, search result manipulation rules (defined below)<br>- C# .Net 2.0 XML web application |
|---|---|
| MS502 | **Merchandising Service (Search Result Manipulation Rules - Each expanded below)**<br>- Rules will have 5 main elements: **Trigger, Rule definition, Action, Priority**<br>- **Trigger** – based on search keyword. Ex: *keyword = "OPC-3"* or Always<br>- **Rule Definition** – defines search result matching or query addition options<br>- **Action** – push up in resultset, push down in resultset, remove from the resultset, add to the resultset or *redirect to URL* (redirection will be handled by the web layer) (see MW920)<br>- **Priority** – defines the order in which rules should be applied |
| MS503 | **Merchandising Service (Search Result Manipulation TRIGGER Types)**<br>- Search Keyword(s) – allow multiple keywords and phrases for same rule<br>- Linguistics will be entered manually for each rule for Phase 1, because GSA will be handling search term stemming.<br>- Canned Searches for Landing Pages and Home Page – an attribute called "page" will be available for specifying rules that will affect page specific canned searches.  For implementation, the web site will contain a hardcoded search, passing along a "page" value that can be matched against to process these rules. |
| MS504 | **Merchandising Service (Search Result Manipulation RULE Definition)**<br>- Based on name/value pairs, Phase 1 data elements only.<br>- For result matching must support both "equal" and "contains".<br>- Ex: If Vendor=MarketAmerica |
| MS505 | **Merchandising Service (Search Result Manipulation ACTIONS)**<br>- Push up, push down<br>- Remove from results<br>- Add to query (this will add the given name/value pair to the GSA search query)<br>- Add to results (choose specific products to add to results)<br>- Redirect to URL/Landing page (bypass search results) |
| MS506 | **Merchandising Service (Search Result Manipulation PRIORITY)**<br>- defines priority when a given search results in more than one rule being activated |
| MS507 | **Merchandising Service (Zone Manipulation)** |



- Phase1 - 2 Zones – Best Sellers and Recommended
- Rules will have 3 main elements **Trigger, Rule, Action**
- **Trigger** – based on search keyword. Ex: keyword = "OPC-3"
- **Rule Definition** – add to query or define specific products
- **Action** – add to GSA query or statically define products to display.
- If no products are define for each of the zones the 4 top products returned in the search should be shown in the zones

| | Admin Application |
|---|---|
| AD601 | **Admin Application**<br>Develop interface to allow manipulation of merchandising rules, feeds, and reporting.<br>- C# .Net 2.0 web application |
| AD602 | **Admin Application (Merchandising Service)**<br>- Admin system will support the editing of rules defined above in the Phase 1 Merchandising Service<br>- Search Result Manipulation Rules<br>- Zone Manipulation |
| AD603 | **Admin Application (Product Content Service)**<br>- Admin system will support the features of the Phase 1 Product Content Service defined above<br>- Basic CRUD<br>- Query Bridge |
| AD604 | **Admin Application (Search for Rule)**<br>- Admin system will support searching for a rule. |
| AD608 | **Admin Application (Reporting)**<br>- Admin interface to report on search statistics From Req GB808<br>- Phase 1 -- search terms and result counts [pulled from GSA, link to report] |
| AD613 | **Admin Application (Vendor Category <-> MA Category)**<br>- admin system to manage Master Category mapping to Vendor Category |
| AD614 | **Admin Application (Edit MA Category tree)**<br>- admin system to manage Master Category mapping to Vendor Category |
| AD615 | **Admin Application (Security/Roles)**<br>- System will require login<br>- System will support concurrent logins.<br>- If two users are working on the same data, the users that saves data last will win<br>- Phase1 – 2 roles (Full, Read-Only) |
| AD617 | **Admin Application (Banners – Rules)**<br>- Admin system will link to banner system (see BM701) |
| AD618 | **Admin Application**<br>- Admin system UI design will be based upon existing Mercado system wherever possible. |
| AD619 | **Admin Application - Multiple Site Support**<br>- All merchandising rules in the system will be marked with a "Site" data element to differentiate them among the various MA properties.<br>- All admin screens will support a "site" marker on appropriate entities. |
| | |
| | Banner Manager |
| BM701 | **Banner Management (4 Zones)**<br>- LTech will setup and configure Absolute Banner Management System http://www.xigla.com/absolutebm/<br>- Ltech will configure 4 zones for each site channel. (Channel = Search Results, Homepage, etc.)<br>- MA to supply channel list to Ltech.<br>- ABM will be used to upload and manage banners (images, flash, etc) |
| | |
| | GSA Bridge |
| GB801 | **GSA Bridge**<br>Develop middleware library to bridge the GSA, New MA Services, and ColdFusion developed website |



| | - Result manager - goal is to ultimately return XML result set to limit CFM web changes required<br>- Query Builder – help in formatting GSA queries<br>- Product Content Service and Merchandising Service managers<br>- GSA result format will be baseline of XML schema.  Additions will be made to incorporate MA specific info into it.  **See DM209**<br>- Java/J2EE |
|---|---|
| GB802 | **GSA Bridge (GSA Query Builder)**<br>- Develop library to assist in building and managing GSA queries<br>- manage partial and full meta tags<br>- manage sorting options<br>- manage collections<br>- manage filtering (GSA filtering) |
| GB803 | **GSA Bridge (Search Result Manager)**<br>- MS rule querying/caching – will use MS to access rules<br>- Result manipulation – apply MS rules to results<br>- Rules defined above in **See MS501 – MS508** |
| GB804 | **GSA Bridge (Zone Manager)**<br>- MS rule querying/caching – will use MS to access Zone rules<br>- Zone management – use rules and queries to build zone product set<br>- merge into MA Result Schema<br>- Rules defined above in **See MS509 – MS510** |
| GB805 | **GSA Bridge - Search Type Support (Phase 1)**<br>- Keyword search<br>- Category search and navigation (Phase 1 categories)<br>- Store<br>- Item # (SKU)<br>- Dynamic navigation (successive refinement with dynamic categorization) (Phase 1 categories – limited to GSA result limit)<br>- Country |
| GB806 | **GSA Bridge - Faceted Search**<br>Develop library and process to group and count results based on predefined metadata.  This includes brand, store, MarketAmerica category and subcategory only.<br>- traverse search results and build groups of counts to allow for drill down search<br>- Group counts limited to GSA results and GSA result count limits.  Up to 1000 results deep depending on performance testing and acceptance.<br>- Groups will be flat list of categories with counts.  Hierarchical group counts will not be supported for phase 1.<br>- return counts in separate XML data fragment |
| GB807 | **GSA Bridge - Resultset Sorting**<br>- library must support GSA sorting (through query builder) Date and relevance<br>- library must support custom sorting (done through custom code on any returned field) – limited to most relevant results (1000 result limit) |
| | **GSA Config** |
| GB820 | **GSA Linguistic Rules (GSA Query Expansion)**<br>- Phase 1 - Configure custom stemming and stop words in GSA – **limited to GSA features**<br>- For performance purposes, linguistics rules will be handled by GSA for Phase 1, features found here.<br>http://code.google.com/apis/searchappliance/documentation/50/help_gsa/serve_query_expansion.html |
| GB821 | **GSA Keywords**<br>- Configure keywords and related queries in GSA |
| GB822 | **GSA Reporting/Analytics**<br>Analytic information useful for deciding how best to tune search results<br>- Phase 1 limited to GSA reporting interface and features |
| | **MarketAmerica.com Website** |
| MW901 | **MarketAmerica.com Website General Info**<br>- Ltech will provide consulting support for the MA Website requirements.<br>- Ltech will provide stubs for all services so the MA website work can begin in a timely fashion<br>- MA will be responsible for all website deliverables. |
| MW902 | **Search Results Content Zones** |



| | | |
|---|---|---|
| | - alter current MA website to incorporate new search results | |
| MW903 | **Search Result Guided Navigation (Faceted Search)**<br>- change current MA website to incorporate faceted search results (category counts – limited to GSA results and result limit)<br>- new UI design necessary | |
| MW904 | **Merchandising Zones**<br>- alter current MA website to incorporate new Merchandising Zone results | |
| MW905 | **Product Comparison Page**<br>- develop page(s) to use Product Content Service for basic comparison shopping | |
| MW906 | **Product Detail Page**<br>- change current MA website to incorporate new master product data store | |
| MW907 | **Home Page Category Navigation**<br>"MarketAmerica will design, development, and integrate the category navigation. These categories will be hardcoded into the navigation in the web layer." | |
| MW920 | **Redirection**<br>The web tier will execute all redirection rules.  Redirection rules will be passed to the GSA Bridge for consumption by the web tier.. | |
| MW921 | **Store Highlighting**<br>The web site will show the partner stores at the bottom of search that relate to the item they searched.  This data will be available in the results returned from the GSA bridge. | |
| | | |
| | **Misc Requirements** | |
| MISC01 | **Log4Net Support**<br>- All applications and web services will be built with log4net support for dynamic logging and alerting<br>http://logging.apache.org/log4net/ | |
| MISC03 | **Performance testing**<br>- LTech will perform load testing to ensure the solution meets MA performance requirements. | |
| | | |

