## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **MARKET AMERICA, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. 09-494 (GMS)** |
| | ) | |
| **GOOGLE, INC. and** | ) | |
| **LTECH CONSULTING, LLC,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendants.** | ) | |

## COMBINED ANSWERING BRIEF OF PLAINTIF MARKET AMERICA, INC. IN OPPOSITION TO DEFENDANT GOOGLE, INC. AND DEFENDANT LTECH CONSULTING, LLC'S MOTIONS TO DISMISS

**MORRIS JAMES LLP**

Richard K. Herrmann (#405)
Matthew F. Lintner (#4371)
Jody C. Barillare (#5107)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
rherrmann@morrisjames.com
mlintner@morrisjames.com
jbarillare@morrisjames.com

*Attorneys for Plaintiff*
*MARKET AMERICA, INC.*

Dated: September 30, 2009

Dockets.Justia.com

# TABLE OF CONTENTS

**PAGE**

NATURE AND STAGE OF PROCEEDINGS .................................................................1

SUMMARY OF ARGUMENT .................................................................................2

STATEMENT OF FACTS .....................................................................................4

ARGUMENT .....................................................................................................10

I.     THE COMPLAINT AND THE AMENDED COMPLAINT PLEAD FRAUD
       WITH SUFFICIENT PARTICULARITY .........................................................10

       A.     Market America Has Alleged Facts Sufficient to Allow the Court to Draw
              an Inference that the Defendants are Liable for the Misconduct Alleged .............10

       B.     Defendants' Statements about the Capabilities of the GSAs were
              Contemporaneous Statements about the Abilities of the Technology,
              not Unfulfilled Promises of Future Performance ....................................................14

       C.     Market America Has Identified the Time, Place and Substance of the
              Misstatements with Sufficient Particularity ............................................................17

II.    THE AMENDED COMPLAINT ASSERTS A VALID CLAIM FOR RESCISSION
       BASED UPON FAILURE OF CONSIDERATION ........................................................19

III.   THE COMPLAINT AND THE AMENDED COMPLAINT ASSERT A VALID
       CLAIM FOR UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER NORTH
       CAROLINA LAW ...........................................................................................21

       A.     Delaware Conflict of Law Principles Will Determine Whether Delaware
              or North Carolina Law Applies to the Unfair and Deceptive Trade
              Practices Claim .......................................................................................21

       B.     Market America Has Stated a Claim under the North Carolina Unfair and
              Deceptive Trade Practices Act .................................................................22

       C.     North Carolina Has the Most Significant Relationship to the Wrongful
              Actions Alleged. .......................................................................................23

       D.     Delaware Law Does Not Govern the Entirety of the Parties' Relationship ..........25

       E.     North Carolina Has a Materially Greater Interest Than Delaware in the
              Determination of Market America's Unfair and Deceptive Trade
              Practices Claim .......................................................................................27

CONCLUSION...................................................................................................34

# TABLE OF AUTHORITIES

PAGE

**CASES**

*Abry Partners v. L.P. v. F & W Acquisition LLC*,
891 A.2d 1032 (Del. Ch. 2006)..................................................................27, 32

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009)..................................................2, 10, 11, 12, 14

*ATI Centers, Inc. v. ATI Resources, Inc.*,
1999 WL 562243 (W.D. Pa. Aug. 2, 1999) .............................................18, 19

*Bavarian Nordic A/S v. Acambis Inc.*,
486 F. Supp. 2d 354 (D. Del. 2007)........................................................22

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007)..................................................2, 10, 11, 12, 14

*Berdel Inc. v. Berman Real Estate Mgmt, Inc.*,
1997 WL 793088 (Del. Ch. Dec. 15, 1997)................................................15

*Bhatti v. Buckland*,
400 S.E.2d 440 (N.C. 1991)..................................................................33

*Brown v. SAP Am., Inc.*,
1999 WL 803888 (D. Del. Sept. 13, 1999).................................................23

*Chase Manhattan Mortg. Corp. v. Advanta Corp.*,
2005 WL 2234608 (D. Del. 2005) ........................................................23, 24

*Christenson v. Friendly Ford Sales, Inc.*,
169 S.E.2d 542 (N.C. App. 1969)..........................................................20

*Compton v. Kirby*,
577 S.E.2d 905 (N.C. App. 2005)..........................................................23

*Dewey v. Volkswagen AG*,
558 F. Supp. 2d 505 (D.N.J. 2008) ........................................................13

*Financial Software Sys., Inc. v. First Union Nat. Bank*,
1999 WL 1241088 (E.D. Pa. Dec. 16, 1999)..............................................29, 30

*Forbes v. Eagleson*,
228 F.3d 471 (3d Cir. 2000)..............................................................17

*Fowler v. UPMC Shadyside*,
    2009 WL 2501662 (3d Cir. Aug. 18, 2009)....................................................10, 11, 12, 14

*Gloucester Holding Corp. v. U.S. Tape and Sticky Products, LLC*,
    832 A.2d 116 (Del. Ch. 2003)................................................................22, 26, 27

*Jones v. Harrelson & Smith Contractors, LLC*,
    670 S.E.2d 242 (N.C. 2008)................................................................22, 23, 29, 33

*Klaxon Co. v. Stentor Electric Mfg. Co.*,
    313 U.S. 487 (1941)................................................................................22

*Lum v. Bank of America*,
    361 F.3d 217 (3d Cir. 2004)................................................................17

*Marshall v. Priceline.com Inc.*,
    2006 WL 3175318 (Del. Super. Oct. 31, 2006)....................................25, 31, 32

*Millett v. Truelink, Inc.*,
    2006 WL 2583100 (D. Del. Sep. 7, 2006)....................................24, 25, 31, 32

*M/S Bremen v. Zapata Off-Shore Co.*,
    407 U.S. 1 (1972)................................................................................28

*Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*,
    394 A.2d 1160 (Del. Super. 1978)................................................................22

*Olivetti Corp. v. Ames Bus. Sys., Inc.*,
    344 S.E.2d 82 (N.C. App. 1986)................................................................29

*Organ v. Byron*,
    435 F. Supp. 2d 388 (D. Del. 2006)................................................................28

*Phillips v. County of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)................................................................10, 11, 12, 13, 14

*Playtex Family Products, Inc. v. St. Paul Surplus Lines Ins. Co.*,
    564 A.2d 681 (Del. 1989)................................................................28

*Reybold Venture Group XI-A, LLC v. Atlantic Meridian Crossing, LLC*,
    2009 WL 143107 (Del. Super. Jan. 20, 2009)....................................20

*In re Rockefeller Center Properties, Inc. Securities Litig.*,
    311 F.3d 198 (3d Cir. 2002)................................................................13, 14

*Rolo v. City Investing Co. Liquidating Trust*,
 155 F.3d 644 (3d Cir. 1998)............................................................................17

*Shane v. Fauver*,
 213 F.3d 113 (3d Cir. 2000)...............................................................................1

*Sheehan v. Hepburn*,
 138 A.2d 810 (Del. Ch. 1958)...........................................................................20

*Spartan Leasing Inc. v. Pollard*,
 400 S.E.2d 476 (N.C. App. 1991)................................................................ 15-16

*Spear Pharmaceuticals, Inc. v. William Blair & Co., LLC*,
 610 F. Supp. 2d 278 (D. Del. 2009).................................................................11

*State Farm Mutual Auto. Ins. Co. v. Makris*,
 2003 WL 924615 (E.D. Pa. Mar. 4, 2003)........................................................17

*Stone Street Servs., Inc. v. Daniels*,
 2000 WL 19009373 (E.D. Pa. Dec. 29, 2000)..................................................30

*Sun Microsystems, Inc. v. Versata Enterprises, Inc.*,
 2009 WL 1904369 (D. Del. Jul. 1, 2009) ................................10, 11, 12, 13, 17

*Travelers Indemnity Co. v. Lake*,
 594 A.2d 38 (Del. Super. 1991).......................................................................22

*United Engineers & Constructors, Inc. v. Babcock & Wilcox Co.*,
 1993 WL 50309 (Del. Ch. Feb. 11, 1993) ......................................................19