# Phase 2

| Req Id | Description | |
|---|---|---|
| | **Phase 2 Items** | |
| P201 | **DataHub Data Processor (Categorizer Transformer)**<br>- Phase 2 – Advanced categorization based upon description keyword matching and inference based on previously categorized products | |
| P202 | **DataHub Data Processor (Product Comparison Transformer)**<br>- Phase 2- Advanced product comparisons<br>- Product description hashing and keyword matching technique | |
| P203 | **Merchandising Service (Search Result Manipulation TRIGGER Types)**<br>- Phase 2<br>- For Performance reasons, the following triggers are moved to phase 2.<br>- **Results**: This trigger enables the rule to fire according to the results, and not according to specific query. For example, if most of the results are from the Fashion department, regardless of what the customer was searching for or navigating to then the rule will fire and continue with the rule actions like promoting a specific brand. | |
| P204 | **Merchandising Service (Zone Manipulation)**<br>- Phase2- 2 new zones (Hot Deals and New Items)<br>- Zones will be filled based on application statistics | |
| P205 | **Admin Application (Linguistic Rules)** | |



| | |
|---|---|
| | - Phase 2 – move to custom solution if needed and performance implications allow it<br>- Linguistics Similar Terms Rules - if a customer types in "active shoes" we also want to show results for "sneaker". We can make a linguistics rules that creates an association between active shoes and sneaker so that they are either equal in status or similar in status. Linguistics associations are very useful when your product descriptions cannot include certain words.<br>- Linguistics Don't Associate Rules - If there is an association made between 2 words, we need the ability to break the association so that noise is not returned. For example, if someone types in Prime, we want to show our Prime products. But if there was an association of Prime with Primer, Primer could potentially show before our products and bring a lot of noise. We want to minimize noise by breaking the association.<br>- Linguistics Keep Original Rules - This is valuable when you have brand names that possible look like a misspelling of another word. Such as our product Feminene. It looks like a misspelling of Feminine. We don't want to direct the customer elsewhere, we put in that if a person searches on Feminene to keep the original spelling and only bring results for that product, not other products with the word Feminine.<br>- Linguistics Common Phrases - the ability to tell the search to search for a specific selection of a phrase. For example baby doll, search only for the two words as a phrase, don't search for just the word "baby" and just the word "doll". |
| P206 | **Admin Application (Grouping Rules)**<br>- Phase 2 –ability to group rules into named entities for security and reporting purposes.. |
| P207 | **Admin Application (Rule approval)**<br>- Phase 2 –ability for rules to be in "pending" state and be approved and rejected by admin |
| P208 | **GSA Bridge - Search Type Support (Phase 2)**<br>- Spanish and Chinese<br>- Phonetics<br>- Search as you type (Ajax support) |
| P209 | **Shopping Cart Integration**<br>- alter shopping cart to access new DataHub / PCS |
| P210 | **Hierarchical Navigation (Pre-search)**<br>- design system to represent hierarchical category system<br>- design tree-like interface to user to allow user to drill down into categories before issuing a search<br>- MA defined category data is a prereq |
| P211 | **Multi-Country/Multi-Lang Support**<br>  ------------<br>1.   We require that Spanish and Mandarin (Traditional Chinese) be supported.  We have supplied data and we will need a proof of concept at the bare minimum for Phase 1. |
| P212 | **Admin Application (Product Comparison Shopping)**<br>- Phase 1 will be live queries to the GSA for "related products" on fields defined in DH106<br>- Phase 2 will introduce a data model , admin screen, and altered query logic to allow for "manually entered" related products.<br>**Page Templates** – For example creating a "Motives" page where the background color could be changed. |
| P213 | **GSA Bridge – Search stats logging**<br>- library will support basic search stat logging<br>- search params and  result counts (one row **Related Documents** – For example if there is a study on OPC-3, we could have a rule created to display a pdf file of that study in the page. This could include any file types. |
| P214 | **MVT Rules** – Example, the ability to have multiple banners for the same product, and rotate them to test what customers respond better to. When this is implemented a new report need to be included to show impressions, click through rates to determine which strategy works the best and make it a "traditional" business rule. |
| P215 | **Business Rules, multiple languages** – the ability to create business rules in multiple languages. |
| DH107 | **DataHub Data Processor (Dynamic Attribute Engine) (OA)**<br>- Data from each product will be put through a dynamic attribute engine<br>- Each attribute will have a rule associated with it.<br>- Each attribute/rule will be defined as "Boolean", Text, or "Range"<br>- Example: RAM: "range" attribute – 1-2GBs, 2-4GBs, etc.<br>- Attributes will be delivered by MA prior to start. |



| | |
|---|---|
| | - Automatic categorization based on regular expression patterns (keyword, wildcard matching) |
| **DM210** | **ER Model – Dynamic Attribute System (OA)**<br>- Design structure and queries to represent dynamic attribute system<br>- Each attribute will have a rule associated with it.<br>- Each attribute/rule will be defined as "Boolean", "Text", or "Range"<br>- Example: RAM: "range" attribute – 1-2GBs, 2-4GBs, etc.<br>- Attributes will be delivered by MA prior to start. |
| **DM211** | **ER Model – Approval based Model for Merchandising rules**<br>- Design structure and queries to represent multiple states of a rule<br>- for "Pending/Approval" system in Admin |
| **MS502.1** | **- Schedule** – defines start and end time of rule |
| **MS503.1** | **- Trigger Rules**<br>Always (Always Applied)<br>- Results Count (<, >, =) |
| | - Set category navigation and cross reference - The web merchandisers need to have the capability of setting the navigation displayed on the page where the visitor lands. So promotions and setting of navigation displayed on the page needs to be part of the admin tool for the web merchandisers. See example from the Amazon page where they show trends, exclusive deals, etc. web merchandisers need this capability to create these.[PHASE 2] |
| | Capability of reviewing/editing/add/delete Hot Deals, New Items, Top Sellers, Recommended Products, Related Products - Before the business rule creation is done the web merchandisers need the ability to customize the product display on areas such as Hot Deals, New Items, Top Sellers, Recommended Products, Related Products from what is defaulted to show up. The merchandisers should have the ability to pull by brand, keywords, product type, store, etc and flag different products/brands/etc to show up on inside these areas. For example if we were to create a business rule for digital cameras the digital cameras from STAPLES would already be flagged to show first. [EXCLUSIONS/INCLUSION OVERRIDES ON MATCHING RULES** SCOPE IMPACT] |
| **AD606** | **Admin Application (Schedule)**<br>- Must be able to schedule rules<br>- Manual enable/disable a rule<br>- Start/End date and time<br>- Recurring daily / weekly |
| **AD607** | **Admin Application (Simulate Rule – Search Result Manipulation)**<br>- admin interface to test a merchandising rule.<br>- will run GSA search apply rules and display results in plain format.<br>- will not be integrated into website, just plain search results with no formatting. |
| **AD610** | **Admin Application (Audit)**<br>- Admin system will keep an audit trail of actions and users<br>- basic log viewer interface |
| **AD611** | **Admin Application (Alerts)**<br>- fire email alerts for upcoming scheduling events:<br>      - a rule expired<br>      - a rule start<br>      - a rule is about to start<br>      - processing rule exceptions |
| **AD612** | **Admin Application (Alerts)**<br>- Alert history can be viewed. Search by type and date. |
| **AD616** | **Admin Application (Security/Roles) (OA)**<br>- Site/Section based user entitlements<br>- Rule approval – rules must be setup for "approval" feature<br>- See REQ DM211 |
| **AD620** | **Admin Application – Save as / Copy a rule**<br>- admin system must have the ability to "Copy" a rule to a different name so the rule does not have to be started from scratch. |
| **MISC02** | **Product Audit History:** |



| | |
|---|---|
| | Save all manual changes to a "backup" to allow for web merchandisers to replace changes with backups. [version] |
| AD609 | **Admin Application (Reporting - Export)**<br>- reporting interface will support exporting report to excel (Excel Writer purchase probable)<br>- http://officewriter.softartisans.com/ |

### 3.3 Hosting and Deployment

The NextGen solution will be hosted in MarketAmerica's current hosting environment. In addition to the Google Search Appliance cluster (specified below), the solution will require an instance of SQL Server 2005 on Windows Server 2003 for the DataHub. The server should be configured as follows:

**SQL Server configuration:**

Production Database Cluster:

2 x Compaq DL385 G2

Specs:

2x Intel Xeon (Dual Core) 2.2GHZ 4MB L2

8GB RAM

2 x 73GB Ultra 2 SCSI 15,000 RPM RAID 1 (73GB available)

Dual Power Supply

Dual NICs

Windows 2003 Enterprise 64 bit

MS SQL 2005 Enterprise 64 bit

MSA 1000

(Drive sizes for example purposes only. Actual space needed TBD)

Specs:

2 x 36 GB SCSI RAID 1 – Quorum (For Cluster) (36GB available)

8 x 300 GB SCSI RAID 0+1 – SQL Data (1117.58GB GB available)

4 x 146 GB SCSI RAID 5 – Backups (600GB available)


Ltech recommends a similar single (non-clustered) machine each "Non-Production" environment (Dev, Testing, QA, etc). The additional services and application components described above can sit on the same hardware as SQL Server 2005, for additional scalability an additional set of dedicated Windows Server 2003 servers can be provisioned with the following configuration:

**App Server configuration**

1 HP ProLiant DL380

Dual 3.0 GHz Pentium 4 Xeon

4GB RAM

2 x 73 GB Ultra 2 SCSI 10,000 RPM

RAID 1

Windows 2003

Network Associates AutoMate



### 3.4 Implementation Team

LTech will be providing a team of consultants for the implementation of this solution. The team will be focused on this project, and will not be working on any other major project during the duration of the implementation phase.

This core team will consist of the following individuals:

**Technical Lead and Architect:**
    Jason Keicher
    office: 732-481-2281
    jason@ltech.com

**Senior Developer:**
    Brian Dorry
    office: 732-481-2279
    BDorry@ltech.com

Brian Dorry has been at LTech for over three years and has been involved with implementing enterprise search using the Google Search Appliance for GetTheJob.com, HireHealth.com and BiospaceJobs.com. Brian has also been responsible for implementing SEO friendly web search solutions using various technologies for a variety of Ltech customers.
    Brian holds a Bachelor of Science in Computer Science from Rutgers University.

**Developer:**
    Ralph Weigle
    office: 732-481-2282
    RWeigle@ltech.com

Ralph Weigle is experienced in designing and implementing GSA front-end solutions.
Specifically he has worked in XSLT with Advent and PayPal and parametric search in Red Dog's solution.
Ralph holds a Bachelor of Arts in Information Technology from the New Jersey Institute of Technology.

In addition to the core team listed above, the following individuals will contribute on an as-needed basis:

**Java Architect and Senior Developer:** Eric Klotzko
**Writing and Design:** Kelly Glynn
**Web Technologist:** Chris Bassolino
**Graphic Design:** Matt Hampton

The team will report internally no less than twice per week to the CTO, Ed Laczynski (ed@ltech.com), who will be available as needed for client conferences.