*United Roasters, Inc. v. Colgate-Palmolive Co.*,
 485 F. Supp. 1041 (E.D.N.C. 1979)................................................................29

*Univ. of North Carolina v. Shoemate*,
 437 S.E.2d 892 (N.C. App. 1994)............................................................... 19-20

*Walker v. Fleetwood Homes of NC, Inc.*,
 653 S.E.2d 393 (N.C. 2007).............................................................................23

*White Sewing Mach. Co. v. Bullock*,
 76 S.E. 634 (N.C. 1912)...................................................................................15

*Winner Acceptance Corp. v. Return on Capital Corp.*,
 2008 WL 5352063 (Del. Ch. Dec. 23, 2008)..............................................12, 15

**STATUTES**

6 Del. Code § 2708(a) ..........................................................................25, 29

Delaware Consumer Fraud Act,
    6 Del. Code § 2511 et seq ........................................................30, 31

Delaware Deceptive Trade Practices Act
    6 Del. Code § 2531 et seq. ..............................................................30

North Carolina Unfair and Deceptive Trade Practices Act,
    N.C.G.S. § 75 ...............................................................3, 22, 23, 29, 33

**RULES**

Fed. R. Civ. P. 8 .................................................1, 2, 10, 11, 13, 17

Fed. R. Civ. P. 9(b) ..........................................1, 2, 13, 17, 18, 19

Fed. R. Civ. P. 12(b)(6)...........................................................10, 11, 34

Fed. R. Civ. P. 15(a) ...............................................................................1

**OTHER**

Restatement (Second) of Conflict of Laws § 145 (1971) ........................22, 25

Restatement (Second) of Conflict of Laws § 148 (1971) .................23, 24, 25

Restatement (Second) of Conflict of Laws § 187 (1971) ........................28, 29

Restatement (Second) of Conflict of Laws § 188 (1971) .............................28

Restatement (Second) of Conflict of Laws § 201 (1971) ......................27-28

Restatement (Second) on Contracts, § 159(c) (1981) .................................15

<u>**NATURE AND STAGE OF PROCEEDINGS**</u>

Market America, Inc.'s ("Market America") Complaint (D.I. 1) was filed on July 7, 2009, alleging four counts against both Defendant Google, Inc. ("Google") and Defendant LTech Consulting, Inc. ("LTech") (collectively, "Defendants"): Fraudulent Inducement, Fraud, Failure of Essential Purpose and Unfair and Deceptive Trade Practices. Both Defendants moved to dismiss the Complaint on August 31, 2009. D.I. 17; D.I. 19. Although the original Complaint contained sufficiently specific allegations to satisfy pleading standards of Rules 8 and 9(b), out of an abundance of caution Market America amended the Complaint on September 30, 2009, to identify the Google and LTech representatives who made the fraudulent statements and add further misrepresentations by Google and LTech personnel. D.I. 22. Count III was also renamed Failure of Consideration. Because neither Defendant filed a responsive pleading for purposes of Fed. R. Civ. P. 15(a), Market America's Amended Complaint is allowed as a matter of course. Fed. R. Civ. P. 15(a)(1)(A); *see Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). This is Market America's Answering Brief in Opposition to the Motions to Dismiss of both Defendants.

## SUMMARY OF ARGUMENT

1.      Both Market America's Complaint and Amended Complaint allege facts, accepted as true, sufficient to state claims for fraud and fraudulent inducement that are "plausible on its face" consistent with the pleading standards for Rule 8 of the Federal Rules of Civil Procedure set out in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  By stating facts identifying the speakers as well as the specific date, place, nature and substance of the misrepresentations made by Google and LTech personnel, Market America has asserted a facially plausible claim by pleading factual content that allows the Court to draw the reasonable inference that the Defendants are liable for the misconduct alleged.  Market America has alleged sufficient facts to raise a reasonable expectation that discovery will reveal evidence further supporting its claims.  Further, the Defendants' statements about the scalable capabilities of the GSAs to handle 30 to 90 million products at sub second response times were contemporaneous statements about the abilities of the technology and not mere unfulfilled promises of future performance.  Finally, Market America has identified the time, place and substance of the Defendants' misstatements with sufficient particularity to satisfy Rule 9(b).  Market America's allegations injected precision and substantiation into its claims of fraud to give Defendants sufficient notice of the precise misconduct alleged.

2.      Market America's Amended Complaint states a valid claim for rescission based upon failure of consideration under either Delaware or North Carolina law.  Market America tendered performance to Google and LTech in exchange for the installation of a GSA-based search system.  From the very beginning of the relationship, the Google and LTech search system did not work because the Google Search Appliances were technologically unable to perform the tasks for which they were purchased.  At the very least, the failure of Google and

LTech to perform these basic terms of the contract warrants rescission of the contract and the return of each party to their status quo.

3.     Market America's Complaint and Amended Complaint assert a valid claim under the North Carolina Unfair and Deceptive Trade Practices Act.  The application of Delaware conflict of law principles will determine that North Carolina has the most significant relationship to the transaction and, therefore, North Carolina law will apply to Market America's unfair and deceptive trade practices claim.  Market America has pled sufficient facts to assert a valid claim under North Carolina's Unfair and Deceptive Trade Practices Act.  Delaware courts will consider the policy interests of other jurisdictions when determining which law should govern.  Applying Delaware law to Market America's deceptive trade practices claims would offend public policy by immunizing the Defendants from the consequences of their violations of North Carolina consumer protection laws.  Enforcement of the Delaware choice-of-law provision in this situation would offend North Carolina's fundamental public policy interest in protecting its consumers and its business marketplace from fraud.

## STATEMENT OF FACTS

Market America is an internet retail entity incorporated in North Carolina with its headquarters and principal place of business in North Carolina. Compl. ¶ 1, Amended Compl. ¶ 1.[1] Market America offers customers a unique shopping experience by providing them with an online shopping portal similar to Amazon.com in addition to a personal "customer manager" who can guide their shopping experience, a concept known as One-to-One marketing. Compl. ¶ 6, Amended Compl. ¶ 6. Customers shopping at Market America can choose from Market America-branded products as well as millions of products from other well-known retailers through Market America's "affiliate partner" program. Compl. ¶ 7, Amended Compl. ¶ 7. In 2007, by leveraging its network of tens of thousands of Independent Distributors and with its product offerings rapidly expanding thanks to the affiliate partners program, Market America was poised to enter a phase of unprecedented growth. Compl. ¶¶ 6-7, Amended Compl. ¶¶ 6-7.

The creation of Market America's "Universal Shopping Cart" offers millions of customers a convenient one-stop shopping destination where purchases of both Market America products and affiliate partner products could be completed on the Market America site. Compl. ¶ 7, Amended Compl. ¶ 7. Market America recognized that to fully realize the potential of the Universal Shopping Cart experience, the company needed to enhance its technological infrastructure to accommodate the tens of millions of affiliate products that were being loaded onto the site. Compl. ¶¶ 7-8, Amended Compl. ¶¶ 7-8. Market America understood that it needed to develop a robust, scalable internal enterprise search system that could accommodate a high volume of search requests, access the millions of specific items available for purchase at the

---

[1] Although Market America has filed an amended Complaint, this brief will cite to both Complaints for purposes of clarity and continuity with Defendants' briefs.

affiliate partner stores, and present search results in a quick timeframe consistent with the expectations of its customers. Compl. ¶ 8, Amended Compl. ¶ 8.

In November of 2007, Market America sought out the internet search technology giant Google to develop and implement and install this enterprise search system. Compl. ¶ 9, Amended Compl. ¶ 9. Google Enterprise Sales Representative Robert Evanikoff responded to Market America's inquiry. Amended Compl. ¶ 9. Google introduced Market America to LTech, a Google "partner" and member of the Google Enterprise Professional program, to potentially implement the new search solution. Compl. ¶ 10, Amended Compl. ¶ 10. LTech presented Russ Young, Vice President of Business Development, as the company's point person for this project. Amended Compl. ¶ 10. In early discussions regarding project requirements, Market America emphasized to Google and LTech that it needed a search system that could handle 30 million individual products but was also scalable enough to go up to 50 million products in 6 months and to 90 million products over time. Compl. ¶ 11, Amended Compl. ¶ 11. Market America also made clear to Google and LTech that acceptable response times were a critical aspect of this search system. Compl. ¶ 12, Amended Compl. ¶ 12.