MarketAmerica's technology and business experts will be part of the implementation team as well. The following individuals have been identified as contributors:

Chris Diggs, TBD

**MarketAmerica will identify a single individual as "Project Manager" who will have power to approve decisions and will receive status reports on project progress and communicate with the broader MarketAmerica team.**

### 3.5 Implementation Process

LTech recommends the following implementation process:

- Analysis: Complete the review of current technical infrastructure, feeds, website configuration, CFM and Java touch points, review banner and advertising requirements for recommendation of third-party banner management component, ID "reference" system for regression testing, ID major use cases.

- Specification: Design DataHub data model, merchandising data model, design Product Content Service XML spec and provide sample XML data (will allow for simulation of the GSA Bridge for  MarketAmerica



to begin MarketAmerica website integration testing), specify all business rules for merchandising, write major use cases

- Development: Build out local development environment, develop each module, develop end-to-end test cases, integrate each module, build scheduled jobs, build error logging and exception handling methodology

- Testing: Unit test each component, regression test system end-to-end, compare search results with reference system, run scheduled tests with all services turned on, run fire-drill tests with key modules disabled/unavailable

- Deployment: Deploy GSA devices, deploy hardware and OS software for DataHub, deploy SQL Server 2005, deploy DataHub and modules into staging environment, deploy DataHub and modules into production environment, go-live preparation and execution

LTech will be responsible for delivery of the following modules, with MarketAmerica providing support and guidance:

1. DataHub

2. Product Content Service

3. Merchandising Service

4. Administration Application

5. GSA Feed Application

MarketAmerica will be responsible for delivery of the following modules, with LTech providing support and guidance:

1. MarketAmerica Website

LTech and MarketAmerica will co-develop the GSA Bridge module.

MarketAmerica will be responsible for the deployment and initial configuration of devices, hardware, and software.

**3.6 Pricing**

| | |
|---|---|
| **Account Management** | |
| Account Coordination and Traffic Support | $14,400 |
| Project Tools Setup | $400 |
| | **$14,800** |
| **Project Management** | **$24,000** |
| **Creative Services** | |
| Information Architecture, Copywriting, and Storyboarding | $4,000 |
| Web, Flash, Photo and Illustration Design | $4,800 |
| | **$8,800** |
| **Technology Services** | |
| Architecture and Documentation | $44,000 |

19



| Configuration and Setup | $4,000 |
| Development | $216,400 |
| Testing and Deployment | $64,000 |
| | **$328,400** |
| **Total Fixed** | **$376,000** |

## 4. GOOGLE SEARCH APPLIANCE ORDER

On separate order form.

## 5.   SQL SERVER (additional hardware and software)

Will be purchased separately.



## 6. PAYMENT.

The total cost for the solution described above, according to the requirements as identified as being in "Phase I" of this solution, shall be $ 376,000 for custom development services

Delivery and payment for Services shall occur under the following Milestone payment schedule:

| Milestone | Percentage of Payment Amount | Estimated Date |
|---|---|---|
| Project Kickoff | 20% | February 1st, 2008 |
| Architecture and modeling complete.<br><br>Stub GSA Bridge delivered to test environment.  This allows MarketAmerica web site development team to begin integration. | 20% | February 29th, 2008 |
| All services except for admin application available for acceptance testing. | 20% | March 28th, 2008 |
| Admin application available for acceptance testing | 20% | April 30th, 2008 |
| Full set of services and components accepted by MarketAmerica | 20% | June 15th, 2008 |

Payments due for **SERVICES** under this Agreement: 20% of estimate due at execution of agreement.

Remaining payments are due within ten (10) days of completion and acceptance of each milestone.  The terms for acceptance shall be as set forth in the Services Agreement between the parties.  LTech shall not invoice Client for a milestone until it has been accepted.

LTech may, in its discretion, charge (and Client agrees to pay) 1.5% per month in interest (or the greatest interest allowed by law, whichever is lower) for all overdue amounts.  In the event of a material breach by Client under this Agreement, all amounts owed to LTech under this Agreement shall be immediately due and payable to Client (notwithstanding a later due date that may be specified under this Agreement).

**Expenses**.  Client shall reimburse the following expenses under this SOW:

* Any third-party commercial software or hardware not included in the above SOW required to achieve milestones above

* Any travel expenses related to this SOW.

The foregoing expenses shall only be reimbursed if such expenses are (i) reasonable, actual, and necessary (without mark-ups or commissions); (ii) approved in writing by the Client project manager in advance of incurring such expense; (iii) consistent with Client's expense policies, which shall be provided to LTECH in



advance; and (iv) a request for reimbursement is accompanied by such documentation as Client may request establishing the type, date, amount, payment and purpose for such expense.

## 7. RETAINED SERVICES & CHANGE REQUESTS

During the term of this Agreement (and successor terms) LTech will provide 20 hours of service per month for a flat fee of $3,600.  This retainer is cancelable at anytime by MarketAmerica.  For any hours in excess of 20 hours, LTech will charge $180/hour.  The 20 hours per month retainer services are on a "use them or lose them" basis, and use by MarketAmerica of less than the 20 hours per month does not reduce the $3,600 per month fee.

The $180/hr rate applies to any out of scope work change requests from Client.  Any work requested by client that is not specified in this agreement will be quoted and invoiced to client as a change request as an hourly quote

IN WITNESS WHEREOF, the parties have executed this Statement of Work by persons duly authorized as of the SOW Effective Date set forth above.

**MARKET AMERICA, INC.:**

By:_____

Title:_____

Address: _____

_____

Telephone: _____

Facsimile: _____

**LTECH CONSULTING, LLC:**

By: _____  Ed Laczynski
                2008.02.01 12:29:44
                -05'00'

Title:___
_____ CTO _____

Address:_____ 4000 Route 66 _____

Tinton Falls, NJ 07753

Telephone: (919) 841-6680 _____

Facsimile: (732) 559-7122 _____

Please fax to 732-559-7122

**EXHIBIT B**

02/04/2008 MON 15:19  FAX                                                      ☒001/014

License Agreement
Google Enterprise Products

This License Agreement for the Google Enterprise Products (the "Agreement") is made and entered into by and between Google Inc. ("Google") and Market America, Inc. ("Customer"). Customer may also be referred to herein as "You" or "Your." This Agreement and the corresponding purchasing document by which You order certain Products ("Order Form") from LTech Consulting, LLC, a Google authorized reseller ("Reseller") set forth the terms and conditions under which You may license and use such Products. The Order Form is a purchasing document provided by Reseller. The Order Form is subject to, and is governed by, this Agreement. This Agreement will be effective as of the date each party hereto has executed the Agreement (the "Effective Date"). If you are accepting on behalf of your employer or another entity, you represent and warrant that: (i) you have full legal authority to bind your employer or such entity to these terms and conditions; (ii) that you have read and understand this Agreement; and (iii) that you agree, on behalf of the party that you represent, to this Agreement. If you don't have the legal authority to bind, please do not sign this Agreement.

## 1.  GOOGLE LICENSE

**1.1  LICENSE GRANT.** Subject to the terms and conditions of this Agreement and the Order Form, if applicable, and in consideration of Your payment of all applicable fees and taxes as set forth in the Order Form ("Fees"), Google grants to You (and You agree to comply with) a perpetual, non-sublicensable, non-transferable, non-exclusive, limited license to use: (i) certain Google proprietary computer software identified in the Order Form in binary executable form only (the "Software"), that is installed in certain Google proprietary computer hardware (the "Hardware") and (ii) certain Google proprietary documentation in the form generally made available by Google to its customers for use with the Products (the "Documentation"). The Software and Hardware are collectively referred to herein as the "Appliance." The Appliance and Documentation are collectively referred to herein as the "Product." A license key that enables the Software may be required and, if so, Google (or Reseller) will forward the key to You electronically. Your use of the Products shall be restricted to creating an index of and searching for content owned by You or lawfully licensed to You, whether located on servers that are owned and operated by You, or operated on your behalf. You may allow your Affiliates (as defined below), agents and contractors to use the Appliance for the purposes authorized in this Agreement, subject to the terms of this Agreement. The right to search and access content made available by the Appliance is also hereby licensed to Your authorized end-users. You agree to be responsible for the acts and/or omissions of any such parties in breach of the terms set forth herein. The license grant set forth herein is further limited to indexing the number of Documents specified on the Order Form.

**1.2  LICENSE RESTRICTIONS.** The license set forth herein is further restricted as follows: You agree not to, or to allow others to: (i) adapt, alter, modify, decompile, translate, disassemble, or reverse engineer the Product or any component thereof, including without limitation, the source code and any other underlying ideas or algorithms of the Software (except to the extent applicable laws specifically prohibit such restriction); (ii) alter the number of Documents authorized for Your use; (iii) create license keys that enable the Software; (iv) copy the Software except as provided in Section 4; (v) use the Product for High Risk Activities, as defined below; or (vi) transfer, sublicense, loan, sell, lease or use for timesharing or service bureau purposes the Product or any component thereof. Further you agree to comply with all applicable export and reexport control laws and regulations, including the Export Administration Regulations ("EAR") maintained by the U.S. Department of Commerce, trade and economic sanctions maintained by the Treasury Department's Office of Foreign Assets Control, and the International Traffic in Arms Regulations ("ITAR") maintained by the Department of State. Specifically, You agree that You will not, directly or indirectly, sell, export, reexport, transfer, divert, or otherwise dispose of the Products, their software, or technology (including products derived from or based on such technology) received from Google under this Agreement to any destination, entity, or user, or person prohibited by the laws or regulations of the United States, without obtaining prior authorization from the competent government authorities as required by those laws and regulations. You agree to indemnify Google, to the fullest extent permitted by law, from and against any fines or penalties that may arise as a result of Your breach of this provision. This export control clause shall survive termination or cancellation of this Agreement.