Google and LTech representatives unequivocally represented to Market America that their enterprise search products could provide a solution to meet the needs of Market America's quickly-expanding affiliate partner store offerings. Compl. ¶ 11, Amended Compl. ¶ 11. Google represented to Market America that its Google Search Appliances ("GSAs") – rack-mounted computer servers with loaded software – would have both the flexibility and advanced search capabilities to meet Market America's needs. Compl. ¶ 12, Amended Compl. ¶ 12. In November of 2007, Google Enterprise Sales representative Robert Evanikoff, with the support of Google and LTech engineers, made statements and presented information to Market America

personnel touting the GSAs' scalability and document capacity. Amended Compl. ¶ 13. Also, in response to a 45-point questionnaire about the scope and scale of Market America's needs, Evanikoff returned a document in which Google represented that to handle an increased number of products, multiple GSAs could be combined into clusters which would "function as a single unit even though they may contain multiple nodes." Amended Compl. ¶ 13. Two of Google's top engineers, Barry Fong and Nick Friedman, as well as LTech engineer Bill Mers, were copied on Evanikoff's e-mail to Market America. Amended Compl. ¶ 13. In addition, on December 4, 2007, Evanikoff sent to Market America via e-mail a GSA "deployment guide" which represented that the GSA model GB8008 was "designed to handle document capacity needs of up to…30M." Amended Compl. ¶ 13.

On December 18, 2007, Google Sales Engineer Gary Gies (who was sent to this meeting by Google's Manager of Enterprise Sales, Tom Mills) and LTech representatives Russ Young and Jason Keicher traveled to North Carolina to attend a meeting at Market America headquarters in Greensboro. Amended Compl. ¶ 14. These Google and LTech representatives evaluated Market America's enterprise search requirements during several sessions with Market America personnel from various departments. Amended Compl. ¶ 14. Understanding that scalability with sub second response times was critical to Market America's needs, Gies, Young and Keicher assured the Market America team that the GSA clusters were scalable and could handle searches of over 30 million documents within 3 months and over 60 million products in 6 months, all with sub second response times. Amended Compl. ¶ 14.

As a result of this meeting in North Carolina and Google's prior assurances, Market America contracted with Google and LTech to purchase a series of GSAs and to install and implement a GSA-based enterprise search system. Compl. ¶¶ 14 and 18; Amended Compl.

¶¶ 16 and 20. A Services Agreement was signed between Market America and LTech on February 1, 2008, and a License Agreement was signed between Google and Market America on February 4, 2008. Compl. ¶ 18; Amended Compl. ¶ 20. Through an "LTech Google Search Appliance Form," Market America acquired one GSA model 800815MDNSTD and related equipment and services, for a price of almost $1 million, with an asserted capacity to handle 15 million documents, and an option to upgrade search capacity through the acquisition of additional licenses and additional GSA 8008 machines, with each additional license or machine providing an additional 15 million document capacity to the search capabilities, up to a purported capacity of 90 million documents. Compl. ¶ 18; Amended Compl. ¶ 20.

Attached to the Services Agreement was a Statement of Work ("SOW") which memorialized the prior representations by Google and LTech by promising to implement and install an enterprise search system that would "leverage the power of the [GSA] platform" and "serve search responses in sub one-second time frame." Compl. ¶ 19; Amended Compl. ¶ 21. All services and testing were to be completed by June 15, 2008. Compl. ¶ 19; Amended Compl. ¶ 21. Market America introduced its partnership with Google on February 8, 2008 at Market America's Leadership School, an event held at the American Airlines Arena in Miami and attended by over 20,000 individuals. Compl. ¶ 21; Amended Compl. ¶ 23. Cyrus Mistry of Google, with an LTech representative onstage, addressed the crowd, announcing the relationship and the benefits that Google's search system would provide to Market America, its Independent Distributors and partners. Compl. ¶ 21; Amended Compl. ¶ 23.

In April of 2008, the GSA equipment was installed and tested at Market America's headquarters in North Carolina. Compl. ¶ 24; Amended Compl. ¶ 26. Load testing of the system by LTech revealed response times in the 8 to 15 second range, far from the sub second times

promised by Google and LTech, and the system crashed at 15 queries per second. Compl. ¶ 24; Amended Compl. ¶ 26. On June 25, 2008, 10 days after the date that the GSA-based system was supposed to be up and running, and with no effective solution at hand, Google's Manager of Enterprise Sales, Tom Mills, told Market America: "I can do nothing but apologize profusely for the delays on your project – I am truly sorry for that and promise you we are doing our best to find an effective solution." Compl. ¶ 25; Amended Compl. ¶ 27. On June 26, 2008, Mr. Mills suggested that it would be necessary "to scale back a bit from the initial plan to ensure a reasonable level of performance." Compl. ¶ 26; Amended Compl. ¶ 28.

During a teleconference between the parties on or about June 30, 2008, Google's representatives admitted to Market America that its current GSA-based system was not scalable to 30, 60, or 90 million products as Google and LTech had previously represented, and that the parties would need to develop an alternative long term solution with a different hardware configuration. Compl. ¶ 27; Amended Compl. ¶ 29. Shortly thereafter, during another teleconference on July 8, 2008, Google representatives explicitly declared that its GSA could not perform any better and that Google's engineers would have to implement a different system. Compl. ¶ 28; Amended Compl. ¶ 30. This system, however, was never developed. Compl. ¶ 30; Amended Compl. ¶ 32.

In July of 2008, Google sought to bridge the gap until a long term solution could be developed by proposing an interim search system that could handle 2 million products, well below the 30 million products initially promised by Google and LTech. Compl. ¶ 30; Amended Compl. ¶ 32. This short term system was unveiled on August 8, 2008, in Greensboro, North Carolina at Market America's International Convention. Compl. ¶¶ 31-32; Amended Compl. ¶¶ 33-34. Once again, Google's Cyrus Mistry assured the crowd of 20,000 distributors,

customers, vendors and partners that Google would deliver and install an acceptable search system for Market America. Compl. ¶ 31; Amended Compl. ¶ 33. Despite Mr. Mistry's assurances, the system crashed during a demonstration at the Convention and Market America was left with a broken search system that was worse than the search capabilities it already had before Google promised a better, GSA-based system. Compl. ¶ 32; Amended Compl. ¶ 34. As a result of this failure, among other things, some existing affiliate partners stopped offering their products on Market America's site and other potential affiliate partners declined to sign on to the affiliate partner program. Compl. ¶ 33; Amended Compl. ¶ 35.

Throughout the second half of 2008, Market America expended additional sums on additional hardware, computer programming and internal resources by continuing to work with Google and LTech to develop a solution that would live up to their initial promises. Compl. ¶ 35; Amended Compl. ¶ 37. After several months, however, it became clear that Google and LTech were unable to meet their initial and ongoing promises and by the end of 2008, Google and LTech remained unable to provide Market America with the long term GSA search system that they had promised time and again. Compl. ¶¶ 35 and 37; Amended Compl. ¶¶ 37 and 39. This utter failure left Market America with a severely limited, cobbled-together search system and on January 2, 2009, Market America informed Google that it was done wasting time and resources on failed attempts to implement a GSA-based enterprise search technology. Compl. ¶¶ 35 and 37; Amended Compl. ¶¶ 37 and 39. On July 6, 2009, Market America tendered back possession of the GSAs to Google and LTech. Compl. ¶ 38; Amended Compl. ¶ 40.