**1.3  BACK-UP AND DEVELOPMENT USE.** In the event You acquire an Appliance identified on an Order Form as a Hot Back-up and/or Development Appliance ("Restricted Use Appliance"), Your license to use the Restricted Use Appliance is further restricted as follows: (i) You may use the Restricted Use Appliance for the purpose of acting as a 'hot' back-up in the event a similarly configured Appliance for which You have obtained a license from Google pursuant to an Order Form (the "Primary System"), is disabled due to a critical Hardware or Software failure of the Primary System; (ii)

1

Confidential and Proprietary

You may use the Restricted Use Appliance as a platform and test environment to assist in Your efforts in designing, developing and testing applications for use in conjunction with Google Enterprise Products; and (iii) You may use the Restricted Use Appliance provided hereunder to index the same material as the Primary System, but it may not be used in any commercial or production use. For the sake of clarity, no searches may be conducted nor any results served with the Restricted Use Appliance while the Primary System is operational, with the exception of incidental searches conducted by You for testing purposes only. In the event of a Primary System critical failure, You may use the Restricted Use Appliance acquired pursuant to this Agreement to create an index of and search for content located solely on servers that were previously authorized to be indexed by the Primary System and You agree that upon restoration of the Primary System, You will cease all such searching by the Restricted Use Appliance, unless a subsequent critical failure of the Primary System occurs.

     **1.4 THIRD PARTY COMPONENTS.** Any third party component embedded, included or otherwise provided for use with the Products may only be used in conjunction with such Products ordered under the Order Form, and such use shall be subject to all the terms and conditions of this Agreement. Notwithstanding the foregoing, to the extent that the Products include some components that are governed by open source licenses including provisions prohibiting their distribution by You under this Agreement, those components are instead governed solely by the respective appropriate licenses. To the extent Products include some components covered by open source licenses requiring the provision of corresponding source code for those components, Google hereby offers the provision of such source code consistent with such licenses.

**2.   OWNERSHIP.** For purposes of this Agreement, "Intellectual Property Rights" means any and all rights existing from time to time under patent law, copyright law, semiconductor chip protection law, moral rights law, trade secret law, trademark law, unfair competition law, publicity rights law, privacy rights law, and any and all other proprietary rights, and any and all applications, renewals, extensions and restorations thereof, now or hereafter in force and effect worldwide. All ownership rights, title, and Intellectual Property Rights in and to the Products shall remain in Google and/or its licensors, except that title to the Hardware shall pass to You upon receipt of all Fees by Google. Your title shall be further subject to Your return of such Hardware pursuant to Section 5 of this Agreement. All ownership rights, title, and Intellectual Property Rights in and to the content accessed through the Appliance are the property of the applicable content owner (which may include Customer and/or its partners), and the applicable content owner (which may include Customer and/or its partners, as the case may be, shall retain all right, title and interest in and to such content.

Any trade names, trademarks, service marks, logos, trade dress, and any other distinctive or proprietary symbols, labels, designs or designations ("Brand Features") as well as any copyright or other proprietary notices appearing on or in the Product shall be maintained and shall not be removed, modified or altered by You. At Your option, the search box (or other means used by an end user to enter a search query) and/or results pages may conspicuously display an unaltered graphic in the form provided by Google for the purpose of identifying that the search function is provided by Google and may link to the Google site located at: www.google.com (or such other URL as may be updated by Google). Such graphic may be accessed at: www.google.com/stickers.html (or such other URL as may be updated by Google) and all use of such graphic shall be subject to Google's then current Brand Feature guidelines and policies in effect. Each party agrees not to challenge or assist others to challenge the other party's Brand Features or registration thereof (except to protect such party's rights with respect to its own Brand Features) nor shall either party attempt to register any Brand Features that are confusingly similar to those of the other party. Except as provided for pursuant to this Agreement, neither party shall acquire any right, title or interest in or to the other party's Brand Features.

**3.   DELIVERY.** The Products shall be delivered by the shipping method indicated on the Order Form. Unless otherwise specified in an applicable Order Form, all subsequent supplemental increases or modifications to Your order hereunder shall be deemed to be delivered under the same terms as the original license. Google shall bear all risk of loss, theft or damage during transit. You agree that at the time of Your receipt of any Product, You shall bear all risk of loss, theft or damage of any kind to such Product and that your failure to obtain insurance at the time of Your receipt of such Product will be at Your own risk without liability of any kind to Google.

**4.   TECHNICAL SUPPORT SERVICES.** In consideration of Your payment to your distributor, Reseller or Google (as may be applicable) of all Fees, your distributor, Reseller and/or Google, as set forth in the Order Form (as may be applicable) shall provide technical support services in accordance with the Google's then current Technical Support Services Guidelines, the current version of which are attached hereto as Exhibit A and incorporated herein by reference ( the "TSS Guidelines"), for the Products identified in the Order Form for the time period set forth in the Order Form.  The TSS Guidelines may be updated from time to time by posting a new version to the following URL: http://support.google.com/enterprise/terms (or such other URL as may be updated by Google).  If the updated TSS

2

Guidelines will result in a material adverse impact on Customer, then Customer will remain governed by the TSS Guidelines attached to this Agreement. Upon purchase of Customer Appliance with premium support, Google will provide to Customer contact information for accessing Google directly for support for serving Down / Severity Zero issues should assistance be required after Reseller's support hours.

**5.   TERM AND TERMINATION.** Subject to Your payment of all Fees, the term of the license granted herein for any Product shall commence upon the date of shipment by Google or its designated agent ("Shipment Date") and may be terminated as set forth herein. A party may, by written notice of default to the other party, terminate this Agreement, in whole or in part, (a) if the other party materially breaches this Agreement and/or the Order Form, and the breaching party does not cure such material breach within thirty (30) calendar days after receipt of written notice of such breach; or (b) immediately following the failure to resolve the suspension of business, insolvency, institution of bankruptcy, liquidation proceedings by or against the other party, appointment of a trustee or receiver for either party's property or business, or any assignment, reorganization or arrangement by either party for the benefit of its creditors. Google may immediately terminate this Agreement, in whole or in part, if You are in breach of Section 1.2, (License Restrictions), Section 2 (Ownership) or Section 6 (Confidential Information); or You are in material breach of this Agreement and/or the Order Form more than twice notwithstanding any cure of such breaches.

In the event of termination of this Agreement, all licenses, and any other rights and services provided by Google to You as set forth in this Agreement, shall cease immediately. If this Agreement is terminated for Your material breach, You must immediately return the Product to Google via Google's authorized return shipment process for receipt by Google, at which time Your title in the Hardware shall revert to Google. Except as set forth herein, in the event of termination of this Agreement, You may retain possession of the Hardware, provided that all Software is erased in compliance with the process as instructed by Google, and You will provide written certification that You have properly completed such process within ten (10) business days of such termination.

Termination of this Agreement, Order Form or any license shall not limit either party from pursuing other remedies available to it, including injunctive relief, nor shall such termination relieve You of Your obligation to pay all fees that have accrued or are otherwise owed by You.

**6.   CONFIDENTIAL INFORMATION.** In connection with performance of its obligations hereunder, a party may have access to information that the other party considers confidential and/or proprietary ("Confidential Information"). Confidential Information shall be limited to pricing, the terms of this Agreement and the discussions, negotiations and proposals related thereto and other information clearly and conspicuously identified as "confidential". Notwithstanding the foregoing, Google acknowledges that Your marketing plan, client list, distributor list, internal business records and communications, genealogy reports, trade secrets, software programs, employee information and records, product sources, product pricing, product suppliers, and legal and accounting documents are Confidential Information. In addition, notwithstanding the foregoing, you acknowledge that the following is Google's Confidential Information: Google's trade secrets, financial information, including pricing, technical information, including research, development, procedures, algorithms, data, designs, and know-how, business information, including operations, planning, marketing interests, and products and other issues relating to the Product. You acknowledge that the source and object code of the Software remains a confidential trade secret of Google and/or its licensors and that You are not entitled to review either the object code or the source code of the Software for any reason at any time. Each party agrees to hold the other party's Confidential Information in confidence for a period of five (5) years from the date of disclosure. Neither party will disclose or cause to be disclosed any Confidential Information of the other, except to those employees, agents, representatives, or contractors of the parties who require access to the Confidential Information to perform under this Agreement and who are bound by written agreement not to disclose third-party confidential or proprietary information. Furthermore, each party agrees to be responsible for any act and/or omission of any employees, agents, representatives, or contractors in breach of this Section. Each party shall protect the Confidential Information disclosed by the other party by using the same degree of care, but no less than a reasonable degree of care, that it uses to protect its own confidential information of a like nature to prevent its unauthorized use, dissemination or publication to any unauthorized third parties. A party's Confidential Information shall not include information that: (i) is or becomes publicly available through no act or omission of the other party; (ii) was in the other party's lawful possession prior to the disclosure and was not obtained either directly or indirectly from the disclosing party; (iii) is lawfully disclosed to the other party by a third party without restriction on Recipient's disclosure; or (iv) is independently developed by the other party without violation of this Agreement. Each party may disclose Confidential Information solely as needed to comply with a court order, subpoena, or other government demand (provided that it first notifies and gives the disclosing party the opportunity to challenge such court order, subpoena, or government demand). Each party acknowledges that damages for improper disclosure of Confidential Information may be irreparable;

therefore, the injured party is entitled to seek equitable relief, including temporary restraining order(s) or preliminary or permanent injunction, in addition to all other remedies, for any violation or threatened violation of this Section 6, Section 1.2 or Section 2. In the event that You return the Appliance to Google, You will use commercially reasonable efforts to remove Your Confidential Information on the Appliance before returning the Appliance to Google. The terms contained in this Section 6 shall survive termination of this Agreement.

## 7.   LIMITED WARRANTY.

7.1 Limited Warranty – Hardware and Software. Google warrants to Customer that (i) Hardware will be free from defects in material and workmanship, and will substantially conform to all material aspects to the Administration Console Help Center documentation ("Specifications") for a period of ninety (90) days from the later of the installation of the Products or ten (10) days following the Shipment Date, and (ii) Software will substantially achieve the functionality described in the Specifications for a period of ninety (90) days from the date of shipment to Customer. Google's entire liability and Customer's sole and exclusive remedy with respect to breach of this warranty will be at Google's option, either (a) repair of the Product in accordance with Google's TSS Guidelines or (b) replacement of the defective component or entire Appliance, as applicable; or (c) refund of the purchase price paid for the Appliance.