**ARGUMENT**

## I. THE COMPLAINT AND THE AMENDED COMPLAINT PLEAD FRAUD WITH SUFFICIENT PARTICULARITY

### A. Market America Has Alleged Facts Sufficient to Allow the Court to Draw an Inference that the Defendants are Liable for the Misconduct Alleged

Defendants argue that nothing in the Complaint would justify an inference that Google and LTech committed any form of fraud. They do not deny, however, that they promised that the Google GSAs could process sub-second searches of the millions of documents Market America anticipated presenting on its site. Rather, they argue that such statements, even if flatly wrong, and even when made by someone with vastly superior knowledge about the capacities of the technology in question, would not allow this Court to plausibly conclude that the Defendants might have known such statements were false when made, or at least that the Defendants were reckless as to their truth.

The Defendants base their argument on the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). Yet these important cases do not alter pleading standards as much as Defendants suggest. *See Twombly*, 127 S. Ct. at 1974 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."). In the wake of these two decisions, the Third Circuit has provided additional clarity regarding the appropriate Rule 8 pleading standards and the general Rule 12(b)(6) standard. *See Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008); *Fowler v. UPMC Shadyside*, 2009 WL 2501662, at *7 (3d Cir. Aug. 18, 2009). To survive a motion to dismiss, a complaint must allege facts, accepted as true, to state a claim to relief that is "plausible on its face." *Sun Microsystems, Inc. v. Versata Enterprises, Inc.*, 2009 WL 1904369, at *4 (D. Del. Jul. 1, 2009) (quoting *Twombly*, 127 S. Ct. at 1964). A claim is facially plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sun Microsystems*, 2009 WL 1904369, at *4 (quoting *Iqbal*, 129 S. Ct. at 1937).

The Supreme Court's "plausibility" standard requires a plaintiff to make a "showing" of an entitlement to relief. *Phillips*, 515 F.3d at 234; *Fowler*, 2009 WL 2501662, at *7; *Spear Pharmaceuticals, Inc. v. William Blair & Co., LLC*, 610 F. Supp. 2d 278, 283 (D. Del. 2009). Yet a "showing," the Third Circuit has explained, merely calls for plaintiffs to set forth enough facts in their complaint to raise a reasonable expectation that discovery will reveal evidence supporting the claim. *Spear Pharmaceuticals*, 610 F. Supp. 2d at 283 (citing *Phillips*, 515 F.3d at 234). In *Phillips*, The Third Circuit noted that while *Twombly* introduced a "plausibility paradigm" for evaluating the sufficiency of complaints, the Supreme Court did not intend to drastically alter the Rule 8 or Rule 12(b)(6) framework. *Phillips*, 515 F.3d at 230. The Supreme Court repeatedly emphasized throughout the *Twombly* opinion that it was not adopting or applying a "heightened pleading standard" of specifics nor imposing a probability requirement. *Phillips*, 515 F.3d at 233 (citing *Twombly*, 127 S. Ct. at 1964, 1965, 1973 n. 14, 1974). Specifically, after *Twombly*, plaintiffs still are not required to present detailed factual allegations in support of their complaint so long as they gave defendants fair notice of their claim and the facts that supported it. *Spear Pharmaceuticals*, 610 F. Supp. 2d at 283 (citing *Phillips*, 515 F.3d at 230-31).

The Third Circuit formulated the post-*Twombly* pleading standard as "'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 127 S. Ct. at 1965); *Sun*

*Microsystems*, 2009 WL 1904369, at \*4. There must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation. *Phillips*, 515 F.3d at 234-35. The "plausibility" determination will be "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Fowler*, 2009 WL 2501662, at \*7 (quoting *Iqbal*, 129 S. Ct. at 1950).

Applying *Twombly*, *Iqbal* and *Phillips* to the facts of this case demonstrates that Market America's complaint states a plausible claim for relief and should not be dismissed. Unlike the complaint in *Twombly*, which "mentioned no specific time, place or person involved in the alleged" wrongdoing, the complaint in the present action sufficiently identifies core facts and information which plausibly support Market America's claims. Market America identifies the specific date, place, nature and substance of the misrepresentations made by Google and LTech personnel.

Both the Complaint and the Amended Complaint unequivocally allege that Google and LTech, just prior to contracting with Market America, made specific misrepresentations about a contemporaneous fact: that the GSAs and GSA clusters had the capacity to handle certain transaction volumes at certain speeds, when in fact they did not. *See Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at \*7 (Del. Ch. Dec. 23, 2008) (finding that "[t]o support a claim for fraud, the putative misrepresentation must concern either a past or contemporaneous fact or a future event that falsely implies an existing fact."). In addition, both the Complaint and the Amended Complaint specify that these fraudulent statements regarding the capacity of the GSAs were made by Google and LTech personnel "[a]t a meeting at Market America headquarters" held in December 2007 after evaluating Market America's enterprise search needs. Compl. ¶ 13; Amended Compl. ¶ 14. The specificity of the facts and allegations

in Market America's pleadings give Google and LTech more than fair notice of Market America's fraud claims and the underlying facts supporting them. *Phillips*, 515 F.3d at 230-31.

In addition, Market America has satisfied Rule 8 by plausibly alleging that Google and LTech knew their statements were false or were reckless with regard to their truth or falsity.[2] Market America is alleging that the Google and LTech representatives present at the December 18th meeting, and those who made representations prior to that meeting, could not have had a reasonable basis to believe specific representations about the speed, capacity and scalability of the GSA appliances were true. These were statements about the capabilities of *their own technology*. The subject of the fraudulent statements – the capacity and ability of the GSAs to be scalable to handle transaction volumes with sub second response times – was peculiarly within the Defendants' knowledge or control at the time the statements were made. The plausibility standard does not require Market America to know better than Google and LTech the nature and extent of Google and LTech's own technological offerings. When Google and LTech represented that their own GSA technology and search system was scalable and had the ability to handle over 30 million products with sub second response times, it was plausible to infer that both Defendants knew the truth or falsity or recklessly disregarded the truth or falsity of their representations at the time the statements were made. The fact that these statements were flatly wrong resulted in significant damages to Market America, as it worked in vain for months with

---

[2] As Google readily admits in its Opening Brief (D.I. 18), knowledge and state of mind are not subject to Rule 9(b)'s heightened pleading standard for fraud. *See Sun Microsystems*, 2009 WL 1904369, at *8 (Rule 9(b) states that "malice, intent, knowledge…may be alleged generally"). This is especially true where the requisite factual information is peculiarly within the defendant's knowledge or control. *In re Rockefeller Center Properties, Inc. Securities Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 526 (D.N.J. 2008) (holding that generally alleging intent is sufficient under Rule 9(b), especially where the specific facts as to the misrepresentations are within Defendants' control).

Google and LTech to make the GSA system perform tasks it inherently did not have the capacity to handle.

Consistent with the pleading standard of Rule 8, the facts alleged raise a reasonable expectation that discovery will reveal evidence further supporting Market America's claim. *Phillips*, 515 F.3d at 230-31. Discovery will show exactly what the Google and LTech representatives present at the December 18th meeting, Google Sales Engineer Gary Gies and LTech representatives Russ Young and Jason Keicher, knew about the scalability and the capabilities of the GSA appliances at the time they made their misrepresentations, and on what internal Google or LTech information that understanding was based.

Market America has substantiated its legal theory of fraud with factual allegations about the date, place, nature and substance of the fraudulent statements made by Google and LTech about their own technological capabilities. This substantiation elevates Market America's fraud claim from one that is merely "theoretically viable" to one that is "plausible" on its face. *In re Rockefeller Center*, 311 F.3d at 216. Accordingly, the facts pled by Market America constitute enough heft to show a "plausible" claim for relief and justify moving the case beyond the pleadings stage and into discovery. *See Fowler*, 2009 WL 2501662, at *7 (finding that although "not as rich with detail as some might prefer," a complaint pleading how, when and where the alleged misconduct took place set forth sufficient facts to support a "plausible" claim under the standards announced in *Twombly* and *Iqbal*).