7.2 Extended Limited Warranty – Hardware. Provided that Customer purchases Premium Support in connection with the Product, Google warrants to Customer that Hardware will be free from defects in material and workmanship, and will substantially conform to all material aspects to the Specifications starting on the date ninety-one (91) days from the later of the installation of the Products or ten (10) days following the Shipment Date and continuing until the end of Customer's initial Premium Support term. Google's entire liability and Customer's sole and exclusive remedy with respect to breach of this warranty will be at Google's option, either (a) repair of the Product in accordance with the TSS Guidelines; or (b) replacement of the defective component or entire Appliance, as applicable.

7.3 Exclusions. The limited warranties set forth in Sections 7.1 and 7.2 above will not apply to defects or errors in Product or Software that are caused by: (i) Customer's failure to follow Google's environmental, installation, operation or maintenance instructions or procedures in the Specification; (ii) Customer's mishandling, abuse, misuse, negligence, or improper storage, servicing, or operation of Product (including without limitation use with incompatible equipment); (iii) modifications, repairs or improper installation not made by Google; or (iv) power failures, surges, fire, flood, accident, actions of third parties or other like events outside Google's reasonable control. Without limiting the generality of the exclusions set forth in this Section 7.3, Google does not warrant that the operation of the Software will be error-free or uninterrupted.

7.4 Disclaimer. EXCEPT AS SPECIFIED IN THIS SECTION, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS AND WARRANTIES, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT AND ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, ARE HEREBY DISCLAIMED EXCEPT TO THE EXTENT THAT THESE DISCLAIMERS ARE HELD TO BE LEGALLY INVALID. GOOGLE MAKES NO WARRANTIES OR REPRESENTATIONS WITH RESPECT TO ANY THIRD PARTY SOFTWARE PROVIDED AS PART OF, OR IN CONNECTION WITH, PRODUCT. IN ADDITION, GOOGLE EXPRESSLY DISCLAIMS ANY WARRANTY OR REPRESENTATION TO ANY PERSON OTHER THAN CUSTOMER WITH RESPECT TO PRODUCT OR ANY PART THEREOF. THE PRODUCT AND SERVICES ARE PROVIDED BY GOOGLE AND ITS LICENSORS ARE OTHERWISE PROVIDED "AS IS". GOOGLE AND ITS LICENSORS DO NOT WARRANT THAT THE PRODUCT OR ANY PORTION THEREOF, ARE ERROR OR BUG FREE, OR THAT YOUR USE OF THE PRODUCT OR SERVICES WILL BE UNINTERRUPTED. GOOGLE AND ITS LICENSORS ASSUME NO RESPONSIBILITY FOR THE PROPER INSTALLATION AND USE OF THE PRODUCT. GOOGLE AND ITS LICENSORS MAKE NO REPRESENTATIONS ABOUT ANY CONTENT OR INFORMATION MADE ACCESSIBLE BY THE PRODUCT. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. IN THAT EVENT, TO THE EXTENT PERMISSIBLE, ANY IMPLIED WARRANTIES ARE LIMITED IN DURATION TO NINETY (90) DAYS FROM THE DATE OF SHIPMENT OF THE APPLICABLE PRODUCT. THE PRODUCT IS NOT FAULT TOLERANT AND IS NOT DESIGNED, MANUFACTURED, OR INTENDED FOR USES SUCH AS THE OPERATION OF NUCLEAR FACILITIES, AIR TRAFFIC CONTROL OR LIFE SUPPORT SYSTEMS, WHERE THE FAILURE OF THE PRODUCT COULD LEAD TO DEATH, PERSONAL INJURY, OR ENVIRONMENTAL DAMAGE ("HIGH RISK ACTIVITIES").

**8. LIMITATION OF LIABILITY.** EXCEPT FOR CUSTOMER'S BREACH OF ANY LICENSE IN THIS AGREEMENT OR ANY AMOUNTS PAYABLE TO THIRD PARTIES PURSUANT TO THE PARTIES' INDEMNIFICATION OBLIGATIONS HEREUNDER, IN NO EVENT WILL EITHER PARTY OR GOOGLE'S LICENSORS BE LIABLE (i) FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES INCLUDING, BUT NOT LIMITED TO, DAMAGES FOR LOST DATA, LOST PROFITS, OR COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, HOWEVER CAUSED (INCLUDING BUT NOT LIMITED TO USE, MISUSE, INABILITY TO USE, OR INTERRUPTED USE) AND UNDER ANY THEORY OF LIABILITY, INCLUDING BUT NOT LIMITED TO CONTRACT OR TORT AND WHETHER OR NOT EITHER PARTY WAS OR SHOULD HAVE BEEN AWARE OR ADVISED OF THE POSSIBILITY OF SUCH DAMAGE REGARDLESS OF WHETHER ANY REMEDY SET FORTH IN THIS AGREEMENT FAILS OF ITS ESSENTIAL PURPOSE; OR (ii) FOR ANY CLAIM ATTRIBUTABLE TO ERRORS, OMISSIONS, OR OTHER INACCURACIES IN THE PRODUCT OR DESTRUCTIVE PROPERTIES OF THE PRODUCT. IN NO EVENT SHALL GOOGLE'S AND/OR ITS LICENSORS' TOTAL AGGREGATE LIABILITY UNDER THIS AGREEMENT EXCEED THE AMOUNT OF FEES PAID BY CUSTOMER UNDER THE ORDER FORM GIVING RISE TO SUCH LIABILITY.

**9. U.S. Government Restricted Rights.** The Product is commercial within the meaning of the applicable civilian and military Federal acquisition regulations and any supplement thereto. If the user of the Product is an agency, department, employee, or other entity of the United States Government, the use, duplication, reproduction, release, modification, disclosure, or transfer of the Product, including technical data or manuals, is restricted by the terms, conditions and covenants contained in this Agreement. In accordance with Federal Acquisition Regulation 12.212 for civilian agencies and Defense Federal Acquisition Regulation Supplement 227.7202 for military agencies, the use of the Software is further restricted by this Agreement.

**10. INDEMNIFICATION.**

10.1 Subject to this Section 10 Google will defend, or at its option settle, any third party lawsuit or proceeding brought against You by a third party based upon a claim that the Appliance used in accordance with the Documentation and this Agreement infringes any copyright, trade secret, or trademark right of a third party ("IP Claim"), provided that You: (a) promptly notify Google in writing of any such IP Claim; (b) give Google sole control and authority to direct the investigation, preparation, defense and settlement of the IP Claim; and (c) assist and fully cooperate in the defense of same. Indemnification shall be provided for any claim covered under this Section 10 and shall be limited to payment of any final award of damages assessed against Customer resulting from such IP Claim, including any awarded costs, or any settlement amount agreed to by Google in writing. Google shall not settle any IP Claim brought against Customer pursuant to this Section 10 without Customer's prior written consent, which consent shall not be unreasonably withheld or delayed. Google will not be responsible for any settlement it does not approve in writing prior to such settlement.

10.2 Following notice of an IP Claim or any facts which may give rise to such IP Claim, Google may, in its sole discretion and at its option, (a) procure for You the right to continue to use the Appliance, (b) replace the Appliance with a product of equal or higher quality and functionality, or (c) modify the Appliance to avoid the alleged infringement, in a manner that does not diminish the quality and functionality of the Appliance. If Google determines that it is not commercially reasonable to perform any of these alternatives, Google shall have the option to terminate the license for the allegedly infringing Appliance and refund the Appliance Fees actually paid by You through the date an IP claim occurs for such allegedly infringing Appliance, less depreciation for use assuming straight line depreciation over twenty-four (24) months.

10.3 In no event will Google have any obligations under this Section 10 or any liability for any claim or action if the IP Claim is caused by, or results from: (a) Your combination or use of the Appliance with software, services, or products developed by You or third parties, to the extent that the IP Claim was caused by, or resulted from, such action, (b) modification of the Appliance by You or any third party, to the extent that the IP Claim was caused by, or resulted from, such action, (c) Your continued allegedly infringing activity after being notified thereof and after being provided modifications that, if used, would have avoided the alleged infringement, (d) Your use of the Appliance in a manner not in accordance with this Agreement or the Documentation, (e) Your use of other than Google's most current release of the Appliance, or either of the two (2) immediately prior versions, if the claim or action would have been avoided by use of one of such releases or revisions; provided that such releases or revisions were provided to you by Google. You will defend and indemnify Google, or at your option settle, in the same manner as provided in this Section 10, any claims made against Google for infringement based on any conduct by You described in subsections (a) through (e) of this subsection 10.3.

**10.4**  THE FOREGOING STATES GOOGLE'S ENTIRE LIABILITY AND YOUR SOLE AND EXCLUSIVE REMEDY FOR INTELLECTUAL PROPERTY RIGHTS INFRINGEMENT.