### B. Defendants' Statements about the Capabilities of the GSAs were Contemporaneous Statements about the Abilities of the Technology, not Unfulfilled Promises of Future Performance

Both Google and LTech argue that Market America is wrongfully attempting to turn a garden variety breach of contract action into a fraud claim, and stress that the long period of cooperation between Google, LTech and Market America belies any intent on the part of the

Defendants to defraud Market America.  LTech notes that one component of the overall relationship was an attempt to "develop" and "implement" a "search solution" for Market America.  D.I. 20, LTech Brief at 12.  Google stresses these many months of continued cooperation after the initial failure of the GSAs:  "LTech worked with Market America to design and implement this technology, but, despite everyone's best efforts, it was not scalable and could not perform as hoped."  D.I. 18, Google Brief at 14.  Both Defendants cite *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *7 (Del. Ch. Dec. 23, 2008) for its holding that "[a]n unfulfilled promise of future performance will not convert a potential contract claim into a claim sounding in fraud, unless at the time the promise was made the speaker had no intention of performing."

Yet as the discussion in *Winner* makes clear, a misrepresentation is actionable if it concerns "*either* a past or contemporaneous fact *or* a future event that falsely implies an existing fact."  2008 WL 5352063, at *7 (emphasis supplied).  *See also Berdel Inc. v. Berman Real Estate Mgmt, Inc.*, 1997 WL 793088, at *8 (applying Florida law but noting that Delaware law is the same); Restatement Second on Contracts, § 159(c) ("An assertion must relate to something that is a fact at the time the assertion is made in order to be a misrepresentation.  Such facts include past events as well as present circumstances but do not include future events."); *White Sewing Mach. Co. v. Bullock*, 76 S.E. 634, 639 (N.C. 1912)[3] ("As a general rule, false representations upon which fraud may be predicated must be of existing facts, or facts which previously existed, and cannot consist of mere promises or conjectures as to future acts or events…unless the promise includes a misrepresentation of existing facts, or the statement is as to some matter peculiarly within the speaker's knowledge, and he makes the statement as a fact"); *Spartan*

---

[3] Market America has stated plausible claims under either North Carolina or Delaware law.

*Leasing Inc. v. Pollard*, 400 S.E.2d 476, 478 (N.C. App. 1991) (holding that "the fraudulent misrepresentation must be of a subsisting or ascertainable fact").

Defendants' misrepresentations did not relate to future promises of performance; they related to "present circumstances" – the present capabilities of the GSAs, and the capacity of those devices to be employed scalably to search tens of millions of documents with sub second response times. Market America did not think it was signing on to a technology development effort; it contracted with Google and LTech because the Defendants said flatly and unequivocally their GSA appliances would work – the devices would be scalable (in that several devices could be linked together) to enable searches of the tens of millions of products Market America wanted to offer to visitors on its site, and that they would perform at sub second response times.

The GSAs that the Defendants provided were installed and they were a dramatic failure. *See* Compl. ¶ 24; Amended Compl. ¶ 26. The appliances performed not with "sub second" response times, as was promised, but with response times in the 8 to 15 second range. Compl. ¶ 24; Amended Compl. ¶ 26. In the world of internet search, the difference between sub second response times and 8 to 15 second response times is the difference between keeping a visitor to a site satisfied and having that visitor leave for another site with adequate search capacity. Despite a clear promise that the GSAs were scalable, as Google now admits in its Motion to Dismiss, the GSA technology "was not scalable and could not perform as hoped." D.I. 18, Google Brief at 14.

It is certainly true that after the initial dramatic failure of the installed GSAs, Market America struggled for months with Google and LTech to find a workable enterprise search system using the GSAs. Compl. at ¶¶ 25-32; Amended Compl. ¶¶ 27-34. But that long struggle

is not what Market America was promised – it was promised scalable GSAs with the capacity to handle tens of millions of products with sub second response times. At the time that Defendants made that promise, they either knew or should have known that their own proprietary technology could not deliver, no matter how much development effort was expended.

      C.      **Market America Has Identified the Time, Place and Substance of the Misstatements with Sufficient Particularity.**

In addition to meeting the pleading standard under Rule 8, the facts and allegations in Market America's complaint adequately plead a claim for fraud with sufficient particularity to satisfy the standard of Rule 9(b). Under Rule 9(b), plaintiffs must plead with particularity the circumstances of the alleged fraud in order to give the defendant appropriate notice of the precise misconduct with which they are charged. *Lum v. Bank of America*, 361 F.3d 217, 224-25 (3d Cir. 2004). Plaintiffs may meet Rule 9(b)'s requirements "by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Sun Microsystems*, 2009 WL 1904369, at *8 (quoting *Lum*, 361 F.3d at 224). However, there is no standard formula for pleading fraud with particularity. *See Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998), *abrogation on other grounds recognized*, *Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2000) (stating plaintiffs need not plead the date, time or place of the fraud so long as they provide an alternative means of injecting precision and some measure of substantiation into their allegations); *State Farm Mutual Auto. Ins. Co. v. Makris*, 2003 WL 924615, at *4 (E.D. Pa. Mar. 4, 2003) (finding that "there is no formula for pleading fraud with particularity").

Although the original Complaint contained sufficiently specific allegations to satisfy Rule 9(b),[4] out of an abundance of caution Market America has amended the Complaint to identify the Google and LTech representatives who made the fraudulent statements and add further misrepresentations by Google and LTech personnel.  The Amended Complaint specifies that the fraudulent statements regarding the capacity of the GSAs were made by Google Sales Engineer Gary Gies and LTech representatives Russ Young and Jason Keicher at a meeting at Market America headquarters held on December 18, 2007, after evaluating Market America's enterprise search needs.  Amended Compl. ¶ 14.  Gary Gies was sent to this meeting by Google's Manager of Enterprise Sales, Tom Mills.  Amended Compl. ¶ 14.  During several sessions with Market America personnel from various departments, Gies, Young and Keicher assured the Market America team that the GSAs were scalable and could handle searches of over 30 million documents in sub second response times.  Amended Compl. ¶ 14.

Additionally, in the weeks leading up to the meeting in North Carolina, Google Enterprise Sales representative Robert Evanikoff, with the support of Google and LTech engineers, made statements and presented information from Google's engineers to Market America personnel touting the GSAs' scalability and document capacity.  Amended Compl. ¶ 13.  In response to a 45-point questionnaire about the scope of Market America's needs addressed to the Google Enterprise Search team, Evanikoff returned a document in which Google represented that in order to handle a greater volume of documents, multiple GSAs could be combined into

---

[4] Market America injected precision and a measure of substantiation into their allegations of fraud by pleading facts showing the date, place, nature and substance of the misrepresentations made by Google and LTech representatives.  This gave the Defendants adequate notice of the fraud claims against them.  Market America's failure to identify the speakers of the misrepresentations is a consideration but not the sole factor in a court's decision whether to dismiss the claim.  *ATI Centers, Inc. v. ATI Resources, Inc.*, 1999 WL 562243, at *6 (W.D. Pa.

clusters which would "function as a single unit even though they may contain multiple nodes." Amended Compl. ¶ 13.  Two of Google's top engineers, Barry Fong and Nick Friedman, as well as LTech engineer Bill Mers were copied on Evanikoff's e-mail to Market America.  Amended Compl. ¶ 13.  On December 4, 2007, Evanikoff sent to Market America via e-mail a GSA "deployment guide" which represented that the GSA model GB8008 was "designed to handle document capacity needs of up to…30M."  Amended Compl. ¶ 13.

By identifying the speakers of the fraudulent statements along with pleading factual allegations concerning the date, time, place and substance of the misrepresentations, Market America has injected precision and substantiation into its allegations of the fraud perpetrated by the Defendants.  Taken as a whole, Market America's Amended Complaint affords Google and LTech appropriate notice of the precise misconduct with which they have been charged.  *See ATI Centers*, 1999 WL 562243, at *6 (viewing the overall particularity and substance of the allegations and finding that Rule 9(b) is satisfied where the complaint provides defendant notice of the claim).  As a result, Market America's fraud claims have been pled with sufficient particularity to fulfill the policy goal of Rule 9(b) and should withstand a motion to dismiss.