**11. Miscellaneous.** Nothing in this Agreement shall be construed to prevent Customer from independently developing or enhancing its own software, hardware, appliance or product, any of which may perform functions similar to those performed by the Software, Hardware, Appliance and Product; provided that Customer complies with the terms of this Agreement. With respect to either Google or Customer an "**Affiliate**" is any entity that directly or indirectly controls, is controlled by, or is under common control with such party. For these purposes, "control" includes control over greater than fifty percent (50%) of the voting rights or equity interests of a party. This Agreement is personal to You. Neither party may assign or otherwise transfer its rights or delegate its obligations under this Agreement or any Order Form, in whole or in part, without the prior written consent of the other party, provided, however, that Google may assign this Agreement in whole (and any Order Form, if applicable) to any Affiliate or in connection with a merger, consolidation, or sale or other disposition of all or substantially all of its assets. Notwithstanding the foregoing, You may assign Your rights or obligations hereunder to an Affiliate as defined above provided that (i) You notify Google in writing of such assignment, (ii) such Affiliate is not a competitor of Google, and (iii) such Affiliate shall expressly assume, in a writing promptly provided to Google, the performance of all of the terms of this Agreement. Any attempted assignment in derogation hereof shall be null and void. The parties agree that any Affiliate granted any rights herein shall be bound by the terms and conditions of this Agreement; that the entity executing any Order form shall be responsible for all actions of any of its Affiliates affecting any rights or obligations under this Agreement; and the cumulative use of the product by the entity executing any Order form and its Affiliates shall not exceed the licensed limits stated on each such Order form. The parties hereto are and shall remain independent contractors, and nothing herein shall be deemed to create an agency, partnership, or joint venture between the parties hereto. Both parties shall be responsible for performing their respective obligations as set forth herein. Upon termination, the following Sections of this Agreement will survive: 1.2, 2, 5, 6, 7, 8, 9, 10, and 11. This Agreement and any claim or dispute of whatever nature arising out of or relating to this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware and the federal U.S. laws applicable therein, without giving effect to any choice of law principles that would require the application of the laws of a different state. You and Google agree to submit to the personal and exclusive jurisdiction of the courts located in New Castle County, Delaware. The parties specifically exclude from application to this Agreement the United Nations Convention on Contracts for the International Sale of Goods and the Uniform Computer Information Transactions Act. If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and remain enforceable between the parties. The failure of either party to act in the event of a breach of this Agreement by the other shall not be deemed a waiver of such breach or a waiver of future breaches. Any notice given under this Agreement shall be in writing and in the English language and shall be delivered by certified or registered mail, postage prepaid, return receipt requested. Notices shall be deemed given upon acknowledgment of receipt. All notices to Google must be sent to the attention of Google as set forth on the Order Form or to any other address Google specifies in writing, provided that a courtesy copy shall also be sent to the attention of the Google Legal Department for all legal notices. Notices to Customer shall be sent to the address set forth on the Order Form or to any other address You specify in writing, provided that a courtesy copy shall also be sent to the attention of Customer's Legal Department for all legal notices. Neither party shall be liable for failing or delaying performance of its obligations resulting from any condition beyond its reasonable control, including but not limited to, governmental action, acts of terrorism, earthquake, fire, flood or other acts of God, labor conditions, power failures, and Internet disturbances. This Agreement and related Order Form(s), and the terms or other provisions located at any Google uniform resource locators (URLs) referenced pursuant to this Agreement (which are all incorporated herein by reference), constitutes a complete, absolute integration and the entire agreement between the parties hereto relating to the subject matters of this Agreement, and supersedes all prior representations, proposals, discussions, and communications, whether oral or in writing, and all contemporaneous oral communications, and any terms contained in any related purchase order(s) or other documents pertaining to the subject matter of this Agreement shall be null and void. This Agreement may be modified only in writing signed by both parties. In the event of a conflict between the terms and conditions of this Agreement and any individual Google Order Form, that Order Form shall govern. The parties may treat faxed documents as originals; however, this shall not preclude either party from requiring the exchange of original signatures.

Confidential and Proprietary

By signing this Agreement, each party represents and warrants that (i) it has read and understands the Agreement and agrees to be bound by its terms, and (ii) it has full power and authority to enter into the Agreement.

IN WITNESS WHEREOF, this Agreement has been executed by persons duly authorized as of the date signed by Google below ("Effective Date").

Google, Inc.                                    Market America, Inc.

By: _____                  By: _____
          David Girouard
      VP and General Manager, Enterprise        Print Name: __Martin Weissman__
Print Name: __    Google, Inc.                  Title: __Executive Vice President__

Title: _____               Date: __February 4, 2008__
          2008.02.05
Date: __  10:25:25 -08'00'__



Confidential and Proprietary                                                7

**GOOGLE SEARCH APPLIANCE™**

**(GB-1001/GB-5005/GB-8008)**
**TECHNICAL SUPPORT SERVICES GUIDELINES ("Guidelines")**

Google Confidential

**1. Definitions**

For the purpose of these Guidelines, the following capitalized terms will have the following meanings. All other capitalized terms not defined herein shall have the meaning set forth in the License Agreement for the Google Search Appliance and/or Order Form(s) which references these Guidelines (collectively, the "Agreement").

1.1. "Business Day" means either (a) for Appliances located in Europe, Middle East and Africa any day other than Saturday, Sunday or any UK Bank or Public Holiday; (b) for Appliances located in Japan any day other than Saturday, Sunday or any Japan Bank or Public Holiday; or (c) for Appliances located in all other countries, any day other than Saturday, Sunday or any U.S. Federal Holiday.

1.2. "Business Hour" means hour within Hours of Operation.

1.3. "Customer Contacts" means up to two (2) search system administrators or technical employees designated by Customer in writing who are allowed to contact Google for technical support.

1.4. "Feature Request" means any suggestion made by Customer to Google Technical Support Personnel that is unique to Customer Contact and is unrelated to a Fix, Severity 2 Request, Severity 1 Request, or Severity 0 Request. This includes requests by Customer Contact to incorporate a new feature or enhance an existing feature of the Software or Hardware. Feature Request is categorized as Severity 3 Request.

1.5. "Fix" means a correction, fix, alteration, Software Update, or workaround that solves a Severity 2 Request, Severity 1 Request, or a Severity 0 Request.

1.6. "Google Enterprise Support Site" (or "GES Site") means the site provided by Google to its customers including Documentation and online knowledge base (currently at https://support.google.com/enterprise, or such other URL as may be updated by Google from time to time).

1.7. "Google Enterprise Support Telephone" (or "GES Telephone") means the telephone number provided by Google to its customers for reporting Severity 0 Requests (or such other telephone number as may be updated by Google from time to time).

1.8. "Google Technical Support Personnel" means the Google representative responsible for handling technical support requests.

1.9. "Hardware" means the tangible components of the Appliance and includes the media on which the Software is pre-loaded (but excludes the modem available upon request to be shipped by Google for remote access to the Appliance).

1.10. "Hours of Operation" means either (a) for Appliances located in Europe, Middle East and Africa, 7:00 to 17:00 Greenwich Mean Time (GMT) on Business Days; or (b) for Appliances located in Japan, 7:00 a.m. to 5:00 p.m. Japan Time; or (c) for Appliances located in all other countries, 6:00 a.m. to 5:00 p.m. Pacific Time on Business Days.

1.11. "Hours of Telephone Support" means 6:00 a.m. to 5:00 p.m. Pacific Time on Business Days for Appliances located in the U.S., or 9:00 a.m. to 5:00 p.m. GMT for Appliances located in the United Kingdom.

8

Confidential and Proprietary

1.12. "Remote Support" means a Customer-enabled modem (modem supplied by Google upon request) or SSH connection that provides access to the Appliance for Google Technical Support Personnel to diagnose and/or correct a Severity 2 Request, Severity 1 Request, or Severity 0 Request.

1.13. "Request" means any of Feature Request, Severity 2 Request, Severity 1 Request, or Severity 0 Request.

1.14. "Serving Downtime" means a failure of the Appliance to provide any search results to Customer and its end-users.

1.15. "Severity 0 Request" means any error, bug, or malfunction that causes Serving Downtime in the Appliance used in any commercial or production scenario and not used as a backup Appliance.

1.16. "Severity 1 Request" means an inquiry regarding any error, bug or malfunction that is not a Severity 0 Request and causes Serving Downtime in an Appliance not used in any commercial or production scenario

1.17. "Severity 2 Request" means any error, bug, or malfunction that is not a Severity 1 Request or Severity 0 Request, or a single question regarding features of the Hardware or Software, but excludes Feature Requests.

1.18. "Software" means certain proprietary computer programs in binary executable and script form only, as well as proprietary software data, as such may be modified from time to time, that is installed in the Hardware.

1.19. "Special Remote Support" means a connection to the Appliance other than customer-enabled modem (provided by Google upon request for remote access to the Appliance) or SSH. Special Remote Support requires prior approval by the Google Technical Support team.

1.20. "Support Period" means two years from the date of shipment of the Appliance by Google, unless otherwise specified in the Agreement.

1.21. "Update" means minor enhancements to functionality and modifications to the Software that are made generally available to customers as part of Technical Support Services during the Support Period.

## 2. Summary of Service Levels

| Support Level | Standard Support | Premium Support |
|---|---|---|
| 24x7 Pager Support for Sev0 Request | Not available | Included |
| Severity 0 First Response: Phone (During Hours of Telephone Support) | 2 Business Hours | 1 Business Hour |
| Severity 0 First Response: Web/Email | 2 Business Hours | 2 Business Hours |
| Severity 1 First Response | 1 Business Day | 1 Business Day |
| Severity 2 First Response | 1 Business Day | 1 Business Day |
| Severity 3 (Feature Request) First Response | 2 Business Days | 1 Business Day |
| Installation Service and Transfer of Knowledge for 500S and 800S Appliances | Included (if applicable) | Included |
| VPN Connect (Remote Support) | Purchase Separately | Included |
| Desktop Connect (Remote Support) | Purchase Separately | Purchase Separately |
| Disconnected Support | Purchase Separately | Purchase Separately |

## 3. Google Responsibilities

3.1. Service Addenda. In addition to the terms described herein, Customer will be provided support for the Appliance at the level identified in the Agreement which corresponds with the following Addenda:

Support Level                              Described In:

Confidential and Proprietary

| | |
|---|---|
| Standard Support | Addendum A |
| Premium Support | Addendum B |
| Optional Support Offerings | Addendum C |

If no support level is identified in the Agreement, Appliances shall be provided Standard Support. In addition to the two available Support levels, Customer may select any number of the optional offerings as identified in the Agreement.

3.2. Characterization of Requests. Upon receiving a request from Customer Contact, Google will determine whether the request is a Severity 0 Request, Severity 1 Request, Severity 2 Request, or a Feature Request. Google reserves the right to determine in its sole discretion the characterization of a support request within these Guidelines.

3.3. Remote Maintenance. Google may conduct regular maintenance of the Appliance Hardware or Software no more than once per quarter. The date(s) for completion of such maintenance shall be scheduled by Google and approved by Customer at least two (2) weeks in advance. Customer shall provide remote access according to Section 4.5. This does not apply to customers who have purchased the Disconnected Support option.