## II.     THE AMENDED COMPLAINT ASSERTS A VALID CLAIM FOR RESCISSION BASED UPON FAILURE OF CONSIDERATION

Market America has amended the complaint to state a valid claim for rescission of the contract for lack of consideration under either North Carolina or Delaware law.  *See United Engineers & Constructors, Inc. v. Babcock & Wilcox Co.*, 1993 WL 50309, at *3 (Del. Ch. Feb. 11, 1993) ("the courts of this State, of course, can grant rescission for a number of reasons," including "failure of consideration"); *Univ. of North Carolina v. Shoemate*, 437 S.E.2d 892,

---

Aug. 2, 1999) (refusing to dismiss fraud claim solely due to the plaintiff's failure to identify the speakers of the misrepresentations where other aspects of the fraud are adequately pled).

895 (N.C. App. 1994) (under North Carolina law, where a contract is impossible to perform at the time it is made, consideration between the parties is lacking, and the contract is void *ab initio*); *Christenson v. Friendly Ford Sales, Inc.*, 169 S.E.2d 542, 544 (N.C. App. 1969) ("A buyer may rescind a contract for failure of consideration if, at the time of the sale, the subject of the contract could not be used for the purposes for which it was intended."). Although the label on the claim has changed, the relief sought is identical to the original Complaint. *See* Compl. Count III; Amended Compl. Count III. An unjustified failure to perform basic terms of a contract warrants rescission. *Sheehan v. Hepburn*, 138 A.2d 810, 812 (Del. Ch. 1958). A plaintiff is entitled to a decree restoring him to the status held by him prior to entering into the contract, but as rescission necessarily operates *ab initio* both parties must be placed in status *quo ante*. *Id.*; *Shoemate*, 437 S.E.2d at 895. In an action for rescission, the court has the authority to enter an order restoring plaintiff to his original position by awarding monetary damages or the return of the property of which he has been deprived. *Reybold Venture Group XI-A, LLC v. Atlantic Meridian Crossing, LLC*, 2009 WL 143107, at *4 (Del. Super. Jan. 20, 2009).

Even in the absence of actual fraud, Market America should, at the very least, be entitled to return to Google the useless equipment and receive its money back. Market America contracted with Google and LTech to produce and implement a GSA-based enterprise search system for use in its internet retail business. Market America has expended a large amount of time and money in an attempt to implement and achieve this search system but Google and LTech have completely and utterly failed to deliver a workable search system in return. The GSA boxes and other equipment are useless to Market America and serve no purpose whatsoever. The failure of Google and LTech to perform the basic terms of this contract warrants rescission of the contract and the return of each party to their status quo. Market

America has already tendered to Google the equipment from the failed search system.  Google and LTech should now be required to return Market America to its status quo by reimbursing the money expended for the equipment and attempted implementation of this failed system.

III.    **THE COMPLAINT AND THE AMENDED COMPLAINT ASSERT A VALID CLAIM FOR UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER NORTH CAROLINA LAW**

   A.    **Delaware Conflict of Law Principles Will Determine Whether Delaware or North Carolina Law Applies to the Unfair and Deceptive Trade Practices Claim**

   Both Google and LTech seek to dismiss Count IV of Market America's Complaint, arguing that (a) Market America would lack standing to bring an action under the Delaware Deceptive Trade Practices Act; and (b) there can be no claim under the Delaware Consumer Fraud Act because there is no wrongful act alleged which took place in Delaware.  Although Market America acknowledges that it does not have a claim under Delaware's Deceptive Trade Practices Act or Consumer Fraud Act, such arguments are based on the incorrect assumption that Delaware law controls not only claims arising under the contracts between Market America and Google and LTech, but also Market America's claim under the Unfair and Deceptive Trade Practices Act.  Application of choice-of-law rules, however, will demonstrate that Market America's claim should be governed by North Carolina's Unfair and Deceptive Trade Practices Act.

   The Court will note that Market America did not plead the Delaware Deceptive Trade Practices Act or the Consumer Fraud Act in the Complaint or Amended Complaint.  Instead, the Amended Complaint refers to unfair and deceptive trade practices generally.  It was Market America's intent to argue and plead choice of law, specifically North Carolina choice of law, at the appropriate time.  If the Court determines that now is the appropriate time, it is clear that North Carolina law controls this Count.

To determine which state's law governs the controversy before it, a Delaware federal court sitting in diversity should apply Delaware choice-of-law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In both tort and contract actions, Delaware courts apply the "most significant relationship" test to determine which law applies to the dispute, assuming the laws of the probable jurisdictions in fact conflict with one another. *See Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc*., 394 A.2d 1160 (Del. Super. 1978); *Travelers Indemnity Co. v. Lake,* 594 A.2d 38 (Del. Super. 1991) (adopting Restatement (Second) of Conflicts § 145); *Gloucester Holding Corp. v. U.S. Tape and Sticky Products, LLC*, 832 A.2d 116 (Del. Ch. 2003). Section 145(1) of the Restatement provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties...." With respect to Market America's Unfair and Deceptive Trade Practices Act, the state in which the circumstances surrounding the unfair and deceptive practices actually occurred and the harm was incurred clearly has the most significant relationship to the underlying wrongful conduct. *See Bavarian Nordic A/S v. Acambis Inc.*, 486 F. Supp. 2d 354, 362 (D. Del. 2007) ("The factors that must be considered in the most significant relationship test are: (a) the place where the injury occurred, (b) the place where the conduct causing injury occurred, (c) the location of the parties, and (d) the place where the relationship between the parties is centered."). The law of North Carolina should apply.

### B.      Market America Has Stated a Claim under the North Carolina Unfair and Deceptive Trade Practices Act

A claim under the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA) is a substantive claim, the remedy for which is treble damages. *Jones v. Harrelson & Smith Contractors, LLC*, 670 S.E.2d 242, 251 (N.C. 2008). The UDTPA allows a claim for treble

damages where "the business of any person, firm or corporation shall be broken up, destroyed or injured." N.C.G.S. § 75-16. In order to state a claim under the UDTPA, the plaintiff must show: (1) defendant committed unfair or deceptive act or practice; (2) in or affecting commerce; and (3) plaintiff suffered actual injury as a proximate result of the defendant's conduct. *Walker v. Fleetwood Homes of NC, Inc.*, 653 S.E.2d 393, 399 (N.C. 2007); *see also* N.C.G.S. § 75-1.1(a). Plaintiffs can assert both UDTPA violations and fraud based on the same conduct or transaction, and successful plaintiffs may receive either punitive damages or treble damages. *Harrelson & Smith Contractors*, 670 S.E.2d at 252; *Compton v. Kirby*, 577 S.E.2d 905, 918 (N.C. App. 2005).

Market America has pled sufficient facts to state a claim against Google and LTech for unfair and deceptive trade practices under the North Carolina UDTPA. Market America satisfies the first element by alleging that Google and LTech engaged in deceptive acts by misrepresenting the capacity and ability of their GSA and search technology to handle certain transaction volumes at certain response times. The deceptive acts by Google and LTech were in and affecting commerce as they involved the sale of goods and services to Market America who sought to develop a search solution for an internet retail sales business. Finally, Market America expended significant sums of money in reliance on Google and LTech's representations and suffered additional damages as a result of the fraud. Therefore, Market America adequately pled that it suffered actual injury as a proximate result of the deceptive conduct of Google and LTech.

C.     **North Carolina Has the Most Significant Relationship to the Wrongful Actions Alleged.**

For cases involving fraud or misrepresentation claims, Section 148 of the Restatement (Second) of Conflicts lists contacts that are relevant to a choice of law determination. *Chase Manhattan Mortg. Corp. v. Advanta Corp.*, 2005 WL 2234608, at *12-13 (D. Del. 2005); *Brown v. SAP Am., Inc.*, 1999 WL 803888, at *6 (D. Del. Sept. 13, 1999). Those contacts include:

(1) the place, or places, where the [injured party] acted in reliance upon defendant[s'] representations,

(2) the place where the [injured party] received the representations,

(3) the place where the defendant[s] made the representations,

(4) the domicil ... place of incorporation and place of business of the parties,

(5) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(6) the place where the [injured party] is to render performance under a contract which [it] has been induced to enter by the false representations of the defendant[s].