3.4. On-Site Maintenance. Google reserves the right to perform on-site maintenance of the Appliance, as deemed necessary by Google. In order to receive further Technical Support Services, Customer shall respond within two (2) Business Days to any request for access by Google Technical Support Personnel, and shall arrange for any such site visit(s) at the parties' mutual convenience.

3.5. GES Site. If the URL for the GES Site or any procedure associated with the GES Site is changed in the future, Google will notify Customer Contacts via e-mail in advance of any such change.

3.6. Support Hours. Google shall only process Requests during Hours of Operation. Any Requests received outside of Hours of Operation shall be logged and processed at the beginning of the next Business Day.

3.7. Software Subscription Service. Customer shall be entitled to receive Updates to the Software during the Support Period. Software Updates will be made available on the GES Site. Google Technical Support Personnel may notify Customer Contacts via e-mail when Updates to the Appliance become available.

3.8. Hardware Support Service. Google reserves the right to supply a replacement Appliance as part of an Appliance Update. Any Requests which are related to the Hardware will be handled as follows:

3.8.1. Replacement. If a replacement Appliance is provided by Google, Google will ship to Customer a replacement Appliance of at least the same hardware configuration.

3.8.2. Expedited Replacement. If a replacement Appliance is provided by Google, and the Customer is experiencing Serving Downtime, Google will ship to Customer a replacement Appliance using an expedited courier or other commercial shipping method.

3.8.3. Hardware Issue. When Google Technical Support Personnel determine that any bug, error, or malfunction is caused by Hardware failure, Google will determine whether a replacement Appliance will be provided or whether Google Technical Support Personnel will repair the Appliance.

3.8.4. Repair. If repairs to the Hardware are required, Google Technical Support Personnel will arrange a visit to the Customer site. The visit will be scheduled at the earliest mutual convenience of both parties.

3.8.5. Hardware Damage. Normal wear and tear on the Hardware is not included in Technical Support Services. Any Requests submitted due to damage to the Hardware other than damage that occurs during shipment shall not be covered by Technical Support Services.

10

Confidential and Proprietary

### 4. Customer Responsibilities

4.1. Point of Contact. Customer Contacts are expected to provide first-level support to the end-users of Customer's Appliance(s). Google Support Services are second-level support only. Prior to making a request to Google, Customer Contacts shall make reasonable efforts to resolve the issue using the Documentation or FAQs on the GES Site. All Requests shall be submitted to Google Technical Support Personnel via the GES Site.

4.2. Support Contacts. If Customer wishes to change its designated Customer Contacts, it shall notify Google via e-mail at least five (5) Business Days prior to such change.

4.3. Diagnostic Information. When making each Request, Customer shall provide diagnostic information including but not limited to (i) providing unique appliance identification number (e.g. GDX/GID/GED/GEX) (ii) describing the problem, the configuration, and Customer's network; (iii) providing data or logs; and (iv) communicating further via e-mail or telephone to answer questions and assist Google Technical Support Personnel as appropriate.

4.4. Internet Access. Customer Contacts may be required to download Updates from the GES Site located on the Internet in order to provide a Fix to resolve a Request.

4.5. Remote Access. Customer shall provide a dial-up connection via an analog phone line or an SSH connection. Customer shall set up this connection as part of the initial installation of the Appliance. If Google determines that remote access is required to resolve a Request, Google Technical Support Personnel shall connect to the Appliance via the modem provided by Google upon request for remote access to the Appliance or an SSH connection. Google Technical Support Personnel will not access the Appliance via any other means. This does not apply to customers who have purchased the Disconnected Support option, defined in Addendum C.

4.6. Physical Access to the Appliance at the Customer site. If Google determines, in its sole discretion, physical access to the Appliance is necessary to resolve a Request, Google shall request physical access to the Appliance. For GB-5005 and GB-8008, physical access requires 24" clearance on both sides of the Appliance. Google shall make commercially reasonable efforts to schedule such a site visit at the earliest mutual convenience of both parties. If Customer Contact cannot provide access within ten (10) days Business Days of Google's request, the Google Technical Support Personnel will close the Request. Customer agrees to provide Google with full and timely physical access to the Search Appliance. If physical access is necessitated due to Customer's election of Disconnected Support, as defined in Addendum C, Customer will be responsible for all costs associated with any site visits, including and not limited to materials, actual travel, and out-of-pocket expenses.

4.7. Installation of Updates. Customer shall use the current version, or any of the two immediately prior versions of the Software available for its Appliance platform. Only the current version and two immediately prior versions for each Hardware platform will be supported. If Customer does not install a Software Update, Google Technical Support Personnel shall not respond to Requests or provide subsequent Updates until the Appliance has been updated to a supported version. In the event that a Fix requires installation of the current software version, Customer shall use that version.

4.8. Return of Replaced Unit. If Google ships a replacement Appliance to Customer for any reason, Customer must ship the replaced Appliance back to Google for receipt by Google within forty-five (45) days of Google's shipment to Customer of the replacement unit following instructions for return set forth on the GES Site. If Customer and Google mutually agree that Customer will not return the replaced unit in the Agreement, Customer shall follow the Hardware Replacement Procedure for Non-Return Units in the Disconnected Support option (Addendum C).

### 5. Other Services

Any support services not included in these Guidelines must be purchased from Google, subject to availability and pursuant to a separate agreement.

### Addendum A: Standard Support

Standard Support consists of:

Confidential and Proprietary

11

- GES Site access

- Software Subscription Service (Software Update)

- Hardware Support Service

- Standard Response

- Installation Services for 5005 and 8008 (if applicable)

**Standard Response**

1. Severity 0 Requests. Google Enterprise Support will respond within two business hours. For Severity 1 and 2 requests, Google Enterprise Support will respond within one business day. For all other requests, Google Enterprise Support will respond within two business days.

2. Severity 1 Requests. Google will make reasonable commercial effort to respond to Severity 1 Requests by the next Business Day. Google may require remote access to conduct diagnostic tests to determine how the Severity 1 Requests may be resolved, and shall make commercially reasonable efforts to provide a Fix for the Severity 1 Request.

3. Severity 2 Requests. Google will make reasonable commercial effort to respond to Severity 2 Requests by the next Business Day. Google shall conduct diagnostic tests to determine how the Severity 2 Request shall be resolved, and shall make commercially reasonable efforts to provide a Fix for each Severity 2 Request.

**Installation Services for 5005 and 8008 Appliances**

Installation of the Appliance shall be conducted solely by Google Technical Support Personnel or Google's authorized representatives. Self installation by Customer of 5005 and 8008 Appliances may be done with Google's prior approval and assistance. Google shall provide up to one (1) day of on-site support, including the knowledge transfer session described below, to assist in the installation of the Appliance. Current information on technical details and procedures regarding the Appliance shall be available at the GES Site. In the event the Appliance is installed by any other means than as set forth herein, or Customer transfers the Appliance to a location different from the original installation, Customer shall be liable for any recertification costs and additional support costs to continue receiving Technical Support Services. The fees for such costs will be billed at Google's then current rates. That is, Customer shall pay Google for all of the time spent performing such additional support, plus materials, actual travel, out-of-pocket expenses incurred, and taxes, which are not included in the rates and will be invoiced separately, if applicable.

As part of the installation services, Google shall provide up to four (4) hours of knowledge transfer at a location in the proximate locale of the installation site (e.g., within 10 miles of the installation location). The knowledge transfer session will be provided either immediately preceding or immediately following the installation.

**Addendum B: Premium Support**

Premium Support consists of:

- GES Site access

- Software Subscription Service (Software Update)

- Hardware Support Service

- Premium Response

- 24x7 Pager Support for Severity 0 Request

Confidential and Proprietary

- Installation Services for 5005 and 8008

- Transfer of Knowledge Services for 5005 and 8008

- VPN Connect

**Premium Response**

1. Severity 0 Requests. Google will make reasonable commercial effort to respond to Severity 0 Requests within one (1) hour during Hours of Telephone Support if the Request is reported to Google Enterprise Support Telephone or within two (2) hours during Hours of Operation for all other Requests. Google may require remote access to conduct diagnostic tests to determine how the Severity 0 Requests may be resolved.

2. Severity 1 Requests. Google will make reasonable commercial effort to respond to Severity 1 Requests within one (1) Business Day. Google may require remote access to conduct diagnostic tests to determine how the Severity 1 Requests may be resolved, and shall make commercially reasonable effort to provide a Fix for the Severity 1 Request.

3. Severity 2 Requests. Google will make reasonable commercial effort to respond to Severity 2 Requests within one (1) Business Day. Google shall conduct diagnostic tests to determine how the Severity 2 Request may be resolved, and shall make commercially reasonable efforts to provide a Fix for each Severity 2 Request.

4. 24x7 Pager for Severity 0 Requests only. 24x7 Pager for Severity 0 Requests service requires either software or hardware VPN. This service can only be used for Severity 0 Requests. Google will make a reasonable commercial effort to respond to Severity 0 Request pages within thirty (30) minutes.

**Installation Services for 5005 and 8008 Appliances**

Installation of the Appliance shall be conducted solely by Google Technical Support Personnel or Google's authorized representatives. Self installation by Customer of 5005 and 8008 Appliances may be done with Google's prior approval and assistance. Google shall provide up to one (1) day of on-site support, including the knowledge transfer session described below, to assist in the installation of the Appliance. Current information on technical details and procedures regarding the Appliance shall be available at the GES Site. In the event the Appliance is installed by any other means than as set forth herein, or Customer transfers the Appliance to a location different from the original installation, Customer shall be liable for any recertification costs and additional support costs to continue receiving Technical Support Services. The fees for such costs will be billed at Google's then current rates. That is, Customer shall pay Google for all of the time spent performing such additional support, plus materials, actual travel, out-of-pocket expenses incurred, and taxes, which are not included in the rates and will be invoiced separately, if applicable.

As part of the installation services, Google shall provide up to four (4) hours of knowledge transfer at a location in the proximate locale of the installation site (e.g., within 10 miles of the installation location). The knowledge transfer session will be provided either immediately preceding or immediately following the installation.

**VPN Connect**

Software VPN support requires Customer-purchased and Google-approved software with 24x7 accessibility to the Appliance.