*Chase* Manhattan, 2005 WL 2234608, at *13 (citing Restatement (Second) of Conflicts, § 148(2)).

Application of these contacts demonstrates that North Carolina has the most significant relationship to the unfair and deceptive trade practices at issue here, while Delaware has virtually no relationship at all with the conduct at the heart of Market America's claims. First, Market America acted in reliance upon the fraudulent representations of Google and LTech at its headquarters in Greensboro, North Carolina. Second, Market America received the misrepresentations in North Carolina. Third, Google and LTech made the representations in North Carolina. Fourth, Market America is a North Carolina entity with its principal place of business in North Carolina which weighs heavily in favor of North Carolina. *See Millett v. Truelink, Inc.*, 2006 WL 2583100, at *3 (D. Del. Sep. 7, 2006) (applying factors in § 148 and finding that "plaintiffs' residence is more important than defendant's for the purpose of determining which state's laws apply"). Of all the parties to this action, only Google is a Delaware entity but its principal place of business and operations are in California. Fifth, the "tangible thing which is the subject of the transaction," the GSAs and other equipment, were situated and housed in Market America's North Carolina headquarters. Taken together, these

contacts overwhelmingly point to the application of North Carolina law to Market America's unfair and deceptive trade practices act. *See id.* at *3 (applying the factors of Restatement § 148 and determining that Kansas law should apply despite a Delaware choice-of-law provision where the plaintiffs received the misrepresentations in Kansas, acted in reliance on the misrepresentations in Kansas, tendered their payment from Kansas and resided in Kansas).

Through its passage of 6 Del. Code § 2708(a), the State of Delaware has determined that when two parties agree that Delaware law shall govern a contract, that agreement "shall be conclusively presumed to be a significant, material relationship with this State and shall be enforced whether or not there are other relationships with this State." Enactment of this statute allows two parties to successfully agree that Delaware law will govern a valid contract, even where neither of the two parties are citizens of the State, or located in the State, or have any other relationship to the State. Yet § 2708(a) does not establish that Delaware's material relationship to a particular interaction between two parties automatically trumps the interests of other states with respect to the interactions at issue. The question for purposes of the Restatement, § 145 is which state has the "most" significant relationship to the occurrence and the parties. With respect to Google and LTech's unfair and deceptive trade practices, that state is North Carolina.

**D.**      **Delaware Law Does Not Govern the Entirety of the Parties' Relationship**

It was unreasonable for the parties to assume that Delaware law would apply to all aspects of the parties' relationship, even the tortuous non-contractual aspects, where none of the parties have their principal places of business in Delaware and all of the significant transactions were to occur in North Carolina, a state having its own consumer fraud laws to protect its citizens. *See Marshall v. Priceline.com Inc.*, 2006 WL 3175318, at *2 (Del. Super. Oct. 31, 2006) (holding that it was unreasonable for parties, residing in other states, to assume Delaware consumer fraud law would apply where the allegedly unfair or deceptive activity never occurred

in Delaware, especially when the states where the parties resided had their own consumer protection statutes to protect their own citizens). Where the parties to a contract have determined that Delaware law governs the contract, Delaware courts undertake to evaluate whether the language of the contract is sufficiently broad enough to encompass all other aspects of the relationship between the parties. *Gloucester Holding Corp. v. U.S. Tape and Sticky Products, LLC*, 832 A.2d 116 (Del. Ch. 2003) (noting "there are certain circumstances where courts have held that a broad choice of law clause in a contract could encompass tort claims that relate to contract formation.")

The governing law provision in the Services Agreement between LTech and Market America states:

> This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without regard to the conflict of laws provisions thereof ...

D.I. 21, Declaration of Donald P. Jacobs at page 5 of 48. Just as Vice Chancellor Lamb decided in *Gloucester*, a clause of this nature is simply not broad enough to encompass tort claims arising out of the contractual relationship. 832 A.2d at 124. Thus, with respect to the relationship between LTech and Market America, neither party had any reasonable expectation that tort claims arising from their interaction, or consumer protection claims, would be governed by Delaware law.

Admittedly, the boilerplate language that Google inserted into its license agreement is broader:

> This Agreement and any claim or dispute of whatever nature arising out of or relating to this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware and the federal U.S. laws applicable therein, without giving effect to any choice of law principles that would require the application of the laws of a different state.

D.I. 21, Declaration of Donald P. Jacobs at page 36 of 48. Such language would be more likely to be held by a Delaware court as encompassing tort claims arising from contract formation. *Gloucester Holding*, 832 A.2d at 124 (noting cases in other jurisdictions in which a choice of law provision claims to cover litigation that "arises out of" or "relates to" an agreement). The question in such an evaluation is whether the parties could have reasonably believed that a tort claim, or a consumer protection claim, would also be covered by Delaware law. Vice Chancellor Strine concluded in *Abry Partners v. L.P. v. F & W Acquisition LLC*, 891 A.2d 1032 (Del. Ch. 2006), in the context of a closely negotiated asset purchase agreement between two Delaware entities, that it would be "illogical" to assume that such parties "wished to have the enforceability of that contract judged by another state's law." 891 A.2d at 1048.

Yet in the context of the license agreement presented by Google to Market America, in which this boilerplate language was presented to Market America, it is not clear that a Delaware court would come to the same conclusion as Vice Chancellor Strine reached in *Abry Partners*. Indeed, as the *Abry Partners* decision itself notes, a party signing a contract with a boilerplate merger clause may not be surrendering all claims of misconduct against the party presenting the boilerplate. 891 A.2d at 1061 and fn. 73. Market America certainly did not understand itself to be surrendering all consumer protection laws of its home state by accepting Google's boilerplate language.

### E. North Carolina Has a Materially Greater Interest Than Delaware in the Determination of Market America's Unfair and Deceptive Trade Practices Claim

While LTech and Market America clearly did not agree that Delaware law will control any tort actions arising from their relationship, as discussed above, Google has a stronger argument that this is the case. However, even where parties to an agreement determine that Delaware law will control fraud claims, that is not the end of the enquiry. The Restatement

27

(Second), § 201 indicates that "The effect of misrepresentation, duress, undue influence and mistake upon a contract is determined by the law selected by the application of the rules of §§ 187-188."  In turn, under section 187(b) of the Restatement, where the application of the chosen state's law would be contrary to a fundamental policy of another state with a materially greater interest, the choice of the parties will not control the relationship.  North Carolina has such a fundamental policy interest in this case and its consumer protection laws should apply here to protect a citizen of North Carolina (Market America) who was defrauded in the State.

Although a choice of law provision may state that conflict of law rules should not be given effect, a choice of law clause can be held "'unreasonable' if, *inter alia,* 'enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or judicial decision.'"  *Organ v. Byron*, 435 F. Supp. 2d 388, 391 (D. Del. 2006) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).  Delaware adopts the choice of law principles set out in Restatement 2d, Conflict of Laws which add that "the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue" must be considered. *Organ*, 435 F. Supp. 2d at 391 (citing Restatement (Second) of Conflict of Laws §§ 6, 188 (1971)); *see also* Restatement (Second) of Conflict of Laws § 187 cmt. g (the "chosen law should not be applied without regard for the interests of the state which would be the state of the applicable law with respect to the particular issue involved in the absence of an effective choice by the parties").  Thus, in making a choice of law determination, Delaware courts must also consider "the public policy of the jurisdiction in which the actions of the [tortfeasor] cause harm." *Organ*, 435 F. Supp. 2d at 391 (citing *Playtex Family Products, Inc. v. St. Paul Surplus Lines Ins. Co.*, 564 A.2d 681, 689 (Del. 1989)).