**Addendum C: Optional Support Offerings**

Customer may elect to purchase additional Google Technical Support offerings, which are described below.

**VPN Connect**

VPN Connect offers an alternate means of 24x7 Remote Support. Customer may select either of these options.

13

Confidential and Proprietary

02/04/2008 MON 15:28 FAX                                                                            ☑014/014

- Dedicated VPN Support. Dedicated VPN support requires Customer-purchased and Google-approved hardware with 24x7 accessibility to the Appliance.

- Software VPN Support. Software VPN support requires Customer-purchased and Google-approved software with 24x7 accessibility to the Appliance.

## Desktop Connect

Another alternative to modem or SSH access, Desktop Connect offers remote access using GoToAssist[TM] made available from Citrix Systems, Inc. The Customer Contact will be directed to a web portal to enter a Request. The Request is then queued for the next Google Technical Support Representative. With the Support Contact's permission, the GoToAssist thin-client is downloaded to the Customer Contact's device while the Customer Contact is in the web queue. The Google Technical Support Representative will then be able to begin a remote-support session with the Support Contact.

## Disconnected Support

Under Disconnected Support, Google shall not have remote access to the Search Appliance for technical support services during the Term of the Agreement, unless the remote access is requested by Customer. Google will use commercially reasonable efforts to provide support via e-mail and online support methods only. Under circumstances when Google determines, in its sole discretion, that an on-site visit is required in order to resolve Customer's Support Request ("Onsite Support"), Customer may then request that on-site Support be arranged. All on-site support will be scheduled and determined by Google, subject to Google's resource availability and Google's standard terms for such services. Customer will be responsible for all costs associated for on-site support at Google's then current rates in effect. For on-site support, Customer agrees to provide Google with full and timely access to the Search Appliance at reasonable times. Failure to provide such access will be at Customer's own risk and without liability to Google.

Under the Disconnected Support model, any Hardware replacement will be handled via the Hardware Replacement Procedure for Non-Return Units as follows:

Should Google determine the Hardware needs to be replaced, Customer will erase all Software from the Search Appliance which Customer has in its possession with the removal process as instructed by Google. Customer will provide certification (in the form requested by Google) that such process has been properly completed within thirty (30) Business Days of Google's notice to Customer that the Hardware will be replaced. Customer may also be required to destroy the hard drive of the predecessor Search Appliance. However, given the performance of the predecessor Search Appliance, Google may request that a Google engineer be permitted to observe the interior of the predecessor Search Appliance to determine which components may have caused the performance experienced by Customer and then to observe the physical destruction of the hard drive contained therein. Customer must refrain from making any use of the predecessor Search Appliance and if for any reason Customer uses the predecessor Search Appliance, such use shall be at Customer's sole risk.

Google will ship to Customer a replacement Search Appliance with a temporary use license only. Upon Google's receipt of certification that all Software has been erased (as set forth in this section above), Google will issue Customer a license key that enables the Software for use with the replacement Search Appliance for the remaining Term of the license granted pursuant to the Agreement. If it is determined by Google, in its sole discretion, that replacement of the Hardware is due to circumstances not associated with standard use of the Search Appliance in conformance with the terms of the Agreement, Customer will be responsible for all costs of the replacement Hardware, as well as, all costs associated for support and destruction of the existing Hardware in Customer's possession. All such costs shall be at Google's then current rates in effect.

Confidential and Proprietary

14

**EXHIBIT C**

02/04/2008 MON 15:16  FAX                                                    ⓩ001/003

  

## LTECH GOOGLE SEARCH APPLIANCE ORDER FORM

| | |
|---|---|
| CONTACT: Mr. Chris Diggs | Quote# MA0801 |
| COMPANY: Market America, Inc. | Effective Date: Jan. 29, 2008 |
| ADDRESS: 1302 Pleasant Ridge Road | |
| ADDRESS: Greensboro, NC 27409 | |
| PHONE, E-MAIL: 336-544-6379, chrisd@marketamerica.com | PLEASE FAX TO: 732-559-7122 |

| GOOGLE PRODUCT | QTY | COST EA. | DOCUMENT COUNT | EX COST |
|---|---|---|---|---|
| GB800815MDNSTD (2 Yr Support Production GSA) | 1 | $550,000 | 15 Million documents | $550,000 |
| SUP-8008-PREM-DN* (2 Yr Sup. Must be licensed w/ Std unit) | 1 | $325,000 | Prem Sup. Hot Backup15MM | $325,000 |
| GB10013M-HOTSTD (Non-Production Units for Testing) | 2 | $ 20,000 | 3 MM Doc Dev., Testing | $ 40,000 |
| | | | **TOTAL** | **$915,000** |

\*\*\* Hot-backup units are licensed for backup and/or development purposes only, and cannot be deployed in a load-balanced or production scenario. All Premium support packages INCLUDE a HOT backup box for production use HOT Backup Box required to be used as production backup.

*The Premium Support provided for herein applies to all additional Google product units purchased by End Customer from Reseller.

For a period of two years from the Effective Date of this Order Form, Reseller agrees to sell to End Customer, upon the request of End Customer:

i)      Additional Google 8008 search product licenses at a price of $450,000.00 each (prorated as set forth below);

ii)     Additional Google 8008 search product hardware and licenses at a price of $550,000 each; provided that the Google 8008 search product hardware has not been discontinued or upgraded to a new model, and is otherwise available for sale at that time; and

iii)    Google search products, other than the Google 8008 search product licenses and hardware, at no more than 5% more than current price per document.

Each additional Google 8008 search product license (under subsection (i) above) and each Google 8008 search product hardware and license (under subsection (ii) above) purchased by End Customer hereunder shall provide an additional 15 million documents to End Customer's search product capacity.

**All prices for additional licenses, including, without limitation, licenses for the Google 8008 search product and licenses for other Google search products, shall be prorated over a two (2) year period, for up to 18 months from the Effective Date of this Order Form.  Any additional hardware purchased will begin under a new 2 year period.

Following is an example for illustrative purposes only:  Provided the Google 8008 search product is available at the time, if End Customer requests an upgrade to its document search capacity to 30 million in 3 months, 45 million in 6 months, 60 million in one year, 75 million in 14 months and 90 million in 16 months, Reseller would charge Market America as follows:

              

| | |
|---|---|
| License upgrade at 3 months: | $393,750 |
| Hardware and license upgrade at 6 months: | $550,000 |
| License upgrade at 1 year: | $225,000 |
| Hardware and license upgrade at 14 months: | $550,000 |
| License upgrade in 14 months: | $187,500 |
| Hardware and license upgrade at 16 months | $550,000 |

The Google Products include on-site installation by Google, half day of training, and Google's premium support which can be viewed at http://support.google.com/enterprise/doc/gsa/terms/tssg_gsa_combined_jun07.html

## ADDITIONAL LTECH SUPPORT:

In addition to Google's second line support, LTech will provide first line support to Market America, as set forth at http://support.google.com/enterprise/doc/gsa/terms/tssg_gsa_combined_jun07.html i, including, without limitation, the following:
Remote maintenance access via support call and VPN
Pager response: 30 minutes, 24/7 for critical issues
Phone support for Sev0 (system down) issues, 1 business hour response time
8 business hour/next business day response time for Sev1-Sev3 issues
LTech hours of operation are 8 am to 5 pm Eastern Time on business days.

## PAYMENT:

Payment for **PRODUCT (Google Search Appliance)** under this agreement are due at time of order to Reseller.

All payments due are in U.S. dollars unless otherwise indicated above. Payments are to be made via wire transfer and must include the following instructions:

Sun National Bank, 226 Landis Ave., Vineland, NJ 08360, Contact: 800-691-7701

LTech Consulting, LLC, Transit #: 031206420, US$ Account#: 4751025880

## TERMS:

LTech ("Reseller") will provide first line technical support to Market America, Inc. ("End User" or "End Customer"), as set forth herein. Such "first line technical support" shall be deemed to include all End User support activities, including, but not limited to, acknowledgment, documentation, research, diagnosis, reproduction, on-site services, and Fix of End User Support Incident as deemed necessary to resolve Support Incident from End User. In the event the parties determine that remote access or onsite access to End User's Product is required by Google to either install or to resolve the Support Incident, Reseller shall facilitate End User's agreement to ensure remote or onsite access is provided by the End User. If not resolved by Reseller, escalations from End Users shall be submitted to Google by Reseller via Google's online support submission tool, and may be followed up by Google via email or telephone/pager. Google shall provide problem resolution assistance via Google's designated web site and Reseller shall provide all relevant End User problem background data. Google will provide such support for the Google licensed term of the appliance.

Google, upon registration of End Customer appliances purchased with premium support, will provide to End User via Reseller, contact information for accessing Google directly for support for Serving Down / Severity Zero issues should assistance be required after Reseller's support hours. All other support requests should be submitted to Reseller and not to Google.

In the event that a replacement unit or onsite repair is required, it will be provided to End User by Reseller or by Google. Google will provide replacement equipment to Distributor for such purpose pursuant to its then current RMA policy in place. Reseller shall apply commercially reasonable means to diagnose any Hardware defects and determine whether a replacement or repair is the necessary course of resolution of the End User Support Incident. Reseller is expected to also follow all instructions provided by Google to ensure that a replacement is necessary.

02/04/2008 MON 15:18 FAX                                                    @003/003

**L·TECH**
CONSULTING LLC                    **Google**

**MARKET AMERICA, INC.: ("End User")**          **LTECH CONSULTING, LLC: ("Reseller")**

By: _____            By: _____

Title: _Executive Vice President_          Title: _____

Address: _1302 Pleasant Ridge Rd._         Address: ___4000 Route 66___

_Greensboro, NC, 27409_                    ___Tinton Falls, NJ 07753___

Telephone: _336- 605- 0040_                Telephone: (919) 841-6680

Facsimile: _336- 605- 0041_                Facsimile: (732) 559-7122

Date: _February 4, 2008_                   Date: _____


SHIPPING INFORMATION, if different than above:

_____


SPECIAL INSTRUCTIONS:

_____


PLEASE FAX TO: 732-559-7122