In determining the choice of law in the current case, this court should consider the strong public policy interest of the jurisdiction in which the actions of Google and LTech caused harm, North Carolina. The North Carolina legislature declared a strong public policy interest by enacting the UDTPA, a statute establishing an effective private cause of action to protect aggrieved businesses and consumers in that state, such as Market America. *Harrelson & Smith Contractors*, 670 S.E.2d at 252; *see also Olivetti Corp. v. Ames Bus. Sys., Inc.*, 344 S.E.2d 82, 94-95 (N.C. App. 1986) (noting the original purpose of the statute included ensuring ethical conduct between businesses); *United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F. Supp. 1041, 1046 (E.D.N.C. 1979) (same). Additionally, section 187 of the Restatement suggests an important consideration in determining whether a state's policy is "fundamental" is the extent to which the significant contacts are grouped in that state. *Id.* § 187 cmt. g.; *see Financial Software Sys., Inc. v. First Union Nat. Bank*, 1999 WL 1241088, at *6 (E.D. Pa. Dec. 16, 1999) (applying § 187 and holding that North Carolina UDTPA should govern a contract whose subject matter was located in North Carolina and was negotiated, formed, and performed in North Carolina).

As demonstrated above, between Delaware and North Carolina, the state with the heaviest concentration of contacts to this transaction by far is North Carolina. Other than the interest established by Del. Code § 2708(a), Delaware has no interest in or connection to the subject matter or performance of the transaction at issue in this case. Therefore, applying a Delaware choice of law provision to govern Market America's unfair and deceptive trade practices claim in this case would deprive Market America of its opportunity for relief and erode North Carolina's strong public policy interest in protecting its businesses from being defrauded.

This erosion of North Carolina's fundamental policy interest is illustrated by the different outcomes when applying each state's consumer protection statutes to the conduct at issue in this

case. As Market America has previously acknowledged, due to the narrow scope of Delaware's Deceptive Trade Practices Act and Consumer Fraud Act, Market America does not have a claim under either statute. Google correctly argues that Market America is not a competitor of Google under the Deceptive Trade Practices Act. D.I. 18, Google's Brief at 17-18. In addition, Google demonstrates just how tenuous of a relationship Delaware has with this transaction by correctly pointing out that none of the unfair or fraudulent activity occurred in Delaware, a fact which is fatal to any claim under Delaware's Consumer Fraud Act. D.I. 18, Google's Brief at 19-20. Therefore, unlike North Carolina law, Delaware law affords Market America no protection against consumer fraud in this case, which strengthens North Carolina's policy interest in seeing its own consumer protection laws enforced. *See Stone Street Servs., Inc. v. Daniels*, 2000 WL 19009373, at *4 (E.D. Pa. Dec. 29, 2000) (finding that where Pennsylvania consumer protection law lacked a protection found in Kansas law, applying a Pennsylvania choice-of-law provision would "substantially erode the protections available under Kansas law"); *Financial Software Sys.*, 1999 WL 1241088, at *6 (refusing to enforce a Pennsylvania choice-of-law provision and applying North Carolina's UDTPA after finding that applying the much narrower Pennsylvania deceptive trade practices statute would leave the plaintiff without a claim and erode North Carolina's fundamental policy interest in ensuring the ethical conduct of businesses operating in North Carolina).

Applying Delaware law to Market America's deceptive trade practices claims would allow Google and LTech, with principal places of business in California and New Jersey, respectively, to hide behind a Delaware choice-of-law provision enabling them to skirt liability for consumer fraud perpetrated in any state, other than Delaware, where their customers reside

and consume their products. Delaware state and federal courts have found this scenario unacceptable.

In *Millet v. Truelink, Inc.*, this Court declined to enforce a Delaware choice-of-law provision as it was against public policy in a situation where it would shield a corporation from consumer fraud statutes of other states. 2006 WL 2583100 (D. Del. Sep. 7, 2006). In *Millet*, a Kansas resident, faced with a broad Delaware choice-of-law provision, brought a class-action Delaware Consumer Fraud Act claim against a defendant incorporated in Delaware but with its principal place of business in California. *Id.* at *1. The defendant sought to dismiss the claim, correctly arguing that the Consumer Fraud Act did not apply because none of the fraudulent conduct occurred in Delaware. *Id.* Due to the extremely narrow scope of the Delaware Consumer Fraud Act, the Court concluded that the enforcement of the Delaware choice-of-law provision in that situation would offend public policy because "[b]y maintaining its principal place of business in California and inserting a Delaware choice-of-law provision, defendant has attempted to insulate itself from liability against all statutory consumer fraud claims, except perhaps those brought by Delaware residents." *Id.* at *4. The Court declined to preside over such a result.

Similarly, in *Marshall v. Priceline.com Inc.*, the Delaware Superior Court held that it was unrealistic for citizens of other states to reasonably expect they would be protected by Delaware consumer fraud law when the allegedly unfair or deceptive activity never occurred within Delaware. *Marshall*, 2006 WL 3175318, at *2. Equally important, the court held it would offend those other states' public policy if a Delaware court allowed a corporation with its principle place of business in another state to draft a contract which insulated itself from the consumer fraud acts of the states in which its consumers reside when those states have their own

consumer fraud acts to provide protection to their citizens.  *See id.* (declining to apply Delaware

Consumer Fraud Act and citing to consumer protection statutes of Ohio and Utah, the states in

which the plaintiffs resided).

Because of the narrow scope of Delaware's deceptive trade practices and consumer fraud

statutes, applying Delaware law to Market America's deceptive trade practices claims would

offend public policy by immunizing the Defendants from the consequences of their violations of

North Carolina consumer protection laws.  Similar to the defendant in *Millet*, Google and LTech

are entities with principal places of business outside of Delaware which are attempting to use the

narrow scope of the Delaware Consumer Fraud Act to shield themselves from liability for

consumer fraud committed in a transaction that has virtually no connection to Delaware other

than a choice-of-law provision inserted into the contract.  As Google asserted in its attempt to

sidestep liability by virtue of Delaware's narrow consumer protection laws, none of the

fraudulent activity occurred in Delaware.  In fact, in the entirety of this transaction, no activity at

all occurred in Delaware.  The misrepresentations were received in North Carolina, the

misrepresentations were relied upon in North Carolina, the plaintiff tendered its performance

from North Carolina, the subject matter was situated in North Carolina, the harm occurred in

North Carolina, and the plaintiff resides in North Carolina.  Consequently, application of

Delaware's law of consumer fraud would impair North Carolina's fundamental interest in

ensuring ethical treatment of consumers in North Carolina.

In contrast to *Abry Partners v. L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1046

(Del. Ch. 2006), where all parties involved in the transaction at issue were Delaware entities, and

no other state had a compelling interest in protecting the rights of its citizens against misconduct,

(because the allegedly defrauded entity was based in Massachusetts but was a citizen of

Delaware), here North Carolina has such a compelling interest.  The North Carolina legislature declared a strong public policy interest by enacting the UDTPA, a statute establishing an effective private cause of action to protect aggrieved consumers in that state, such as Market America.  *Harrelson & Smith Contractors*, 670 S.E.2d at 252; *Bhatti v. Buckland*, 400 S.E.2d 440, 443 (N.C. 1991).

Applying a Delaware choice of law provision to govern Market America's non-contract claims in this case would contravene North Carolina's strong public policy interest.  Because Delaware has no material relationship to the transaction at issue, the conflict of laws principles should apply to determine what state's non-contract law applies.  Here, North Carolina's Unfair and Deceptive Trade Practices Act should govern Market America's deceptive trade practices claim because North Carolina has the most substantial relationship to the actions alleged and application of the Delaware choice-of-law provision would erode North Carolina's strong public policy interest in seeing its consumer protection laws enforced for the protection of a North Carolina citizen.

## CONCLUSION

For the foregoing reasons, Market America respectfully requests that the Court deny both

Defendants' Motions to Dismiss Market America's Complaint for Failure to State a Claim under

Fed. R. Civ. P. 12(b)(6).

<div style="margin-left: 50%;">

**MORRIS JAMES LLP**


_/s/ Richard K. Herrmann_
Richard K. Herrmann (#405)
Matthew F. Lintner (#4371)
Jody C. Barillare (#5107)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
rherrmann@morrisjames.com
mlintner@morrisjames.com
jbarillare@morrisjames.com
*Attorneys for Plaintiff*
*MARKET AMERICA, INC.*

</div>

Dated:  September 30, 2009