1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

   PERSONALIZED USER MODEL, L.L.P.,

4                                        :     CIVIL ACTION

             Plaintiff,                  :

5                                        :

             v.                          :

6                                        :

   GOOGLE, INC.,                         :

7                                        :     NO. 09-525-LPS

             Defendant.

8                              - - -

9                         Wilmington, Delaware
                       Tuesday, January 11, 2011

10                     *Claim Construction Hearing*

11                             - - -

12   BEFORE:        HONORABLE **LEONARD P. STARK**, U.S.D.C.J.

13                             - - -

   APPEARANCES:

14

15             MORRIS NICHOLS ARSHT & TUNNELL, LLP
               BY:  KAREN JACOBS LOUDEN, ESQ., and

16                  JEREMY A. TIGAN, ESQ.

17                  and

18             SNR DENTON, LLP
               BY:  MARK C. NELSON, ESQ.

19                  (Dallas, Texas)

20                  and

21             SNR DENTON, LLP
               BY:  MARC S. FRIEDMAN, ESQ.

22                  (New York, New York)

23
                    and

24

25                              Brian P. Gaffigan
                                Registered Merit Reporter

1    APPEARANCES:   (Continued)

2

3              SNR DENTON, LLP
               BY:   JENNIFER D. BENNETT, ESQ.
4                    (Palo Alto, California)

5                         Counsel for Plaintiff

6

7              POTTER ANDERSON & CORROON, LLP
               BY:   RICHARD L. HORWITZ, ESQ.
8
                     and
9
               QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
10             BY:   DAVID A. PERLSON, ESQ.
                     (San Francisco, California)
11
                     and
12
               QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
13             BY:   ANDREA PALLIOS ROBERTS, ESQ.
                     (Redwood Shores, California)
14
                          Counsel for Defendant
15

16

17

18

19

20

21                        - oOo -

22                   P R O C E E D I N G S

23             (REPORTER'S NOTE:  The following claim

24    construction hearing was held in open court, beginning at

25    10:08 a.m.)

1          THE COURT:  Good morning, everyone.  Let's start

2     by putting your appearances on the record, please.

3          MS. JACOBS LOUDEN:  Good morning, your Honor.

4          THE COURT:  Good morning.

5          MS. JACOBS LOUDEN:  For the plaintiffs, Karen

6     Jacobs Louden and Jeremy Tigan from Morris Nichols Arhst &

7     Tunnell; and I have with me here today Mark Nelson, Jennifer

8     Bennett and Marc Friedman from the firm of SNR Denton; and

9     we also have here with us today Yochai Konig who is one of

10    the inventors and a representative of the plaintiff

11    Personalized User Model.

12          Thank you, your Honor.

13          THE COURT:  Thank you.

14          MR. HORWITZ:  Good morning, Your Honor.

15          THE COURT:  Good morning.

16          MR. HORWITZ:  Rich Horwitz from Potter Anderson

17    here today for Google; and with me from Quinn Emanuel are

18    David Perlson and Andrea Roberts at counsel table; and then

19    behind the table from Google, in-house counsel, Laura

20    Majerus and John LaBarre.

21          THE COURT:  Well, welcome to all of you.  So

22    we're here this morning for the Markman hearing.  We

23    assigned both sides 90 minutes.  Have you any suggestions

24    as to how we split that time up and actually proceed?

25    Mr. Nelson.

```
 1              MR. NELSON:  Yes, your Honor.  The plaintiffs

 2   and defendants -- or plaintiff and defendant had talked

 3   earlier about proceeding, and I guess if you guys were still

 4   in agreement, we were just going to proceed with our

 5   affirmative presentation, reserving some time for rebuttal,

 6   and then they were going to proceed with their presentation.

 7              THE COURT:  Okay.  That's fine.

 8              MR. PERLSON:  That's fine.

 9              THE COURT:  Okay.  Then we'll hear first from

10   the plaintiff.

11              MR. NELSON:  Before we start, may we distribute

12   some materials?

13              THE COURT:  That would be helpful, yes.  Thank

14   you.

15              MS. JACOBS LOUDEN:  Thank you, your Honor.

16              (Binders passed forward.)

17              MR. NELSON:  Good morning, your Honor.

18              THE COURT:  Good morning.

19              MR. NELSON:  We're here today to talk about the

20   claim construction of Personalized User Model, LLP or PUM,

21   or "Pum" for short, versus Google.

22              For the Court's reference, I have the claims,

23   the three dependent claims at issue just on the board there.

24   So if the Court wants to look at the claims in total, the

25   Court may do so.  And I may refer to those every once in
```

1    awhile.

2              We have a lot of slides, as you have now seen.

3    What I plan to do is to try to hit the real highlights.

4    I'll probably skip through a lot of the slides.  There is

5    some legal stuff in there that is in the briefs.  There are

6    some other things in there that are sort of text summaries

7    of the argument, so I'll try to work through it rather

8    quickly, skipping some of the slides.

9              The presentation is organized into basically

10   seven parts.  We've divided the accused groups of terms in

11   order of steps and antecedent basis into sort of seven

12   somewhat related areas, and so the presentation is organized

13   into those seven areas and individual disputes about terms

14   or phrases within those seven areas are contained with that

15   part, so that is how it is organized.

16             Additionally, it's organized as _Phillips_

17   teaches.  First, we look at the claims.  Then we look at the

18   specification.  Then we look at prosecution history, if it's

19   available or relevant.  Then we look at extrinsic evidence,

20   to the extent that it's dictionaries or treatises at or near

21   the time of the patent.  And then, finally, inventor

22   testimony, to the extent it's relevant.  We don't think it

23   is, as we said in the brief.  We don't have any I don't

24   think in our affirmative presentation but for one slide that

25   doesn't relate to the definition of a term, it relates more

1  to introducing some concepts.

2          So with that, I'll go ahead and start.  And I'll

3  skip over a couple things here.  There are two asserted

4  patents, the '040 and the '276.  The title is Automatic,

5  Personalized Online Information and Product Services.

6  Yochai Konig is one of the inventors.  He is sitting back

7  here.

8          The patents identify several objectives which

9  we're going to skip through.

10         There are 15 asserted claims.  As I said

11 earlier, three independent claims that are here, and then

12 independent claim -- dependent claim 34 of the '040 depends

13 from independent claim 32, and so indirectly that one is at

14 issue, too.  I don't have a board for that.

15         Legal principles which of the Court is familiar

16 with, the only one I'll talk about is this one briefly.  As

17 in all claim construction cases, claims must be read in view

18 of the specification of which they are a part, but it is

19 improper to read limitations from the spec into the claims.

20         PUM's position is that its proposed

21 constructions conform to this and follow the first bullet

22 point and don't follow the second and the defendants is just

23 the opposite.

24         THE COURT:  There is a lot of reference to

25 figure 2 of the patent.  First of all, the specification is

1          the same for both patents; correct?

2                    MR. NELSON:  Correct, your Honor.

3                    THE COURT:  I think it was Google that said in

4          their tutorial that claim 1 of both the '040 and the '276

5          patents track figure 2.  To you agree with that?

6                    MR. NELSON:  Not completely, your Honor.

7          Because figure 2 doesn't talk about a search request at all.

8                    THE COURT:  Okay.

9                    MR. NELSON:  So figure -- may I approach?

10                   THE COURT:  Yes.

11                   MR. NELSON:  Both the boards of the '276

12         patent have receiving a search query from the user, step d,

13         retrieving documents based on that query.  And step d

14         here, collecting a plurality of documents of interest to

15         a user.

16                   So those are not in '040, claim 1.

17                   THE COURT:  And, therefore, they're not in

18         figure 2.

19                   MR. NELSON:  They're not in figure 2.  Exactly.

20                   THE COURT:  But other than that addition on the

21         search query, does figure 2 apply to the '276 patent?

22                   MR. NELSON:  Yes, generally I think that is

23         right.  Figure 2 is a preferred embodiment, but it would

24         apply to a lot of the activities that are going on in the

25         '276 as well.

1                   And so here is our seven groupings right here,

2       laid out, and I won't read them at this point.  I'm going

3       to address the first five; and then my colleague, Jennifer

4       Bennett, is going to address the other two.

5                   So this slide just sets forth what all the

6       disputes are, and on the left side is the relevant claim

7       language here.

8                   And so the first phrase term in dispute -- and

9       I'm on slide 9 -- is:  estimating parameters of a

10      user-specific learning machine.

11                  And within that dispute, there are several other

12      disputes.  Parameters, what that means; what estimating

13      parameters means; what learning machine means; what

14      user-specific learning machine means; and then what it

15      means, user model specific to a user; what it means to be

16      specific to the user or user specific in the context of

17      the '276 patent; and then ultimately what the user model

18      actually is.

19                  And so the first groupings I want to address are

20      parameters and estimating parameters.  But before getting

21      into that, I kind of want to set the stage as to what one of

22      the big overall disputes is.  And one of the big overall

23      disputes is -- I'll take my watch off here so I can time.

24      One of the big overall disputes is what it means to be

25      specific to the user.

1           According to our understanding of defendant

2    Google's position, each user model, each learning machine

3    must be "unique to the user."

4           Our understanding of what they mean by unique,

5    which I'm not sure that is correct but that's how we

6    interpret it, is that if I have a user model and my

7    colleague Jennifer had a user model, it would be, first of

8    all, unique, the one and only one to us, and its parameters

9    as defendant defines parameters being variables would be

10   unique.

11          So if you had variables in this context, are

12   you interested in sports, or to the degree that you are

13   interested in cars, they could a binary value or not a

14   binary value.  Google says those phrases, if you will, would

15   be the parameters.  And so the parameters of my learning

16   machine, of Jennifer's learning machine, of your Honor's

17   learning machine and a million other learning machines would

18   all be unique to an individual person, and they would all

19   have different parameters, different sets of questions.

20          That is very different from PUM's position.

21   PUM's position is that the claim language requires that the

22   user model in the learning machine be specific to the user,

23   meaning that there is a user model associated with the user

24   but the specificity is given by our definition of the

25   parameters which are the values and weights given to the

1    variables.

2             So my learning machine "am I interested in

3    sports" might be a 1.  Yes, I am.  Jennifer's might be a 0.

4    No, she is not.

5             Or if you take a non-binary, the degree of

6    interest in cars:  Mine might be a .6.  Jennifer is a car

7    buff.  She might be a .9.

8             It's those values that are the parameters and

9    it's those values that make the user models specific to the

10   user or the learning machine specific to the user.  That is

11   a big overall debate that runs through a lot of these

12   "learning machine" terms.

13           THE COURT:  And under PUM's construction, if two

14   people have precisely the same variables and values, let's

15   just say for now, is that within the scope of the claims or

16   not within the scope?  That is, if there happen to be two

17   that are completely identical, are they specific or are they

18   not specific?

19           MR. NELSON:  They would still be specific to the

20   user.  And, in fact, the specification, which I will get to

21   if I can get the right slide here, actually teaches that

22   exact embodiment.  I'll have to get to it in the order, but

23   the specification talks about two instances where that

24   embodiment is actually taught.  The first, when the user

25   models are initialized, a user can wear a hat or a prototype

1    user.  Well, in that case, if they're both being initialized

2    we would have the exact same user model.  So even though

3    there are two people that have the same one, it would be

4    specific to us because it's associated with us.

5                The specification also talks about at any

6    point in time, a user can choose a temporary profile or

7    a temporary hat.  And it gives an example of a venture

8    capitalist in Silicon Valley buying a birthday present for

9    his teenage daughter; and, in that example, he chooses the

10   profile, and here it the actual text here on slide 60.  He

11   chooses the profile of his or her teenage daughter at this

12   point.

13               Users can choose profiles on a temporary basis

14   for any session.  So any number of users can choose from, in

15   this embodiment, a particular set of predetermined profiles,

16   and if more than one user chose those temporary profiles at

17   the same time, they would have the same user model.  It

18   would still be specific to the user, but it wouldn't be

19   "unique to the user" as Google suggests.

20               THE COURT:  Well, what would be a nonspecific

21   profile?

22               MR. NELSON:  A nonspecific profile?

23               THE COURT:  Right.

24               MR. NELSON:  A nonspecific profile would be if

25   you had a situation like a group model, for example, where

1    you had -- or a clustering, as it's called, where you had a

2    whole group of users together for the purposes of

3    determining the interest in some particular topic.  That

4    would be a nonspecific user model.  And the patents talk

5    about that as a group model, for example, or a cluster

6    model.

7                    Can you type in slide 17?

8                    So let's talk about parameters real quick here.

9                    We define it as values and weights, as I said.

10   Google defines it as variables.  And then the phrase

11   estimating values or weights, we -- or estimating parameters,

12   we describe as estimating values or weights and Google

13   describes that as estimating a value or weight of each of

14   the variables, and then they have this "to calculate a

15   probability" language here on the bottom as well which is

16   disputed.

17                   So slide 17 summarizes the disputes for this

18   area.  And then I'll point out for the Court, too, we tried

19   to color the slide so we're talking about the parameters

20   term here in the broader "learning machine" terms and

21   phrases grouping.

22                   And so why are the parameters, weights and

23   values?  Well, first, because the claims mandate that they

24   be weights and values, that they're not the variables.

25                   And why do I say that?  Well, the claim language

1    is specific.  It talks about estimating parameters.

2              In the context of estimating, it's a

3    mathematical-type function.  Typical meaning of estimate,

4    calculate approximately, rough calculation.

5              When you estimate parameters, if you are talking

6    about parameters being the variable and the variable being

7    defendant's definition, how much do I like sports, it

8    doesn't make sense to talk about I like it very much or a

9    little bit or a lot or somewhat.  It only makes sense that

10   you are estimating the actual parameters if you talk about

11   it in terms of a number.

12             And so that is the first point with respect

13   to the claim language that indicates that it should be a

14   number, a value, a weight, not a variable as Google

15   suggests.

16             Secondly, the claims talk about using the

17   parameters to define a user model specific to the user.  And

18   they talk about, wherein the probability is estimated by

19   applying the identified properties of the document to the

20   learning machine having the parameters defined by the user

21   model.

22             And as we'll get to in a minute, a learning

23   machine, in our view, clearly is a function or a model.

24   Well, to make a function or a model specific to actually

25   allow it to calculate something, a probability, for example,

 1    or to define the user, it's got to be the values or the

 2    weights.  It can't be the variables.

 3           And this is a simplified version of what was

 4    in the tutorial.  The f of x equals a times x plus b is a

 5    template function.  By itself, it has, you can't do anything

 6    with it to calculate.  Google's position would be the a and

 7    the b are the parameters.

 8           If that is the case, if this is sort of your

 9    generic template learning machine before it's ever

10    instantiated with specific values so it's not user specific,

11    you can't calculate anything with that.  You can't estimate

12    probabilities with that.  Not until you have the values can

13    you perform those calculations.

14           And this just gives an example where A is 3 and

15    B is 2.  If those are my parameters for the degree I'm

16    interested in sports and the degree I like cars, and now a

17    document X about cars come in, the system can calculate,

18    estimate the degree that I'm interested in that document.

19    If parameters are the variables, it can't do that.

20           And this is a text from one document or one

21    book at the time of the patents dealing with one particular

22    preferred embodiment of the user model called the multilayer

23    perceptron, and the specification site is here.

24           While any nonlinear function may be used in a

25    user model (for example, a multilayer perceptron), a key

1    feature is that the parameters are updated based on actual

2    user reaction.

3            For the updating of the parameters here, again,

4    it teaches its values are weights.  This is the equation

5    from this page of the book.  You initialize the values and

6    weights, the parameters of the weights to small random

7    values.  You then run the initialized version of the

8    learning machine and you end up with some estimated

9    probability and you calculate the delta for the difference

10   with what you got versus what you expected.  You then take

11   the old weight plus the difference and you get the new

12   weight.  And that is how the thing updates and it learns.

13           Again, if these are not values and weights, if

14   they're I'm sort of interested in sports or I like cars a

15   lot, if the parameters aren't the actual values and weights,

16   this doesn't work.

17           And this is just more examples of the same

18   thing.  Starting with an initial guess for value W, the

19   stochastic approximation procedure for the parameter, the

20   weight.  Again, that was slide 21.

21           This is slide 22.  This is from Google's reply

22   brief.  Parameters take the form of vectors W.  Vectors W

23   are weights.  Again, semi-parametric regression.  Vectors W

24   are weights.

25           Further, the dependent claims mandate that their

1    values are weights.  This is dependent claim 18 and 49,

2    talking about where the parameters define the user model

3    comprise calculated distances between the user model and

4    user models of users similar to the user.

5              Again, the calculated distance here, they're

6    values, they're weights, they're not other things.

7              The specification supports that parameters

8    are -- values are weights.

9              Parameters must be tunable.  They're continually

10   updated.  They estimate a probability.  This tunability, the

11   ability to be continually updated, their use to estimate,

12   all again support they're values and weights and not

13   variables as Google suggests.

14             THE COURT:  Help me better understand why it's

15   not tunable if I go with Google's construction of parameters.

16             MR. NELSON:  Well, if we go back to the equation

17   that had those four steps, that is really what is describing

18   the tuning.  You are taking values or weights of how much

19   I'm interested in sports as a mathematical number.  And

20   as the system learns more about me, it changes that number

21   based on what it learns.  Maybe I'm more interested in

22   sports than I was last month.  Maybe I'm less interested in

23   sports than I was last month.  If the parameters aren't the

24   numbers, it can't really work that way.  There is nothing

25   for it to actually act on.

1          THE COURT:  Why can't it be changing the

2    variables?  The variable was I really like sports a lot and

3    now the variable changes to I don't like it so much.

4          MR. NELSON:  Well, I don't know how that system

5    would work if it was operating on categories or words

6    without actually being numerical values in there.  It

7    really couldn't estimate probabilities because ultimately

8    probabilities are estimated mathematically.  So if it's

9    trying to operate on words like that, it can't really tune

10    itself because it's just -- it would just be phrasing

11    different combinations of words, and the whole concept here

12    is based in mathematics.

13          I'm not sure if that answers your question.

14          THE COURT:  Thank you.

15          MR. NELSON:  This is just an example that Google

16    cited in the brief for why parameters are not -- are

17    variables.  Well, the indicator variables here in the

18    informative, this is a most preferred embodiment, they're

19    not parameters.  They're used to calculate parameters or

20    estimate parameters but they're not parameters.

21          And this table is, on the next column that

22    isn't cited in the briefing, but this shows how the

23    indicator variables are actually used in this most preferred

24    embodiment, and they go calculate the mutual information

25    between the user and the user's interest in the word Bob,

1    and those metrics are then used in this table and you end up

2    with a .16.  It's the .16 that is the parameters.  These

3    indicator variables that are used as part of the estimation

4    aren't parameters themselves and they're not kept.  They're

5    just used to calculate to estimate the end product and then

6    they're done.  And then it's done.

7           The last reason here why -- well, first, let's

8    take a look at their definitions, because their definitions

9    themselves of "estimating parameters" and "parameters" are

10   internally inconsistent.

11          They define parameters as variables here that

12   have a value, but then when they estimate them, you would

13   think you could just plug in the word parameter so it would

14   be estimating a variable having a value or weight, but

15   that's not what they do.  They say estimating a value or

16   weight.

17          And this is -- I apologize there is a typo on

18   the bottom here.  It should be "s".  (Indicating on bottom

19   of slide 26.)

20          But if you follow the normal rules of claim

21   construction where if you define a term and then you plug

22   that term into the bigger phrase, the claim should read:

23   estimating variables, having a value or weight ...

24          That isn't what they do.  And, again, this is

25   another evidence that they're being a little inconsistent

1    here.

2              So the second part of the parameters definition

3    is whether they're used to calculate a probability.  And I

4    won't spend too much time on this, but one test that I often

5    use in these things to determine whether somebody is trying

6    to read in something from the specification, whether it be

7    functional language or some other stuff, is if you take the

8    individual phrase and then you plug that definition of the

9    individual phrase like we just did in the last slide into

10   the bigger picture, and when you take the individual phrase

11   "parameter" here and plug it into the claim language, you

12   start to get, when you get into defendant's construction, a

13   lot of complication.

14             Plaintiff's construction is, estimating the

15   values or weights of the learning machine, wherein the

16   values or weights define user model ... and it goes on.

17             Defendant's construction, on the other hand, is,

18   first of all, estimating a value or weight of each of the

19   variables that are used by the learning machine to calculate

20   a probability.

21             Wherein, now we have rely on variables having a

22   value or weight that are used by the learning machine to

23   calculate a probability, define a user model specific to the

24   user wherein the variables having the value or weight that

25   are used by the learning machine to calculate a probability

1    or estimate.

2              That doesn't need to be there.  The

3    calculated -- the claim is clear, as we'll show here in

4    1E, the claim language says, wherein the probability is

5    estimated by applying the identified properties of the

6    document to the learning machine.

7              Hooking the calculated probability language to

8    the parameters definition, it's just an extraneous

9    limitation they're trying to read in.

10             So let's talk about learning machines.  Learning

11   machines has lots of disputes.  I'm only going hit a couple

12   of them in any kind of detail, and the rest of them I'll try

13   to just hit briefly.

14             The first dispute.  We say it's a model or

15   function.  The defendant says it's a program.

16             The second dispute.  Defendant said it contains

17   parameters used to calculate a probability.  That is from

18   their parameters definition.  We say it's used to make a

19   prediction or intelligent decision.

20             We got criticized heavily for the intelligent

21   decision language.  And in preparing for this presentation,

22   I'll get to it, but we can probably live without that

23   language being in there.

24             Whether it improves or whether it attempts to

25   improve.  The dispute here is really -- I'm not really sure

1    there is one, but to the extent improves means that every

2    time the learning machine runs through that it must get

3    better, we would dispute that.

4              The goal is that it gets better, and over time

5    it gets better, but on any given iteration of it, where you

6    are calculating -- going back to the first slide, where you

7    are calculating a delta wave, and then you add it to the

8    other wave.  Sometimes what the user is doing won't help

9    the learning machine learn more about it.  And so the

10   distinction here is whether it must improve every single

11   time or whether it just has to attempt to improve.

12             And then the last piece here is they propose

13   that it improves over time with the addition of new data or

14   in their most recent brief, monitored user interactions, and

15   we say it attempts to improve based on past observations or

16   experiences.

17             And the dispute here is really that the

18   monitored user interactions with data, it's better than the

19   new data definition but it still leaves out some important

20   things that the learning machine acts on.  And one of those

21   things is a set of documents associated with the user which

22   I will get to.

23             So let's talk briefly about some of these.  The

24   calculate a probability limitation.  Again, going back to

25   the example of, are they trying to read in something or not?

1           This is the definition now of (1)(c) when you

2     apply, or actually it's (1)(e), when you apply the learning

3     machine definition.  And it says, wherein the probability is

4     estimated by applying the identified properties of the

5     document to the program that contains parameters used to

6     calculate a probability, and wherein the predictive ability

7     of the program improves over time with the addition of new

8     data.

9           Okay.  A little clunky but not too bad.  But,

10    remember, they're using parameters here.  Well, parameters

11    has its own baggage associated with it.

12          So now the claim actually reads, if you follow

13    their construction, wherein the probability is estimated by

14    applying the identified properties of the document to the

15    program that it contains.

16          And this is the parameters definition:

17    variables having a value or weight that are used by the

18    learning machine to calculate a probability.

19          This is the rest of the learning machine.  Used

20    to calculate a probability and wherein the predictive

21    ability improves over time with the addition of new data

22    having parameters which also calculate a probability.

23          That is a lot of baggage for claim language that

24    is pretty clear.  Wherein the probability is estimated by

25    applying the identified properties of the document to the

 1    learning machine.

 2            The specification also does not support that you

 3    have to have this calculated probability language.  Learning

 4    machine contains tunable parameters again.

 5            It talks about any model that is a learning

 6    machine.

 7            I'll skip over a couple of these legal slides

 8    here.

 9            The model or function language.  The

10    specification is clear.  A learning machine may be a model.

11    While a specific embodiment of the learning machine is

12    discussed below, it is to be understood that any model that

13    is a learning machine is within the scope of the present

14    invention.

15            It is clear, learning machine can be a model.

16            Learning machine can be a function.

17            The user model, with its associated

18    representations, is an implementation of a learning machine.

19            The user model is a function.  A learning

20    machine can be a function.

21            Nowhere in any of the asserted claims except for

22    dependent claim 32 -- or independent claim 32 of the '040

23    patent is the word "program" ever used.  It's the only place

24    it appears.  There is no rhyme or reason why it should be,

25    why learning machine should be limited to a program in any

1    of these claims.

2             And, in fact, the use of the word program in

3    some claims strongly suggests that it shouldn't be

4    limited to programs in other claims.  I think that is

5    Liebel-Flarsheim, among other cases.

6             So the new data versus monitored user

7    interactions, I'll go over this just quickly.  This is the

8    Google brief where they offered to compromise.

9             The problem with that is it reads out, first of

10   all, a set of documents associated with the user.  And the

11   reason it reads that out is because it's clear from the

12   claim here.  And this is claim element B of the '040 --

13   claim 1 of the '040 patent.  The updated user-specific data

14   file, or -- the estimated parameter of the learning machine

15   wherein the parameters define the user model specific to the

16   user, and wherein the parameters are estimated in part from

17   the user-specific data files.

18            So what this teaches is that the parameters and

19   the learning machine, it must be estimated in part from the

20   user-specific data files.  Okay?

21            Well, what are the user-specific data files?

22   Well, they are the monitored user interactions with data.

23   That's what Google suggests; and we're fine with that part

24   of it; but they're also a set of documents associated with

25   the user.  The monitored user interactions wouldn't

1   encompass that.

2          Nor would the monitored user interactions

3   definition encompass world knowledge, which also can be

4   built into the user model, which I will talk about in

5   connection with another element shortly or other uses

6   such as cluster data that the user model uses in some

7   circumstances.

8          So for that reason, although we think monitored

9   user interactions is better, it still is too narrow.  We

10  think our past observations and experiences language better

11  capture that.

12         Attempts to improve versus improve, we talked

13  about that.  The specification talks about optimizing,

14  again, suggesting, you know, attempts to improve as opposed

15  it must improve every time.

16         The intelligent decision language, we talked

17  about that.  And in looking up the definition of predict, we

18  just decided that the prediction was enough even though

19  other sources define learning in the context of intelligent

20  decisions as well.

21         So unique versus specific.  That, we talked

22  about earlier.  What does it mean to be unique versus

23  specific?  Well, this is the user-specific learning machine

24  that we kind of had up before.  I got a little bit ahead of

25  myself.

1          So the "user-specific learning machine" is the

2     next term or phrase at issue.  What is really at issue

3     there, we talked about what a learning machine actually is.

4     So the definitions here, their definition is it must be a

5     learning machine unique to the user.  Ours is our same

6     definition of learning machine but it must be based on past

7     observations or experience specific to the user.  And just

8     to adopt Google's shorthand version here, learning machine

9     specific to the user.  So this is -- the debate here is the

10    unique versus specific, and we'll discuss this in connection

11    with the user model.

12          And so the definition of a user model -- and

13    this is on slide 53 -- is an implementation of a learning

14    machine updated in part from data specific to the user.

15    That comes out of the claim language.

16          Google's definition is a model unique to the

17    user, that is created and updated by the learning machine

18    and stored in a data structure.

19          So the three disputes:  specific versus unique,

20    whether it's an implementation of a learning machine or

21    created and updated by a learning machine, and then whether

22    it's stored in a data structure.

23          We talked about the present invention stuff a

24    lot in the briefs so I'll skip over that.

25          The claim -- well, so we start with the claims.

1   Well, the claim language talks about specific.  User

2   specific, user model specific.  It doesn't say unique.

3   Nowhere in the claims is the word unique ever used.  Strong

4   evidence that specific shouldn't be unique.

5           The specification repeatedly indicates that the

6   preferred embodiment Personal Web is associated with the

7   user, represents the user, but it doesn't ever say that it

8   is unique to the user:

9           Personal Web stores for each user a user model.

10          User model represents the user's information and

11  product interests.

12          Stores parameters that define the user.

13          Talks about individual user model for user u may

14  be applied to a cluster of users.

15          Again, there is nothing there that says it has

16  to be unique to the user.  We talked about this at the

17  start, the hats.  The specification with the hats teaches

18  specifically that two users can have the same user model at

19  any given point in time, whether on initialization, whether

20  they're wearing a temporary prototype or temporary profile

21  hat or, I suppose, if two people wanted to run the exact

22  same searches, from the same place, they might end up with

23  the same profile in such an extreme example.  But the

24  specification clearly shows that these user models in this

25  context are not unique, meaning the one and only and unlike

1    anybody else all the time.

2            In fact, the specification uses unique only once

3    in the entire specification.  And it uses it in this

4    context:  The user model represents the user interest in a

5    document independent of any specific user information need.

6    This estimation is unique to each user.  In strict

7    mathematical terms, given a user u and a document d, the

8    user model estimates the probability.

9            And so even the usage of unique here is talking

10   about, well, it's making a probability estimate for a user

11   model unique to a user model, not necessarily that it might

12   not be the same estimation if both people are wearing a

13   temporary hat, for example, or a temporary profile.  That

14   is the only time the specification uses unique; and, in our

15   view, that does not mean that the user model itself must be

16   individualized and unique and unlike any other model as

17   opposed to associated with.

18           Now, in reality, in our patent most of the

19   models would probably be unique because the parameters which

20   define the user model and the user specific learning machine

21   would be likely quite different for each individual.  They

22   just don't have to be.

23           And this is some general dictionary definitions:

24           Specific:  having a fixed relationship to;

25   restricted by nature; explicitly set forth; definite;

1   relating to, characterizing, or distinguishing.

2            Right here is likely where Google is going to

3   rely on the unique language, special, distinctive or unique.

4   I don't think that means in the context of this general

5   dictionary that specific equals unique like they say in this

6   context.

7            Definition of specific:  being the one and only.

8   I'm sorry.  Definition of unique:  Being the one and only.

9   2:  being without a like or equal.

10            Again, reading the entire specification in the

11   claim language, we certainly believe that it's clear that

12   the unique language that Google is seeking is not the proper

13   construction here.  The claim language uses the word

14   "specific" and that is how it should be construed.

15            And implementation of a learning machine versus

16   a learning machine or versus created by a learning machine.

17   This is a little piece of the animation from the tutorial.

18   What is intended to be represented here is this is the user

19   specific data files for this user AB15Z3DI-JS.

20            While the specification shows the learning

21   machine user model here, the user model specific to the user

22   comes in part from this, these user specific data files

23   which are up here.  And so here we see the more complicated

24   function from the tutorial that is the user model here,

25   specific to the user because there is the parameters, these

1   values, and so when this things defines a user model, it's

2   not defined by the learning machine, it's obtained by, at

3   least in part, the user specific data files.  And there you

4   see them kind of dumping into the funnel whatever the

5   calculations that are done to then update the parameters of

6   the user-specific learning machine or of the user model

7   specific to the user.  New parameters, new values.  New

8   values here, new parameters.  And, again, that demonstrates

9   in our view that the updating -- the user model is not --

10  the updating is not being done by the learning machine which

11  is what Google suggests.

12          And the specification also teaches that the

13  user model, with its associated representations, is an

14  implementation of a learning machine.  And the

15  specification -- I'll go through the next set of slides 67

16  through about 71.  But you mentioned 72 earlier, and all the

17  text describing figure 2 and that embodiment talks about the

18  user model being the thing that estimates the probabilities,

19  and that is the learning machine in the claims.

20          First, it's initialized.  Then it's updating the

21  parameters.  That is what we just saw with the slide with

22  the funnel.

23          Finally, Personal Web 12 applies the user model,

24  to unseen documents, which are first analyzed in step 36, to

25  determine the user's interest in the document, based on step

1   38.

2           That is the analyzing block of figure 2 which is

3   sending the documents to the user model specific to the user

4   to estimate a probability.

5           The user model represents the user interest in

6   the document independent of information need.

7           We talked about this estimation is unique to

8   each user.  In strict mathematical terms, given a user u and

9   a document d, the user model estimates the probability

10  P(u/d).

11          If a user model is not an implementation of a

12  learning machine specific to the user, that functionality

13  just doesn't really work.  So this is another reason why

14  PUM's definition should be adopted.

15          And this is figure 2, just kind of go through

16  the steps that we talked about.

17          I'm going to skip over.  This is what Google

18  will likely rely on as a counterargument and if we have to

19  address this in rebuttal, we will.

20          So it's stored in a data structure.  The

21  specification doesn't require how this thing is stored.  It

22  may be stored in a data structure.  We don't dispute that.

23  Specification says it's a function that may be implemented

24  with any desired data structure, and that is not tied to any

25  specific structure or representation.

1           "Or representation" language here suggests other

2    types of representations, but even if you read it as Google

3    suggests, this is still one preferred embodiment, and the

4    claim shouldn't be limited to that preferred embodiment

5    based on, you know, there is no disclaimers here that it

6    must be a data structure.  There is nothing to rely on the

7    defendants or the plaintiff has done, I should say, to limit

8    the storage mechanism here.  This is just an attempt to read

9    something in, how the thing is stored as opposed to what it

10   is and should be rejected.

11          So let's talk briefly about user and

12   user-specific data files in particular.

13          User is used throughout the claims.  The

14   definitions of the parties, the first part we're in

15   agreement on.  The second part is where the dispute arises.

16   The person here in an electronic system isn't inside the

17   computer.  They're represented by something.  And we call

18   that something an electronic tag or identifier.  We could

19   have called it a cookie, too, or other things, but someone

20   of ordinary skill in the art in 1999 would understand that

21   in an electronic system, a person isn't in there, they're

22   represented by some electronic identifier to the system and

23   that is all our definition is trying to suggest here.

24          And we start out, the claims refer to the user u

25   in a couple different places.  And the user u is defined as

1    the user and his or her associated representation are

2    denoted with u.  In our view, user u there, which

3    defendant's antecedent basis argument argues is the same as

4    user, includes the identifier.

5         THE COURT:  Well, they argue that that language

6    actually undercuts you because it distinguishes between user

7    and the associated representation.  Therefore, the user

8    isn't the associated representation.

9         MR. NELSON:  Yes.  I can understand that point

10   of view, but I don't think that point of view is correct.

11   It says the user and the associated representation, meaning

12   that it's the user u here is both.

13        THE COURT:  So then what about if we construed

14   it as this user is a user or the associated representation?

15   That is, it's a person sometimes and other times it's an

16   associated representation.

17        MR. NELSON:  I think that would be fine, as

18   long as the associated representation language is in there.

19   Because what we expect they're trying to do and what we

20   learned from their deposition testimony is that they're

21   going to take a position that they don't personalize to a

22   user, they personalize to a cookie.  And, you know, I don't

23   know the last time a cookie had a credit card to buy

24   something from an ad, for example, but that is why this is a

25   valuable thing for them.  So if you construe this as the

1    user is a person or a tag or an identifier, the plaintiff is

2    fine with that.

3           THE COURT:  Now, not only are you fine with it,

4    isn't that a fairer reading of this patent because your

5    patent talks about users writing e-mail, reading e-mail,

6    playing games; you know, when was the last time a computer

7    wrote an e-mail all on its own?

8           MR. NELSON:  I'm not sure I can answer that if

9    it was in 1999 or not.  But I see your point, your Honor.

10   And I guess that even in the context that you just gave,

11   the user writing e-mail, what is seen inside the computer

12   isn't the person writing the e-mail, it's some electronic

13   identifier associated with the person that is sending the

14   e-mail out and is recognized on the other end as this

15   person's electronic ID, and the system then translates that

16   into a person's ID.

17          So I think either definition, PUM's definition

18   or the alternate definition you proposed is an accurate way

19   to describe this.

20          And this is a document just from Google that I

21   put up there just to show that even Google agrees that one

22   of ordinary skill in the art understands that users are

23   electronic identifiers.

24          User-Based Ads Quality.  The user is defined as

25   a prefid or pref-ID cookie.

1          So let's talk about user specific data files.

2          May I ask how much time I have left?

3          THE COURT:  You started at 10 after 10:00, so

4    ...

5          MR. NELSON:  So I'd better hurry.

6          User specific data files.  This is, the dispute

7    here is data files.  Whether they're files and whether they

8    must be unique.  We already talked about unique, so let's

9    talk about files.

10         Well, the claim specifically defines what user

11   specific data files are.  It says the user specific data

12   files -- and I'm on slide 91 here -- they comprise the

13   monitored user interactions with the data and a set of

14   documents associated with the user.

15         This is a recent Federal Circuit case, and you

16   can take this holding and you could put in our claim

17   language and it's verbatim:

18         The "controlling language could hardly be

19   clearer", where the claim recites "a user-specific data

20   files comprising the monitored user interactions with data

21   and a set of documents associated with user."  The claim

22   language is unambiguously defined as what comes after the

23   comprising.

24         That's the end of the inquiry, your Honor, as

25   far as we're concerned.

1          THE COURT:  Does comprising always constitute a

2   definitional term?  You know, whenever a patentee uses

3   comprising in a specification, they're being their own

4   lexicographer?

5          MR. NELSON:  I wouldn't say always, but I think

6   where it's used specific in claim language like this, it

7   does.

8          And there are other cases cited in our brief as

9   well that show that the courts, when the word comprising

10  is used as part of a claim element internally, and it says

11  element X comprises elements Y and Z, that that is

12  definitional language.

13         And the specification is consistent with that.

14  It talks about a set of documents; and here it uses end

15  products associated with the user as well, being that

16  comprising is open-ended.  So it defines at least -- well,

17  the claim in this case tells exactly what it is.  The

18  specification contemplates that it could be more but it

19  is at least what the claim says it is.

20         Now I'm going to just talk about this real

21  briefly and then I will skip over to the next element.

22         The dispute here on monitored user interactions

23  with data, we don't quite understand what defendant is going

24  to contend they are.  The collected information piece that

25  we have here is in there to get the idea that what is going

```
 1   on here is the user is out there and doing stuff on the
 2   web, and that there is information, there is data that is
 3   collected, and that data is then what goes into the table
 4   like you saw above the funnel.  That is data.  That is
 5   collected information.
 6          And so what we want to be clear is that what is
 7   going on is that the data is collected.  It's not you've
 8   just got the monitored user interactions with data.  What
 9   the monitor user interactions mean here is the collected
10   information about what the user did in step A, the
11   transparently monitoring step, is generating data, and
12   what those, what that data is, is the monitored user
13   interactions.  That is really where the dispute arises.  And
14   we think that is clear from the claims.
15          Set of documents associated with the user.  The
16   only dispute here is document.  This is both parties
17   definition of document and so I'll just skip to that.
18          So document, text or any type of media versus
19   any type of electronic file.
20          The real dispute here is whether or not the
21   document storage mechanism in Google's case, whether the
22   document should be defined by how it is stored, basically.
23   Google says it's an electronic file.  We agree it's
24   electronic.  It's an electronic system.  But it doesn't have
25   to be a file.
```

1              In 1999, it was well known that you could have

2      dynamically generated web pages, dynamically generated

3      search results.  Their file definition would rule that out,

4      and that is what we think is wrong.

5              The spec defines it as not just text but any

6      type of media.  It doesn't say that it has to be files.

7              THE COURT:  Does it include always lexicographer

8      language when I see it in a patent?

9              MR. NELSON:  Not necessarily.  I would say this

10     is strong evidence that the term "document" should be

11     construed to be text or any kind of media, at least.  And

12     that is the position we took in the brief.  It doesn't say,

13     per se, the document is.  I'll agree with that.  But I

14     think, looking at the remainder of the specification, it's

15     clear that the document shouldn't be confined to how it is

16     stored.

17             The first evidence of that is that the user in

18     the initialization phase may supply documents not included

19     in browser files.  They may not be files.

20             But, more importantly, in other aspects here, it

21     talks about search results that are visited following a

22     search query, websites that the user visits independently as

23     being examples of positive interactions with documents here.

24             Well, search results that are viewed in

25     websites, at this time it was well understood that you could

1   dynamically generate these types of activities, and that is

2   what the dispute here is really about.  We think that the

3   fact that these things are included in here would be enough

4   to teach one of ordinary skill in the art, and one of

5   ordinary skill in the art would understand that the term

6   "document" here encompasses more than stored files.

7          And this is another cite from the specification

8   on slide 109, talking about sending the user model to

9   third-party websites, which then evaluate their dynamic

10  content, like cnn.com, for example.  They very often are

11  changing content against the user model to decide whether to

12  push information back to the user based on personalization,

13  and those types of systems operate on dynamically generated

14  information.

15         I'll skip over this.  This is just the figure

16  that they cite.  This talks about how documents are parsed.

17  It doesn't say they must be stored as files.

18         Unseen document, I want to spend a little more

19  time on.  The dispute here is whether an unseen document

20  must be seen by -- must be unseen by the user or must be

21  unseen by anybody ever.  And the specification is clear that

22  the unseen document here needs only to be unseen by the

23  user, and it doesn't need to be unseen by everybody.

24         The claim language starts making that clear

25  right from the front.  It talks about a user.  It doesn't

1    talk about this claim being applied to multiple users here,

2    the documents that are unseen here; thus, the whole claim is

3    in the context of a user.

4            The claim 7 talks specifically about, wherein

5    the identified properties of the document d comprise a user

6    independent property selected from the group consisting of.

7    And then I, J and K of slide 116 here all talk about other

8    users having seen the document d.

9            Now it's interesting because defendants

10   antecedent basis argument again suggests that document d is

11   the same document, no matter what.  Well, in this case, an

12   unseen document would definitely be seen by other users and

13   their definition can't be right.

14           The specification contemplates also, I talked

15   about world knowledge earlier.  That world knowledge is

16   incorporated into the user model.

17           Well, what is world knowledge?  Well, it's a lot

18   of things but one things it includes is the number of users

19   who have accessed the document, whether they saved it to a

20   favorites list, whether they previously have been interested

21   in the document, all of which tells you they've seen it

22   before.

23           Again, it's unseen by the user, not by anybody.

24           The specification language also talks about

25   unseen documents in the context of the user, it's single,

 1   not everybody.

 2           I want to talk briefly about -- I mean the

 3   argument that defendants really make here is that somehow in

 4   addressing the Gerace reference in the prosecution history

 5   that PUM has disclaimed the idea that the document must be

 6   unseen by the user and somehow it must somehow disclaim it

 7   so it requires, the only possible construction is the

 8   document must have been unseen by any user, and that isn't,

 9   that isn't at all what Gerace was about.

10           May I approach the board here real quickly?

11           THE COURT:  You may.

12           MR. NELSON:  So what the Gerace system was, was

13   the Gerace system was a system that identified the user

14   interest in a fixed set of categories by finding similar

15   users among the existing set of users within those types of

16   categories.

17           So you had a group of other people, let's take

18   the example, that are Philadelphia Eagles fans.  That is

19   your category.  And that group is shown a bunch of ads, and

20   those ads are given scores; and for other users that would

21   fit into the Philadelphia Eagles interest category, the

22   system in Gerace knows we're going to serve these ads out to

23   this Philadelphia Eagles user because all the other users

24   that are Philadelphia Eagles fans, they like these ads, too.

25           Well, in Gerace, it makes sense that an ad that

1    had never been seen or only had been seen by a couple of

2    people, really, there wasn't enough data on it to make a

3    prediction because the group of users that were the

4    Philadelphia Eagles fans, the category of people that were

5    Philadelphia fans here, they wouldn't have enough data for

6    Gerace to make the prediction.  So the predictions in Gerace

7    are based on other people's views, other people's interests

8    that the system deemed were similar to the users.

9            The system in this patent is completely

10   different.  The system in this patent is based on the

11   information learned about the user and herself.

12           And so the user doesn't care whether anybody

13   else has seen the document, or whether they have.  The user

14   cares about -- the system cares about what this user and

15   whether this user would be interested in the document.  It's

16   really an apples-and-oranges system.

17           And so the language here is talking about:  In

18   other words, it is not taught, nor is it suggested how the

19   first set of users or the first user is presented with an

20   unseen document or an unseen ad in Gerace.

21           It's apples an oranges because the system here

22   can deal with that.  That is what the whole thing is about.

23   It's about learning about the person in the form of the

24   specific learning machine, or the specific user model.

25   Gerace doesn't deal with that issue so it's different, as

1    the applicant suggested.

2           But there is no disclaimer here or anything else

3    that would limit the meaning of unseen document to a

4    document that had not been seen by anybody.  And that is why

5    in the briefs, your Honor, we said that all the cases they

6    cite, they weren't even applicable.

7           THE COURT:  Well, I think are saying this but

8    try to help me understand it this way.  Under your

9    construction of unseen document, how is your invention and

10   improvement over Gerace of what was in the prior art?

11          MR. NELSON:  Well, our invention is -- one way

12   that it is improvement over what was in the Gerace and what

13   was in the prior art is our invention was built upon what

14   the system learns about the individual.  And so the user

15   model is specific to the user having the parameters, as I

16   said earlier, that are my values.  How interested am I in

17   the Philadelphia Eagles?  The Gerace system doesn't care how

18   interested I am in the Philadelphia Eagles.  All it cares

19   about is whether I fit into a predefined category and what

20   ads other users that fit into that predefined category like.

21   That's it.

22          And so our system is a great improvement over

23   Gerace because it models on what our users actually -- what

24   it learns about our users.  So our system, it can deal with

25   a document not seen by anybody, it can deal with a document

1    not seen by one person, it can deal with a document seen by

2    a hundred million people.  The unseen document is just

3    unseen with respect to us.

4         All right.  We'll go through the "probability"

5    terms real quickly here.  The degree of belief or likelihood

6    versus percentage chance is what the dispute is.

7         To really put this dispute into context, you

8    need to sort of understand the two approaches to probability.

9    There is a Bayesian approach, which it's undisputed the

10   patents are about and a frequentist approach.  And this is

11   Mr. Konig's testimony where he talks about the frequentist

12   approach here and the Bayesian approach, and that is on

13   slide 128.

14        The patents clearly are the frequentist

15   approach.  Nobody disputes that.  And for the specification,

16   on the frequentist approach, it's also estimating a probability

17   which suggests less preciseness than a percentage chance to

18   begin with.

19        But if you look at the applicable text, again,

20   specification talks about estimating probabilities, which

21   is consistent with Bayesian versus calculating, which is

22   another dispute that I will skip over.  Looking at

23   statistics most of the time, learning machines and Bayesian

24   statistics express probabilities as beliefs, as likelihoods,

25   as approximations.

1                You then want to find a way of expressing your

2        beliefs about data, taking into account both your prior

3        beliefs and the data ... but it will turn out that if we can

4        collect enough data, then our posterior beliefs will usually

5        become very close.

6                The Role of the Learning Machine.

7                The problem encountered by the learning machine

8        is to select a function from a set of functions that best

9        approximates the system's response.

10                The quality of the approximation produced by the

11        learning machine is measured by the loss or discrepancy

12        between the output produced at a given point X.  That is

13        kind of going back to the figure with the equation, the

14        three pieces pulled out before.

15                Again, this talks about approximations, about

16        estimations, not strict percentage chances that are

17        frequentist approaches.  Tellingly, the specification --

18        neither the specification nor the claims ever uses the

19        term percentage chance.  And although the claim, the

20        specification does talk about calculating and estimating

21        probabilities, for the most part the specification uses

22        estimating and the claims consistently, and only, use

23        estimating.

24                Some general dictionary definitions.  And this

25        is the one point I want to make here because this likely

1    what the defendants will rely on, what they relied on in

2    their briefs.

3           General dictionaries here support our meaning,

4    but they also do support defendant's meaning.  And it talks

5    about in both the statistics and the math context here in

6    a general dictionary being the frequentist approach, the

7    percentage approach.  But what I tried to show here is that

8    this is complicated stuff and a general dictionary for the

9    purposes here just doesn't cut it like a book about actually

10   learning machines and data.

11          The ones that talk about learning machines and

12   data specifically speak about probabilities in the context

13   of likelihoods or beliefs which is more consistent with our

14   definition -- which is consistent with our definition.

15          And this is just a slide about the frequentist

16   approach and what it's generally applicable to:  coin flips,

17   dice, things that you have long runs that you can basically

18   estimate odds for, not for how interested are you in the

19   Philadelphia Eagles versus how interested am I in the

20   Philadelphia Eagles.

21          Approximating or roughly calculating.  We'll

22   skip through that.

23          Posterior probability.  The definition here, the

24   dispute here is they really have a new knowledge piece.  We

25   dispute that.  The claim language is clear.  I'll skip

1    through that as well other than just point to the

2    specification and say here, posterior probability is

3    mentioned specifically.

4           Last piece I want to address here is

5    indefiniteness.  There are two, three phrases they claim are

6    indefinite.  The one I want to focus is on documents of

7    interest to the user, and documents not of interest to the

8    user.

9           The legal standard is very high.

10          The defendants presented no declarations or

11   anything that says someone of skill in the art can't figure

12   this out.

13          I want to address their argument really head on

14   because their argument is based on the Datamize case.  And,

15   Datamize, as your Honor might remember, the phrase was

16   "aesthetically and the District Court found that phrase

17   indefinite, and the Federal Circuit upheld that.  And the

18   reason the District Court found that indefinite and the

19   Federal Circuit upheld it was because the specification

20   didn't provide any guidance whatsoever as to what

21   aesthetically pleasing actually was.

22          The invention in Datamize was a kiosk that

23   you designed sort of the interface to, and there was a

24   requirement that that interface be aesthetically pleasing.

25          So the specification -- this is slide 153.

1    This is a portion of the patent in suit in <u>Datamize</u>.  The

2    specification doesn't provide much guidance as to how to

3    interpret what aesthetically pleasing is or not.  It just

4    says, well, you do it by taking into account the considered

5    opinions of aesthetic design specialists, database specialists,

6    academic studies on public access kiosk systems, user

7    preferences and some other stuff.  There isn't a lot of

8    guidance there that somebody designing a system could

9    objectively look at and find out what is aesthetically

10   pleasing and what isn't.

11          Our situation is completely different.  The

12   specification does provide objective guidance here as to

13   what is or is not a document of interest to the user.

14   Specifically, the specification says, search results that

15   are visited following a search are documents of interest.

16   Documents saved in the user favorites or bookmarks.

17   Websites that the user visits independently of search

18   queries.

19          Negative examples are documents that are not of

20   interest, search results that are ignored although they

21   appear at the top of the search result, deleted bookmarks,

22   and ignored pushed news, for example.  All of those are

23   objective measures that one of ordinary skill in the art or

24   would teach one of ordinary skill in the art what was or was

25   not of interest to the user according to this system.

1            The specification doesn't stop there.  It talks

2     about degrees of interest.  And in looking at the

3     interaction type -- oops -- looking at the degree of

4     interest, whether it was positive or negative.  For example,

5     whether it was saved in the bookmarks file.  How long the

6     user spent viewing it.  Whether the user followed links in

7     the document.

8            Again, these are objective measures.  In 1999,

9     there was certainly data out there that said, well, if a

10    click is this amount of time, it's a good click.  If it's

11    less than that amount of time, it's a bad click.  How many

12    bookmarks?  Did they bookmark it?  Did they follow links?

13           All these are objective things that someone of

14    ordinary skill in the art would look at and say, okay, I

15    know what is of interest or what is not of interested based

16    on the guidance.

17           THE COURT:  If the claim term were interesting

18    as opposed to of interest to the user, do you think that

19    might be subjective and, therefore, ambiguous?

20           MR. NELSON:  I think it could be.  I mean I

21    think certainly what our view is what they're trying to do

22    is they're trying to read this subjectivity into the claim,

23    and the system here is designed, as computer systems must

24    be, to operate in an objective fashion.  It lists objective

25    measures of what would be of interest.  If it did require

1    this must be interesting to the user, that is probably a

2    little bit closer call because what is interesting to the

3    user might read the users into it a little bit more, but I

4    think still there is enough guidance here as to what would

5    be interesting or what would not be interesting to the user

6    based on the objective metrics that are in the specification.

7              And the specification doesn't stop there either.

8    It provides a method and teaches that you can have any grade

9    between 0 and 1.  Another example of something that would be

10   of interest, a website that the user accesses at a frequency

11   greater than a predetermined threshold.

12             All of these things would teach someone of skill

13   in the art what it actually means to be of interest or not

14   of interest to the user.  And for those reasons, we think

15   that this claim should not be found indefinite in any way,

16   shape or form.

17             THE COURT:  Is that a legal issue I need to

18   reach now on Markman?

19             MR. NELSON:  In our briefs, your Honor, we took

20   the position that it wasn't really a legal issue that you

21   needed to reach now.  We think if you want to rule that it

22   is definite, we certainly wouldn't object to that, but if

23   your Honor wants to hold that open until a later time, you

24   know, that is obviously your Honor's decision.

25             And this is the Vikase case that I cited in the

1    briefs.  That is somewhat analogous.  The term there was no

2    measurable losses, and the losses included loss of taste and

3    flavor, and the District Court in the Northern District of

4    Illinois included there might be some subjective aspects to

5    that but the claim was sufficiently definite.

6              And the last term here is, user interest or

7    information derived from the user model.  Other than to

8    argue the claim is indefinite, the defendants presented no

9    evidence on this at all.

10             The specification here on slide 162 talks about

11   it a little bit.  There is just no basis at all for holding

12   this phrase indefinite.  It's clear on the claim language

13   what it means, and there is nothing in the briefs that have

14   been offered otherwise.

15             And with that, I will turn it over to my

16   colleague, Jennifer Bennett.

17             THE COURT:  That's fine.

18             MR. NELSON:  Thank you, your Honor.

19             MS. BENNETT:  Good morning, your Honor.  I'm

20   Jennifer Bennett, counsel for plaintiff, Personalized User

21   Model.  I'm going to walk you through the presenting order

22   of steps and antecedent basis disputes.

23             First, I will again the presenting dispute.

24             The terms "to present" or "presenting" are found

25   in claims 1, 21, 23 and 24 of the '276 patent.  Note they

1    are not found anywhere in the '040 patent.

2            Plaintiff's proposed construction of present or

3    presenting is to provide or make available or presenting or

4    making available, whereas defendant's proposed construction

5    of the terms present/presenting is to display or displaying.

6            If Google is successful with its construction of

7    presenting as displaying, presenting could be interpreted to

8    be done on the user side, and defendant might try to argue

9    this creates a joint infringement argument.  The

10   specification is clear, however, that presenting is done on

11   the server side.

12           To illustrate the dispute, let's consider the

13   example of a user entering a search query.  Upon receipt of

14   the search query by the system, the system could present or

15   make available potentially thousands or even more search

16   results but only a subset of these results, for example, 10,

17   might actually be displayed or shown to the user on his or

18   her browser.

19           As I will explain, the primary dispute here is

20   basically whether presenting means displaying.

21           Defendant's proposed construction should be

22   rejected at least because it contradicts basic principles of

23   claim differentiation.  It is not supported by the claim

24   language or the specification and it is not consistent with

25   the plain and ordinary meaning of present.

1                    First, the claim distinguishes between

2      presenting and displaying.

3                    Independent claim 23 reads, computer implemented

4      method for providing personalized information services to a

5      user, the method comprising, among other things, presenting

6      said selected collected documents to said user.

7                    Dependent claim 24, depending on claim 23,

8      further provides, wherein presenting said selected collected

9      documents to said user comprises displaying said selected

10     collected documents to said user on a Personal Web page

11     associated with the user.

12                   The doctrine of claim differentiation, which the

13     Court is familiar with, therefore, requires that the words

14     "presenting" and "displaying" have different meanings.

15                   The specification further distinguishes between

16     presenting and displaying.  Presenting is used throughout

17     the specification, including, in the example shown here on

18     this slide, to convey a broad concept of presenting as to

19     provide or make available.

20                   Displaying, on the other hand, is used

21     throughout the specification to describe a subset or narrow

22     set of situations in which results, for example, are shown

23     to the user on his or her browser.

24                   To illustrate this distinction, let's look at

25     column 29, lines 14 through 17 of the specification.  The

1   passage recites, the personal related pages application

2   locates pages related to a viewed page.  Upon the user's

3   request (for example, by clicking a button with a mouse

4   pointer), the related pages are displayed.

5           This indicates that the server presents pages

6   when they are located, but it is not until after the user's

7   request that the pages are actually displayed or shown to

8   the user.  Therefore, the differing usages of presenting and

9   displaying in the specification is strong evidence that

10  presenting is different from displaying.

11          Now I'm going to walk through the order of steps

12  and antecedent basis disputes which run throughout the

13  disputes in both the '040 and the '276 patents.

14          Beginning with the order of steps dispute.

15          Defendant is essentially arguing that the steps

16  must be performed in order, whereas plaintiff proposes that

17  no order of steps is required with a few exceptions that are

18  explained in plaintiff's briefs and one in particular which

19  I will discuss in more detail a little later.

20          So the dispute here is whether the claim should

21  be construed to require that the steps of the claims be

22  performed in a specific order.  The presumption is that

23  there is no order.  Unless the steps of the method actually

24  recite an order, the steps are not ordinarily construed to

25  require one.

1          The Federal Circuit has articulated a test to

2     help determine whether steps which do not recite an order

3     must nevertheless be performed in order.  The test is to

4     look at the logic and grammar of the claims as well as the

5     specification to determine whether it directly or implicitly

6     requires such a narrow construction.

7          Here, the claims of the patents in suit clearly

8     do not recite an order of steps.  Further, although figure 2

9     may suggest at first glance a sequence of steps, the

10    specification in fact teaches away from the order of steps.

11         Your Honor asked earlier whether figure 2 was a

12    good representation of the '276 claim.  I would suggest that

13    actually figure 19 is a better representation of what is

14    claimed in the '276 patent.  This figure demonstrates that

15    the steps of claim 1 of the '276 patent do not need to occur

16    in order.

17         For example, the user query in blue corresponds

18    to receiving a search query from the user.

19         Locate search results in purple corresponds to

20    retrieving a plurality of documents.

21         Evaluate results with user model corresponds

22    with identifying properties of the retried documents.

23         Monitor user reaction in yellow jumps up to

24    transparently monitoring user interactions in the top of

25    claim 1.

1          Parse and analyze the documents corresponds to

2     analyzing the monitored data.  And,

3          Update user model in green corresponds with

4     estimating parameters of a user-specific learning machine.

5          It's also worth noting that these steps can

6     occur in parallel.  For example, the system could monitor

7     the user interactions with data while the system is updating

8     the user model and also while the system is using that

9     information to estimate probabilities.

10          Now let's look back at figure 2.  Figure 2

11     further demonstrates that the steps can be performed in a

12     repeating nonconsecutive or overlapping manner.

13          For example, the system could analyze the

14     documents, analyze the documents again, monitor user

15     interactions, monitor more user interactions, update the

16     user model, monitor additional user interactions, update

17     the user model again, then estimate the user interest in

18     documents, followed by providing the personalized service

19     to the user.

20          These steps could be performed, as I explained,

21     in a repeating or overlapping manner but this sequence could

22     also be performed without another cycle of updating the

23     user's specific data files or user model of steps 32 and 34.

24          The specification states, for example, it is not

25     feasible to update the user model after every newly viewed

1    document or search, and also states that applying the

2    initialization process for each update is inefficient.

3            The one exception that I think is worth

4    discussing here is, defendant has criticized it in its

5    responsive brief, is the first part of element F of the '276

6    patent.

7            The first part of element F of the '276 patent

8    recites, identifying properties of the retrieved document.

9    Like analyzing the document d step in the '040 patent, this

10   step can happen at any time.  Once the documents are

11   retrieved in response to a search query, these properties

12   are then used to estimate a probability of the document that

13   would be of interest to the user.  To the extent Google is

14   trying to suggest the properties must be identified each

15   time or reanalyzed each time the documents are retrieved in

16   response to a search query, Google is wrong.

17           Lastly, defendant confuses antecedent basis with

18   a grammatical requirement that the claims must be performed

19   in a specific order.  Antecedent basis, however, does not

20   compel an order of steps.

21           The final dispute I'm going to dispute is

22   antecedent basis which also runs throughout the independent

23   claims of the '040 and '276 patents.

24           Defendant is basically using antecedent basis as

25   another way to impose an order of steps.  Plaintiff proposes

1    no construction is necessary since the claims as written

2    make perfect sense.  Defendant proposes that certain terms

3    within the claims must always refer to the same thing.  The

4    dispute here, therefore, is whether or not the terms must be

5    construed so that the terms and phrases must always refer to

6    the same thing.

7              Defendant does not contest that antecedent basis

8    exists for these terms, but if the claims are not read the

9    way the defendant proposes, only then antecedent basis would

10   not exist.  Antecedent basis does exist, however, without

11   having to read the terms and phrases as defendant proposes.

12             For example, let's look at claim 1, element d of

13   the '040 patent.  Step d introduces a document d.  Step e

14   introduces an unseen document d which represents a subset of

15   document d.  Step d then later refers to the document.  Step

16   E's reference to the document d does not necessarily refer

17   to the same document d that is described in step d because

18   not all of the documents in step d would have been unseen by

19   the user.

20             The use of an indefinite article such as "a" or

21   "an" normally introduces a new claim element as opposed to

22   referring back to a previously introduced element, which is

23   true for the terms here.

24             Thank you, your Honor.

25             THE COURT:  Thank you.  You have about

```
 1   14 minutes on your rebuttal.

 2             MR. NELSON:  Thank you.

 3             MS. BENNETT:  Thank you.

 4             MR. HORWITZ:  Your Honor, one thing I told

 5   Mr. Perlson.  I want to make sure it's still the case.

 6   Since we are not going back and forth, since there is no

 7   burden here, he will get a chance to get up again if he

 8   reserves some time for response; is that correct?

 9             THE COURT:  That is correct.  I was going to

10   point that out but thank you.  You beat me to it.

11             (Binders passed forward.)

12             MR. PERLSON:  Good morning, your Honor.

13             THE COURT:  Good morning.

14             MR. PERLSON:  Your Honor, I just wanted to run

15   right into the claims here because we already got some

16   background, and I know that both parties had submitted

17   tutorials.

18             The first claim term that I would like to

19   address is, user model specific to the user.

20             Generally, we'll be going in somewhat of a

21   similar order as plaintiff.  I think that as we did in the

22   brief, rather than starting with the parameters, we've gone

23   right to the user model learning machine terms, and, in

24   particular, the first term, really the dispute we're going

25   to discuss, is what it means to be specific to the user.
```

1    And I think that really is one of the critical issues here.

2              So, well, first of all, as to user model

3    specific to the user, there are a few disputes.  One is what

4    it means to be specific to the user.

5              Google says that it's the user model that is

6    specific to the user, and PUM seems to admit it is specific

7    to the user but provides a construction which actually

8    avoids that very result.  And the same dispute is with

9    user-specific learning machine and user-specific data file.

10   And then there is also dispute of just what this user model

11   is.

12             So first in talking about what it means to be

13   specific to the user, we look obviously first to the claims.

14   Here, the whole claim is talking about this personalization

15   service that is provided to a user, the user.  It's

16   throughout the claims.  And then in 1-C, it says that you

17   are estimating parameters of a learning machine wherein the

18   parameters define a user model specific to the user.

19             And what is key is that each individual user has

20   their own user model.  And this is really -- let me jump to

21   the spec first because I think it's useful.  Repeatedly, it

22   says that there is a user model for each user.  And it says

23   that in the present invention.

24             Plaintiff skipped over that point, but it is an

25   important point.  And the recent Akamai case shows just how

1    important it is, the present invention language here.  But

2    it's not just in the description of the present invention

3    that it says for each user, it says it again and again and

4    again.

5              And this really is the crux of the dispute.

6    What our construction provides is that each individual user

7    has their own user model.  I have a user model.  You have a

8    user model.  Other people, they each have their own user

9    model.

10             And that is consistent with the common

11   definition of "specific."  This is on slide 6, jumping back.

12             The definition that plaintiff provides or the

13   dictionary, they provide, says restricted by nature to a

14   particular individual.  We have a definition that does use

15   the word unique but then also says, concerned particularly

16   with the subject specified, and also, intended for, applying

17   to, or acting to a particular thing.  So it's about the

18   user.  It's specific to the user.

19             And plaintiff, during the presentation, never

20   really directly disputed that point.  It's not entirely clear

21   whether they conceptually disagree with that.  Certainly,

22   their construction seems to suggest they do, but never once

23   during the presentation or in the briefs did plaintiff ever

24   really rebut this point that each user has their own user

25   model.  In fact, many of the arguments that were made

1   suggest strongly that that is in fact the case.

2          Now, what they seem to be saying now, and I

3   don't think this was actually raised in their briefing so

4   we didn't address it, but they seem to be taking issue with

5   the word "unique" in the sense that they're saying that our

6   construction somehow provides that each of the user models

7   are identical to each other such that my user model would be

8   identified to your user model, or somebody else's user

9   model.  That is not what we're saying.  To the extent that

10  that is what the confusion is, that is not our intent here.

11         THE COURT:  So that means -- and I know this

12  gets somewhat into variables and parameters -- but if we

13  are both being evaluated for our sports enthusiasm and

14  car enthusiasm, your constructions would allow for that

15  possibility.  That is, just because you and I both have the

16  same parameters doesn't mean that your model is not specific

17  to you and my model specific to me.

18         MR. PERLSON:  Right.  Yes.  Definitely.  I mean

19  really the only thing we're trying to get at here is we have

20  a user model, you have a user model, and anyone else using

21  the system has a user model.

22         THE COURT:  Okay.  But then the term is "specific."

23  You want to change it, it looks like, to "unique" and it

24  seems to me the difference between specific and unique that

25  you are getting at is that there is something about your's

1    that no one else in the world can have; and if anyone else

2    in the world does have it, then we're not practicing the

3    claim under your construction.

4             MR. PERLSON:  Sure.  I understand the point that

5    you are raising, and that is not our intent.  And the reason

6    why, frankly, is we think the claim language is pretty clear

7    on its own and throughout the spec that it's specific to the

8    user.  That means that it is specific for that user and not

9    for any other user.

10            So another way to maybe put it would be that

11   it's a user model restricted to a particular user, using the

12   language of "specific."  And the point is that we're not

13   sharing the same user model.  I have a user model, and you

14   have a user model.  Each individual user has to have their

15   own user model.  Whether what is in the user model is the

16   same or not is not, is not what we're trying to get at.

17            THE COURT:  Let me try it this way.  Maybe you

18   will tell me it's irrelevant.  But I live in a house and

19   there are other people that live in my house.  I have a

20   specific address, but I don't have a unique address.  As I

21   understand it, I don't live in a specific house under your

22   construction because I share the house with a number of

23   other people.

24            MR. PERLSON:  Well, I guess the problem I'm

25   having with it is that the patent, in the context of the

1    patent, we're talking about a user, it's a one user, so the

2    analogy of the house or multiple people, I think that is

3    what I'm grappling with.  If you were in your own apartment

4    and you are living by yourself, I suppose you had an

5    address and that apartment would be your apartment, and

6    then somebody else would live in a different apartment.

7    That is why I'm struggling with the analogy.

8             But the point we're trying to get at here is

9    it's each individual user has their own user model.  If

10   there are 10 users, there are 10 user models.  And that is

11   really the critical dispute about all of this.

12            Now, whether it's being said through "unique to

13   the user" as we've said it or "restricted to a particular

14   individual" or some construction that requires that to be

15   the case, that is really the critical issue.  And I think

16   that, you know, I will explain why their construction

17   doesn't get at that.

18            Again, it's not entirely clear whether they

19   dispute this, but I think that their construction is

20   designed to avoid the result that each individual user has

21   their own user model.  And, you know, they made comments

22   about what we're trying to do for purposes of noninfringement.

23   Well, the reason they're trying to do that is because they

24   don't want to be stuck with a situation where each individual

25   user has to have their own user model because they're

1   worried about how that affects their infringement case.

2            THE COURT:  I'm pretty sure nobody is here out

3   of the goodness of their own hearts; right?

4            MR. PERLSON:  Now, one of the points from the

5   specification that was raised was the, I guess the third

6   quote from the spec, which is actually identical to the

7   second.  Well, actually, the third.

8            But they cited the first part of the sentence in

9   one of their slides, the user model represents the user

10  interest in a document independent of any specific user

11  information need, and omitted the second portion of it; and

12  then in other slides, they did address it and, it says this

13  estimation is unique to each user.  And what that is saying

14  is that this user model represents, you know, your interest

15  in a document and that representation, that estimation is

16  unique to you.

17           THE COURT:  Is that, in fact, the only place

18  where the word "unique" appears in the patent?

19           MR. PERLSON:  I think that is probably right.

20  Yes.

21           Now, this is addressed in the brief, but I think

22  it is important that, you know, the use of this invention,

23  the present invention is used to describe the user model

24  as being for each individual user, and it's also the only

25  method described.  Nowhere in the patent does it describe

1    where a user model specific to the user is shared with

2    multiple users.  And I think the recent Akamai case just

3    further shows that that is critical in how you construe the

4    phrase.

5            And to be clear, we think that the "specific to"

6    language on its own shows that our construction is correct

7    and that this notion there has to be one user model for each

8    individual user is required by the claim language "specific

9    to."  So it's not like we are trying to read something in

10   even but it certainly can't be broader than that.

11           THE COURT:  What about they try to distinguish

12   Akamai from the specification language that says, you know,

13   the following preferred embodiment of the invention is set

14   forth without any loss or generality, something to that

15   effect.  Was that present in Akamai?  Is that a reasonable

16   distinction?

17           MR. PERLSON:  Your Honor, I have a slide ready

18   for that, too.

19           THE COURT:  All right.

20           MR. PERLSON:  In fact, Akamai squarely rejects

21   that argument.  And, in fact, we pointed this out your Honor

22   in our statement of supplemental authority and they just

23   ignored it, as they do here.

24           But Akamai said, this court also acknowledges

25   that much of a language describing a string indicating a

1    URL, the invention -- and that was the limitation that was

2    at issue that the Court eventually found was appropriately

3    included in the construction -- occurs within a entitled

4    detailed description of the preferred embodiment.  And then

5    it notes that figure 4 is referred to as a preferred

6    embodiment.  But it goes on to say that the specification as

7    a whole makes clear that including the object's original URL

8    is the only method to achieve the claimed association.  Then

9    it goes on to say, indeed, it is the only method described.

10             And in the interest of time, I won't, you know,

11   go over this, but our slide 10 kind of talks through how

12   really this is the same issue where here, for each user,

13   having his own user model is the only one described.  And

14   we would submit the construction that would be broader than

15   that would be inconsistent with even this very recent

16   Federal Circuit authority, in addition to Phillips and its

17   progeny.

18             We're not the only ones, your Honor, who agree

19   that each individual user has his own user model.  Mr. Konig

20   testified, the inventor.

21             I took his deposition and I said:  What is the

22   difference between a group model and a user model?

23             And he said:  Well, group model represents the

24   combined interests of more than one user.  And a user model

25   attempts to model the one particular user.

1            And this is exactly our point.

2            Now, the plaintiff says, oh, you should ignore

3    Mr. Konig.  He doesn't know anything about the patent.  He

4    hasn't read it in 10 years.

5            Well, first of all, he was deposed.  He was

6    prepped for two days, and he is here representing the

7    plaintiff.  He is an interested party.  And, certainly, I

8    think it speaks volumes as to what is going on in the patent

9    and what is really claimed when the inventor and interested

10   party testifies in a manner consistent with how he said it.

11   And we cited a Federal Circuit case, <u>Voice Tech</u>, that says

12   it's appropriate to rely on.

13            THE COURT:  That portion of the testimony you

14   are showing me, he doesn't say it's uniquely modeling the

15   particular user.

16            MR. PERLSON:  Right.  And, again, I don't want

17   to get --

18            THE COURT:  I understand you are not wedded

19   necessarily to the word "unique" but you are wedded to the

20   concept of if anybody else shares the identical model, then

21   they're not practicing the claims of this patent.

22            MR. PERLSON:  Well, let me say it this way.  I'm

23   not sure that that is right.  If, by coincidence, I have a

24   model that is identical to yours but it's created for both

25   of us, separately, then I think that that would be included.

1    I'm not saying -- we're not saying that that is out, but,

2    you know, as -- I mean, you know, as plaintiff conceded, as

3    a practical matter, that is unlikely to happen.  But we're

4    not saying that if, by chance, two people have identical

5    models, that there would be no infringement, or that that

6    wouldn't meet that particular element.

7              What we're saying is those two people have to

8    have their own model.  Whether, by coincidence, they somehow

9    have the exact same model is not going to take it out of the

10   claims.

11             THE COURT:  You may have a slide on this, but

12   what about the initialization and the trying on a hat portion?

13             MR. PERLSON:  I do have a slide on that.

14             This is slide 20, your Honor.

15             First of all, initialization is not the subject

16   of the independent claims.  If you look at any there, it's

17   not a subject.  In fact, it's dependent claim 28 talks about

18   initialization.  So it's not even in the independent claims.

19             The independent claims talk about monitor the

20   user interactions and then you update the user-specific data

21   files.  And then you estimate the parameters of the learning

22   machine, and then it talks about the user model is specific

23   to the user.

24             Now, if you look at even the language cited

25   in plaintiff's own brief, it says, the initialization is

1    performed without any user specific information in the

2    situations where there is a prototype user or a hat.  This

3    is not a user model that is specific to the user.  It's a

4    general user model that might be used by a user but the

5    language that they cite shows that it's not a user model

6    specific to the user.

7            And, in fact, later on, it goes on to say, when

8    they're talking about hats -- and this is at column 24, 19

9    to 21 -- it says when you are using a hat, your actions

10   don't affect your own user models.  I'm sorry.  That they

11   only affect your own user model, not the prototype user

12   model.  So there is a distinction.  This is completely

13   irrelevant to the user model specific to the user.

14           Now, in going back to plaintiff's construction

15   here, plaintiff admits in their briefs that the model needs

16   to be specific to the user.  But if you look at their

17   construction, that is not what their construction says.

18   Their construction provides that there is data specific to

19   the user.  And then, again, they kind of say something

20   similar in their language about "related to" here.  They say

21   that -- this is slide 18 -- that PUM views that specific to

22   the user only requires the user model be associated with the

23   specific user or relating to the specific user.  And they

24   justify this by saying that you just need to use data from

25   the user and then thereby it becomes related to the user.

1            But that is not what the patent is talking

2     about.  First of all, there is no support for this notion of

3     related or specific to.  I think that they, plaintiff

4     pointed to slide 59 in which they purported to provide

5     supports of why this associated with language would work.

6     And I think if you look at that slide, none of those quotes

7     that they provide use that language or anything like it.

8            But here is really what is going on here, your

9     Honor, is that -- and this is slide 16 -- is that the patent

10    talks about what is on the right.  This is the critical

11    issue that I was referring to.  That each user gets their

12    own user model.

13           Plaintiff is trying to get the result on the

14    left where you can have multiple users using a generic user

15    model, and when those users are using that user model, it's

16    specific to them.  That is not what the patent describes,

17    and that really is the critical thing that is here.

18           And part of the reason -- another reason why

19    that can't be right is, in fact, when the patent talks about

20    a shared model, it is referring to a group model.  And I

21    think that you had asked plaintiff's counsel about that

22    situation.  That is what the situation is when there are

23    multiple users that are sharing a model.  It is a group

24    model, and that is absolutely not a specific model.  And

25    just because the group model might take some information,

1    you know, from the user on the left or the user on the right

2    and feed that into the group model, that doesn't make it

3    specific to them.  It's specific to the group.

4              So the only way that you have a situation where

5    it's specific to the user is on the right here where each

6    user gets their own user model.

7              So going on to what this user model is, our

8    language provides that it is created and updated by the

9    learning machine.  I don't think there is any dispute that

10   that is what it does.  The specification, as we show here on

11   slide 21, is perfectly consistent with that.

12             PUM says the claims don't require it, but I

13   actually haven't seen any explanation why that is the case.

14   Instead, they say that there is a definition of the user

15   model.

16             Well, because there is a statement in the

17   specification that the user model with its associated

18   representation is an implementation of a learning machine.

19   Well, that language is all over the place.  Is it a user

20   model that has an identity?  Is it user model that has a

21   function?  And that is not definitional.

22             What the user model is, is a data structure.

23   And there is no dispute that it is stored in a data

24   structure.  And, again, here, Mr. Konig agreed that it's

25   stored in a data structure; and what plaintiff is really

1    trying to achieve here is really going back again to this

2    notion of the user model, the generic user model, they want

3    to say by using data that is specific to the user and

4    applying it to a generic user model that you implemented a

5    user model in a way that is specific to the user, even if

6    the user model itself is not specific to the user.  That's

7    not what the patent claims, and the language of their

8    construction is specifically designed to allow them to later

9    argue that, and we would submit that that is completely

10   contrary to the claims and that construction should not be

11   allowed.

12           So the next dispute is user-specific learning

13   machine.  Again, the dispute is here as far as what it means

14   to be user specific versus specific to the user, I don't

15   think there is much dispute that the issue here is the same.

16   And, again, you know, we cite to the same evidence here.

17           One thing I will -- and, again, getting back to

18   this point of plaintiff trying to say that merely by using

19   data of the user makes it, the user model specific to the

20   learning machine -- specific to the user.  The same thing

21   really happens here with learning machine.  They're saying

22   that it's the past observations and experiences that are

23   specific to the user, not the learning machine itself, and

24   so they're really trying to accomplish the same result

25   that we just went through as to user model through their

1    construction of user-specific learning machine.

2              The next dispute is what is this learning

3    machine.

4              We all seem to agree that the learning machine

5    learns and that it makes predictions and then it improves

6    over time, but we have some other disputes.

7              It seems like the intelligent decision dispute

8    is now out, so I won't go over that.  But then there is a

9    dispute about new data and past observations and experiences

10   and then whether the learning machine is a program or a

11   model or mathematical function.

12             Now, here again, like with our definition of

13   user model, there really doesn't seem to be any dispute

14   that the learning machine uses parameters and outputs a

15   probability.  In fact, much of plaintiff's presentation

16   seems focused on exactly that point, and so there really

17   shouldn't be any dispute there.  Again, they have dropped

18   intelligent decision language so I won't go over that.

19             But we do seem to have -- I'm not sure whether

20   there is a dispute or not, but there was an issue that was

21   raised as to whether our construction requires that with

22   every update, there is an actual "improvement."

23             I don't think that is what our construction

24   requires.  Our construction requires that you have to at

25   least attempt to do that.  And I don't think there is a

1    dispute on that either.

2          THE COURT:  So you don't have a problem with

3    "attempt to improve" instead of "improve?"  I think that is

4    where that dispute came up.

5          MR. PERLSON:  Right.  I guess the -- that's

6    right.  The program has to at least attempt to improve over

7    time.  Yes.

8          THE COURT:  Okay.  I don't think you have a

9    dispute on that point.

10          MR. PERLSON:  Okay.  Well, we're making progress.

11          THE COURT:  Slowly but surely.

12          MR. PERLSON:  Another dispute, which, again, I'm

13    not really sure is a dispute at all, is this observations

14    and experiences language.  They say theirs is better than

15    ours.  They don't really say why.  We tried to come up with

16    a solution because we thought that what they were saying in

17    their briefs was that the learning machine improves from the

18    monitored use interactions with data.  So we said, okay,

19    let's define it as that.

20          Apparently, now they're saying, no, that is not

21    good enough because there are all these other things that

22    can improve it, too.  Well, but all the things they

23    identified are new data, so I'm not really sure what the

24    dispute is here.

25          THE COURT:  I'm not sure that I'm sure either,

1    but it seemed like they were emphasizing the past observations

2    and experiences, and that something about your construction

3    would read out that past information as a basis for

4    improving going forward.

5            MR. PERLSON:  Well, I don't think that it does

6    that.  I think that the problem with the way that plaintiff's

7    language read is that it seemed to suggest that you could

8    just look at something in the past, so let's say you started

9    this learning machine on Day One and there was data that

10   happened, you know, before that.  And then, you know,

11   10 days later, you updated and you are using the data that

12   happened before Day One but you are not looking at what

13   happened in between, and the data that happened before would

14   be past experiences but what you are using to update is the

15   new data you are getting as you go along.  And I think that

16   their construction actually allows for you not to actually

17   have to use that new data, and that is really the point that

18   we're trying to make.

19           There is a dispute about our use of the language

20   of program versus function.  I mean the claim says it's

21   computer implemented.  It doesn't use the word program, but

22   it's computer implemented.  Well, what is implemented in a

23   computer?  It's a program.

24           They say that it's a function.  Well, even

25   their own -- this is their own evidence, your Honor, says

 1    that, you know, that the learning machine is capable of

 2    implementing functions and that these, you know, functions

 3    or algorithms are usually implemented in software.

 4              Instead, they replace it with some model

 5    language, but, you know, first of all, the claim -- there

 6    is a user model and there is a learning machine.  They're

 7    different terms, and they shouldn't have the same

 8    construction.  And this is the prosecution history says

 9    this, too, on slide 37.

10              There are three limitations here:  A learning

11    machine, parameters, and a user model.

12              Now, they responded to this in their brief and

13    said, well, ours is the same.  I mean ours is consistent

14    about this, too.

15              Well, I'm not sure how that is possible mainly

16    because, if you noticed, they defined a user model as an

17    implementation of a learning machine and they defined a

18    learning machine as a model.  They're both referring to each

19    other, and they're circular.  So to define a learning

20    machine as a model, I would submit, basically is not

21    consistent with the claims and not consistent with the

22    prosecution history.

23              And the next claim term here is "parameters of

24    a user-specific learning machine."  I think that this

25    dispute has gotten far more complicated than it really needs

1    to be.  And I guess maybe I should just explain it before

2    we get into the slides and it might make things a little

3    clearer.

4          So, obviously, the constructions that we have

5    are similar; right?  And so plaintiff is saying that the

6    parameters are the values or weights themselves.  And we're

7    saying, well, there are variables and these variables have

8    values or weights themselves.

9          Then when you look at the estimating phrase,

10   which includes parameters, when you are estimating

11   parameters, what you are doing is you are estimating the

12   values or weights, you know, of the variables and you are

13   coming up with a number.  And there doesn't seem to be any

14   dispute on that.  That is why we construed estimating

15   parameters of a learning machine as we have, and we've

16   construed parameters as we have.

17         So I think if we go into talking about this, in

18   the patent, this is slide 42 is a good explanation of what

19   is going on here.

20         So this row there is, that is the parameter,

21   and it has a weight or value.  That is .72.  The .72 is a

22   number.  It's a value.  In and itself, it doesn't really

23   have any sort of significance if it's not attached to the

24   variable.  So that is the variable and it's computed.  And

25   the learning machine is made up of, has all these variables,

1    and they're computed through the learning machine.

2              And this is actually perfectly consistent with

3    the extrinsic evidence by the plaintiff.  They said

4    parameters are a variable that must be given a specific

5    value.  That is exactly what we're saying.

6              If you look at what Mr. Konig said, he said:

7    The way that I think about it, the variable that represents

8    the user interest is this parameter.  The value for a

9    specific user is the value of this parameter.

10             I'm sorry.  I think I may have misspoke.

11             The value for a specific user is the value for

12   this parameter for a specific user.

13             So there are the parameters and then the

14   parameters have numbers.  And when you are estimating the

15   parameter, you are estimating that number.  And that is

16   exactly what our construction is intending to provide.

17             And it's interesting because Mr. Konig said

18   it's kind of semantics.  And maybe he is right, but I think

19   that the semantic issue is what we were trying to deal with

20   by having the two constructions the way that they are.

21   Because, you know, what we're talking about is estimating

22   parameters, and I think that our construction actually

23   accurately describes what is going on in the specification

24   and what is described and what this invention is really

25   about.

```
1                THE COURT:  What about the tunability point that
2    was put to me?  That it wouldn't work, we couldn't do tuning
3    if I take your construction?
4                MR. PERLSON:  I don't understand -- I heard the
5    argument.  I don't understand it because our point is that
6    when you are estimating a parameter of the learning machine,
7    you are estimating the values of the weight.  That is tuning.
8    That is what the estimating of the parameters are.  You are
9    tuning.  That is exactly what our construction allows for.
10               THE COURT:  So you agree you would be estimating
11   the weights or the values.  You just don't want the Court
12   to tell the jury that the weights or the values are these
13   parameters.
14               MR. PERLSON:  Exactly.  Exactly.  That is why we
15   have these two different constructions.  Because I think
16   that this, the way we framed it, is, you know, the clearer
17   way of describing what is going on here.
18               There is a procedure.  It's estimating parameters,
19   and our construction says what that is in an accurate way
20   that is consistent with, you know, the intrinsic evidence,
21   extrinsic evidence and the claims, and there really shouldn't
22   be any confusion, and I think ours actually eliminates the
23   confusion.
24               THE COURT:  In Mr. Nelson's framework, the
25   level of interest is sports.  He terms the variable at the
```

```
 1    80 percent or 10 percent, depending on how much we like

 2    sports, is the weight or measure.  In your view, though,

 3    how much we like sports isn't the parameter.

 4              MR. PERLSON:  No.  Actually, it's the inverse.

 5              THE COURT:  Okay.

 6              MR. PERLSON:  So they're the ones defining the

 7    interest in sports as the number.  We're the ones saying

 8    that is the variable and the variable has a number.  What

 9    is your interest in sports?  There is a number attached to

10    that.  That is what is on slide 42.

11              And, you know, it's not the exact sample,

12    obviously, that you just came up, but the parameter is the

13    row and the weight or value of the parameter is .72.  That

14    is what we're providing.  I think the way you had just

15    suggested to me is flipped from what I think.

16              THE COURT:  I confused it.  Yes.

17              MR. PERLSON:  Well, unless your Honor has any

18    further questions on that one, I'll move on.

19              So the next phrase I'll address here is

20    "estimating probability."  And, Your Honor, we have included

21    these together because we think that the point as to them is

22    really related.

23              There is no real dispute as to what this P(u/d)

24    phrase means.  We were able to work together and come to

25    some agreement as to what that means.
```

1           But there is a dispute as to what estimating

2    means and what probability means.  And it's interesting

3    because I think that when you heard plaintiff's presentation

4    on parameters, it was all about math.  We're talking about

5    math, we're doing everything about math; and then, you know,

6    when we're talking about probability, it seems like we're

7    now starting to get away from that.  And we would submit,

8    your Honor, this is in fact all about math.

9           On slide 47, we show where the specification

10   talks about how the mathematical framework is based on

11   Bayesian statistics.  It appears there is no dispute about

12   that.  Mr. Konig said the same thing and, you know, as he

13   did today, he admits that in his brief.

14          The specification repeatedly talks about

15   calculating probabilities.  Sure, it uses the word

16   estimating.  But if you look, whenever it is talks about

17   estimating, what is actually going on here is calculating.

18   I mean this is about math.  These probabilities are

19   calculated through math.  It's the number, the weights.  You

20   use the weights, and you put them together as the patent

21   describes and you come up with this number, and you do that

22   by calculating.

23          And on slide 48, we cite the Bell Atlantic case,

24   and I think that this and other cases such as Akamai would

25   support really the same points here as that.  There is no

1    disclosure in the patent of estimating meaning anything

2    other than calculating.

3              And I think, your Honor, it seems like there

4    wasn't any dispute about that in the parameters.  In that

5    context, it seems like plaintiff conceded what you are doing

6    is making calculations as well, and it really has the same

7    meaning here.

8              This is from one of plaintiff's treatises that

9    they cite, it's also cited in the spec, and it refers to

10   learning as the process of estimating.  Well, okay.  But

11   look at what they're talking about.  It's done through math.

12   It's all math.

13             I asked Mr. Konig:  When probabilities are

14   estimated in your patent, those probabilities are estimated

15   through mathematical calculations; right?

16             Yes.

17             Now, when we're talking about the probability --

18   that last bit was a little bit more about the calculating.

19   We're now moving on to probability, and both parties have

20   submitted dictionary definitions.

21             What we need to do with a dictionary definition,

22   as the Federal Circuit has told us, is that we have to,

23   to the extent they're relied on at all, is to look at

24   definitions that are consistent with the intrinsic evidence.

25   What is consistent with what the patent is talking about

1    here?  The task is not to find the broadest possible

2    dictionary definition.  That sort of Texas Digital and its

3    progeny were rejected by Phillips.

4            So where do we go to find what the meaning

5    would be?  Well, we went to the American Heritage College

6    Dictionary which talks about statistics and provides a

7    construction that plaintiff appears to concede is consistent

8    with ours; but, you know, it wasn't just us.  Plaintiff went

9    to the Oxford English Reference Dictionary.

10           Now, they didn't cite this to you, your Honor.

11   In fact, in their briefs, they gave you like definition one

12   and two and they omitted the definition for math, but that

13   is also consistent with us.  And this is the context here.

14           Now, plaintiff tries to make a distinction

15   between this notion of frequency and measurement of belief

16   to say that somehow our construction is inconsistent with

17   that.  And I had here a note from one of my associates who

18   helped me kind of frame this issue here and so, hopefully,

19   I'm not messing this math up, but it's really this is a

20   distinction without a difference.

21           It seems like what they're pointing to is the

22   fact that when you are flipping a coin, you have a 50/50

23   chance and there is a 50 percent chance it's going to be

24   heads and a 50 percent chance it's going to be tails, and

25   that is consistent with this frequency notion.  And they're

1    saying that somehow the probability means something else in

2    the context of Bayesian statistics.

3              And, here again, there is kind of a semantics

4    here.  Bayesian statistics, you take information you know

5    and you look at information you have in the past and then

6    you have to apply, you know, some knowledge to it and make

7    some, you know, judgments, and that really has nothing to

8    do with the actual computation itself but perhaps how you

9    set up the system or set up the parameters and that type of

10   thing.

11             So the percentage will represent your belief.

12   So there is a 70 percent chance that a user will be

13   interested in this document.  Now, it's true that that

14   expresses a belief but it's a subset essentially of belief.

15   There are other ways of expressing a belief, too.  And I

16   think plaintiff talked about them.

17             Like he really likes this car.  Well, that is

18   my belief he likes that car, but that is not probability,

19   and that is really the difference here is that there is kind

20   of -- they're kind of saying, well, probabilities are

21   beliefs so you should define it as a belief.

22             Well, that is not really accurate.  I mean a

23   compact car is a car.  That doesn't mean that you define a

24   compact car as a car.  It's a compact car.  So it's really

25   if you are drawing like a Venn diagram, your Honor, like the

1   probability would be within beliefs.

2           And there also doesn't seem to be any dispute

3   here, your Honor, that what you are doing with the

4   probability is a number.  We're coming up with a number, and

5   I think in plaintiff's tutorial that they had said it didn't

6   need to be a number.

7           Now, there wasn't -- they didn't say what that

8   could possibly be, and the patent certainly doesn't say it,

9   and I haven't heard any suggestion that it can be anything

10  other than a number.

11          And I think this slide really demonstrates kind

12  of the distinction between what our construction allows

13  and what we think patent describes and what plaintiff's

14  construction describes.  I mean the patent is talking about

15  math.  It's using this computer that using these formulas

16  that I'm not going to try to pretend to try to explain to

17  you and it comes up with a number, and that number is the

18  percentage chance that the user is interested in the document.

19          What it is not doing is what plaintiff's

20  construction allows for, just approximating a degree of

21  likelihood or belief.  It's not saying pretty sure he is

22  interested, he is probably interested, more likely than not.

23  That is not what is going on at all.

24          In fact, in the context of the parameters,

25  plaintiff's presentation made this clear.  He is talking

1    about how in the parameters he is using these values or

2    weights.  And he said, well, he is pretty sure he likes cars

3    as a parameter.  And you are not saying he -- I'm sorry.

4    He was saying whether or not he likes cars is a parameter.

5    And you are not saying he is pretty sure, we're pretty

6    sure he likes car.  He is saying there is a number attached

7    to it.  And another parameter might be whether he likes

8    Fords, and there would be a number attached to that, too,

9    and you are taking those numbers and you are coming up

10   with the probability, the percentage chance of interest in

11   a document.  You are not combining your pretty sures and

12   maybes to come up with I'm pretty sure he is interested.

13            And I would submit that those three examples

14   that we have on slide 54 would, each one of them would be

15   approximating a degree of likelihood or belief.  And that is

16   not what is going on in this patent.

17            The next one I have is posterior probability.

18   We'll submit that on the briefs.  I think that that is

19   sufficiently dealt with there.

20            What time did I get started?  11:30?

21            Well, the next one I will go to is user-specific

22   data files.

23            Here, there is a dispute about whether they need

24   to be user specific and whether they need to be data files.

25   We say they need to be both, and we would submit that

1    plaintiff seeks to eliminate both of those requirements.

2         The user specific should be the construed as

3    unique to the user for the same reasons as user specific --

4    user model specific to the user and user specific learning

5    machine -- you know, we've had some back and forth about

6    what unique means and I think those same issues would apply

7    here.

8         And I will note on -- but we do think that there

9    is a requirement that the data file, each user has to have

10   their own data file.  That is what it means to be user

11   specific.  And I think if you actually look at slide 66 of

12   plaintiff's dec., that is how they're displaying it, too.

13   They had a row and then there was a -- they identified a

14   user through some number, and then they had all the

15   information about that user, but it's about that user.  It's

16   not multiple users.  And that is really what we want, we

17   think the construction needs to have, and there seems to be

18   a dispute on that and it should be resolved.

19        The next dispute is whether there need to be

20   files.  Frankly, you know, the claims say files, files,

21   files, again and again.  Slide 63.  The spec talks about

22   them being files.

23        In its brief, plaintiff did point to files in

24   other situations in the spec.  I'm not sure why because in

25   those situations they were also used as files.

1            And, you know, this is I think useful to

2     understand what is going on here.  They're saying that the

3     claim defines the term but they're really repeating claim

4     language.  There is really no point.  I mean no construction

5     at all would be better than what they're providing because

6     what they are doing is limiting -- they're basically

7     eliminating the user-specific data files.

8            And here is an example I came up with just to

9     kind of, from a grammatical point of view, show why what

10    they're saying doesn't really make any sense.  You know,

11    they're saying that the wherein the user-specific data files

12    comprise language provides a definition.

13           Well, we came up with an element here, baking a

14    pizza wherein the pizza comprises pepperoni and mushrooms.

15    Under their rationale, the pizza would be defined as

16    pepperoni and mushrooms, but that is not what a pizza is.

17           And, really, the same thing is true here with

18    the user-specific data file.  You can't do that with

19    pointing to the rest of the claim, and that is exactly what

20    they're doing.

21           There is no basis in the spec to suggest that

22    the data files don't need to be files; and we would submit

23    that that would be improper to adopt such a construction.

24           THE COURT:  Sometimes, though, comprise is

25    definitional.

1           MR. PERLSON:  I am not saying there isn't a case

2     where comprise isn't definitional, but it isn't here, and,

3     in fact, there are numerous cases that say that comprising

4     means consisting of.  And, usually, this comes up in a

5     situation where somebody will be going for a construction

6     that will say it's comprising but it can't be anything else.

7     That is usually where the terms -- you know, someone, a

8     defendant might be saying that something comprises A and B

9     and they'll be arguing, well, that means that it comprises A

10    and B and nothing else.  And most of the cases say, well,

11    no, it can also have C, B, A, you know, several other things.

12          Most of the cases that you will see about

13    comprising really aren't on point here; but, you know, just

14    as a matter of common grammar, it has to be a data file.  It

15    contains those things obviously that are in the claim, that

16    the claim says comprises but that does not define what the

17    data file is.

18          Going on to "user."

19          Here, we have the disputes as to whether a user

20    is a person or a person as represented by a tag or identifier.

21          I think, as your Honor observed, the patent, you

22    know, is talking about a user in the sense that it's a

23    person that someone is sending an e-mail and someone looking

24    on the Internet, browsing documents; and, of course, when

25    we're talking about personalization services, it makes sense

1    then.  We would be providing these services to a person.

2              And, in fact, plaintiff, in their brief, admits

3    that using -- a person using a computer is the common

4    meaning of user.  And if you look at the brief, I think they

5    consistently are using it in that same way.

6              The specification does as well.  You know, the

7    person is him or her.  It's not the tag or identifier.  It

8    is him or her.  The tag or identifier claim never ever

9    appears in the spec, nothing, it, or anything like it.

10             And Mr. Konig, I asked him:  Okay.  So a user

11   in the context of your invention is a human being; is that

12   correct?

13             Is human being operating a computer.

14             Now, PUM, again, they admit, in lay parlance,

15   the user is the person operating the computer, and they are

16   actually arguing here there is a special definition.  So,

17   essentially, you know, that there is a disavowal of the

18   meaning of user.

19             Now, we know that when you are disavowing

20   something, a plain meaning, that there has to be a very

21   clear indicator of that.  There is nothing even close to

22   that here.  Instead, as we've just shown, user is a user.

23   It constantly uses a person.

24             Now, the one thing that plaintiff really seems

25   to be hanging their hat on is this user u notion, but we

1   would submit, your Honor, that has nothing to do with the

2   tagger identifier construction that they provided.  All the

3   patent is saying, when it is talking about a user u, is a

4   convenient way in all those formulas we have seen in the

5   patent to denote it.  It's like probability, $P(u/d)$.  It's

6   using -- it's just a shorthand notation that is used in, you

7   know, statistics and those books.  You look through it and

8   see a bunch of Us.  That is how you express it in a formula.

9   It's not talking about a tagger identifier in a computer.

10          THE COURT:  There is some representation of a

11  person in the computer; right?  That is not in dispute.

12          MR. PERLSON:  Well, in what?  In the patent?

13  The patent doesn't say -- the patent does not say in any way

14  how the user is going to be tracked.  There could be any

15  number of ways to track the user.

16          THE COURT:  In 1999, and the way I'm thinking

17  of offhand is a webcam, watching the person physically in

18  the room.  Wouldn't one of ordinary skill in the art in 1999

19  know that the user is the representation of the user in the

20  computer because that is what the computer talks to?

21          MR. PERLSON:  No, I don't agree with that.  And

22  let me explain.

23          The one of skill in the art would recognize that

24  a user is a person operating a computer.  It's a live person

25  that you are providing personalization services to.

```
 1              Now, of course, one of skill in the art would

 2    recognize that the person is not -- there is some -- in

 3    plaintiff's tutorial, they showed this Robert Smith walking

 4    into a computer and suddenly being inside the computer.

 5    Obviously, they're not obviously suggesting that the person

 6    was physically inside the computer, but they would recognize

 7    that is not going on, and that there would be ways that

 8    you would want to track a user so that you can monitor

 9    interactions, so you can update user-specific data files,

10    and there can be any number of ways to do that.

11              The point is the patent is not talking --

12    it's not -- it's not talking about that.  It's just not

13    addressing that issue.  What it is addressing is what you

14    are doing in relation to a user, which is a person.

15              Now, what Google does or anyone else does in

16    connection with the services they provide, whether or not

17    those individual instances are monitoring user interactions,

18    whether those things are actually monitoring a person is not

19    an issue of claim construction.

20              The point is that, later, someone will determine

21    whether what Google does or, you know, someone else, whether

22    that is actually monitoring the user.  But that doesn't

23    change the fact that it's the user that is being monitored.

24    And, obviously, there, the user is not inside the computer

25    doing that.
```

1          THE COURT:  So your reading of the patent is

2     that I won't find any instances where a user, the word

3     "user" is being used to refer to something other than a

4     person.

5          MR. PERLSON:  I think that is right.  It's

6     always a person.  It's never -- it's certainly never a tag

7     or an identifier.  There is nothing in there about how you

8     are tracking.  They reference cookies and how Google does

9     the cookies.  Certainly, it's not talking about cookies.

10    And to the extent they want to define a user as some sort

11    of computer representation of a user, they could have done

12    that.  They could have done that.  They could have said

13    transparently monitoring user interactions by looking at a

14    representation of a user in a computer.  They didn't do

15    that.  They said transparently monitoring user interactions.

16          So what is going on here is it's a user.  And,

17    you know, this notion that -- I also reject this notion that

18    we're somehow trying to manufacture some noninfringement

19    argument here.  We didn't even suggest initially that user

20    be construed because, frankly, I didn't think I would have

21    to be here arguing as to whether a user is a person or not.

22    And so, you know, this is not a dispute of our creation,

23    your Honor.

24          Next is, "document."

25          You know, electronic file or text or media.

1           We pointed out in our briefs that there is any

2    number of places in the claims that talk about the document

3    that don't make any sense unless the document is an

4    electronic file.

5           You know, I listed some here:  linking to a

6    document, properties of a document, crawling network

7    documents.  They didn't respond to that in the briefs, and I

8    didn't hear any response to that here.

9           This is slide 77.

10           We pointed to very similar instances in the

11    specification where the same thing, documents are talking

12    about in ways that makes no sense unless it's an electronic

13    file.  Again, no rebutting.

14           Plaintiff had this slide -- this figure 13 at

15    slide 78.  It was up on the screen briefly but you didn't

16    address it.  Here again, documents don't make sense unless

17    they're electronic files.

18           Slide 79, figure 18.  Again, all these things

19    that are going on only make sense if it is an electronic

20    file.

21           Now, in their brief, they did say that all of

22    the actions above don't have to be performed on all documents.

23    Well, that is neither here nor there.  The point is that the

24    use of documents in the claims and specification only make

25    sense if it's electronic documents.  Whether or not you are

1    linking to documents doesn't change the fact that what we're

2    trying to do here is figure out what document means in the

3    context of this patent.

4          Now, plaintiff's construction would allow for

5    interpretation of the term that is entirely inconsistent,

6    we would submit, your Honor, with what is going on in the

7    patents.  I mean it's text or media, so a single word could

8    be a document.  A web page with 500 words could be 500

9    documents.

10         Claim 7(e) and (f) discloses identifying an

11   author and age of a document.

12         Well, if there is a word -- if there is a page

13   with 500 words, does each one have a different age?  We're

14   trying to figure out when one was typed and not the other.

15   That is not what the patent is talking about.

16         And, again, we haven't heard any -- this was

17   raised in our briefs, and it's never been rebutted.

18         One argument that plaintiff did raise during its

19   presentation is this notion of a dynamically created page.

20   And I'm not sure why they think that our construction would

21   preclude a dynamically created page.  We don't think it

22   does, and they didn't explain how it does, and I don't think

23   it does.

24         What they do say, they say that the

25   specification defines document as text or other media.  But

1     it doesn't define it.  It says what a document may include.

2     It may include text.  It may include media.  Sure.

3                 And our construction is perfectly consistent

4     with that.  Your electronic file can include your text, it

5     can include your sound, it can include the video.  And it's

6     argument.

7                 We would submit, your Honor, that it's only our

8     construction that would be consistent with what the patent

9     is actually talking about.

10                THE COURT:  But you don't mean electronic file

11    to exclude text or other types of media.

12                MR. PERLSON:  Well, of course, not.  It would

13    include.  In the electronic file, it could include text or

14    any other type of media.

15                I mean I think, you know, if it would say an

16    electronic file that could include text and all the other

17    things, if that is the hang-up, I don't think we would

18    object to that.  I think electronic file is simple among

19    itself, but ...

20                So the next dispute as we're talking about the

21    documents is "unseen document."  And, here, we're talking

22    about whether the document is unseen by any user or unseen

23    by the user.

24                And, now, the specification talks about these

25    collaborative filtering systems.  I think both tutorials

1   actually describe these systems in the context of Amazon

2   where someone would be, you know, looking for a movie, I

3   think, and they look to see what other people like you, what

4   movies they liked and suggest one of those movies to you.

5           But the problem that the specification talks

6   about with these systems is that an item that has never been

7   rated cannot be recommended or evaluated.  So if no-one has

8   ever seen this movie, then it's not going to be recommended

9   to you because there is no one like you who has seen the

10  movie that would allow you to be recommended.

11          And there is a further comment later on, so

12  that a product can be recommended even if it has never been

13  purchased or evaluated previously.  Again, this is a similar

14  distinction.  This is on slide 85.

15          And then during prosecution, the claims were

16  rejected over the Breese patent, and then the plaintiff or

17  the patentees added the limitation where it used to be the

18  document d and they replaced it with the unseen document d.

19          Well, there was another rejection, this time

20  under Gerace which was a collaborative filtering system, so

21  the applicants distinguished Gerace on the basis that unlike

22  the patent as amended, it does not teach documents unseen by

23  any user.  And I mean that is what it says.

24          In other words, it is not taught, nor is it

25  suggested how the first set of users or the first user R is

1    presented with an unseen document or an unseen ad.  And we

2    would submit, your Honor, that they would be bound to this

3    and that plaintiff should not be able to provide a

4    construction inconsistent with this construction because,

5    you know, they made a deal with the Patent Office.  They

6    made the representations and, as part of their bargain,

7    their patent was offered, and they can't come back in and

8    now claim something else.

9           THE COURT:  That is clearly the law, but help me

10   understand how their construction is actually doing that.

11          MR. PERLSON:  Sure.  So Gerace allowed for --

12   put simply, the distinction that they were trying -- that

13   the applicants were trying to raise was that Gerace didn't

14   allow for determining an interest of an unseen document.  I

15   mean it seems pretty clear that that is what is going on.

16          But that distinction only makes sense if it's

17   a document unseen by any user because Gerace allowed a

18   determination of interest to a user for an unseen document

19   by them.  I mean that is the whole point.  The whole point

20   is that you are relying on opinions of others to determine

21   whether a document is of interest to you.

22          So Gerace allowed you to look at documents that

23   were unseen by you, but what it didn't allow -- and this is

24   the distinction that they were raising -- is that it didn't

25   allow for review of documents that hadn't been reviewed by

1    anybody, and that is the distinction they're making.  So

2    that distinction only makes sense if it is an unseen document

3    by any user.

4              If it's an unseen document by the user, Gerace

5    could do that.  I didn't have to -- in order for it to

6    recommend a document to me, I didn't need to see it, but

7    somebody else did.  Somebody else in my group did.  And the

8    applicants were saying, well, in my patent, you don't have

9    to worry about that, because nobody needs to see it.

10             THE COURT:  Well, under plaintiff's

11   construction, their system allows you to make a prediction

12   whether the document has been unseen by everybody or whether

13   it's just been unseen by the user.  So I'm just trying to

14   understand what it is they disclaim that they're now trying

15   to claim back.  That is where you are losing it.

16             MR. PERLSON:  Sure.  Sure.  So I guess I agree

17   that their construction would allow the fact that it's

18   unseen by anybody but it should be required that it's unseen

19   by anybody.

20             THE COURT:  So you think in the language you

21   just showed me, they specifically disclaimed being able to

22   make a prediction as to whether a user would be interested

23   in a document that the user hadn't seen but others had seen?

24   Is that the disclaimer?

25             MR. PERLSON:  And other users haven't seen.

1    They're saying, in the patent, you could determine an

2    interest in a document that both the user and other users

3    have not seen.

4              And, again, going back to what Gerace is about,

5    Gerace is about allowing you to determine an interest in an

6    unseen document to the user.  I mean that is what it does.

7              But what the patentees were saying it doesn't do

8    is allow you to review, to determine interest in a document

9    that is unseen by any of the users.  And if that distinction

10   is not included in the claims, and if that is not how unseen

11   document is interpreted, then the distinction they are

12   raising doesn't make any sense, because Gerace did allow you

13   to determine an interest in a document that was unseen by

14   you.  And so plaintiff is, by making that the only limitation

15   and saying that it doesn't need to be unseen by you and also

16   unseen by the other users, they eliminated the only thing

17   that distinguishes Gerace.

18             THE COURT:  I think I understand you.

19             MR. PERLSON:  Okay.  And, your Honor, the plaintiff

20   talked about dependent claim 7 and the specification, and,

21   you know, we addressed this in our brief.  You know, the

22   fact there may be other claims that existed before they

23   disclaimed this meaning shouldn't allow them to recapture

24   what was done through prosecution history.

25             THE COURT:  There is no legal significance to

1    the fact that claim 7 emerged nonetheless?  Was granted to

2    them?

3            MR. PERLSON:  I'm not aware of any legal

4    significance.  The legal significance that I know of is that

5    a disclaimer -- and this is in the context of the preferred

6    embodiment.  But that there is a disclaimer.  It doesn't

7    matter whether there is -- even if it excludes a preferred

8    embodiment, I mean they are held to the bargain.

9            The fact that, you know, maybe someone just

10   didn't think about it.  Well, gees, I really want to get

11   claim 1 in.  How does that affect claim 7?  Maybe nobody

12   thought about it.  May they should have pointed that out to

13   the Patent Office, but they didn't.  But that doesn't mean

14   that plaintiff should be able to come back in here after the

15   applicants made their deal with the Patent Office and undo

16   what they did to get the patent granted.

17           Now, going back to documents.  I guess one of

18   the last document-type phrases here.

19           This is a phrase about indefiniteness.  You

20   know, the law is clear that if there is not an objective

21   standard to be applied in determining infringement that the

22   patent would be indefinite.

23           Here, really, the question is whether the "of

24   interest" itself presents such a subjective question.  And

25   we would say that the patent talks about determining whether

1    a document is of interest to the user.  And that is

2    precisely a subjective test.

3               Now, plaintiff cites examples from the

4    specification as to what, you know, the specification

5    describes as positive examples that come up with some sort

6    of what would be an objective measure, and they talk

7    about -- and this is slide 93 -- talk about things like

8    visited websites and search results.

9               But that doesn't necessarily mean that a

10   document is interesting.  You know, you visited the website

11   and, gees, this is ridiculous.  I have no interest in this

12   at all.

13              Or a document that is saved in favorites is

14   another one.  Well, it could have been bookmarked by

15   mistake.  There could have been some other reason why he

16   bookmarked it.

17              The user spent a long time viewing the document.

18   Maybe he just left the room.  That is not an objective

19   indication of it.

20              Or the fact that the user followed links in the

21   document.  Well, maybe he did that because he didn't like

22   what he found in the document.

23              So none of those are objective bases which can

24   determine interest.

25              And someone who is trying to practice this

 1  invention, maybe they're tracking these things for some

 2  other reason.  Are they determining whether someone is, you

 3  know, the user interest simply because they're doing these

 4  things even if that is not their intention in tracking them?

 5  And the ambiguity regarding these positive examples shows

 6  that this is really an unanswerable question.

 7          And, once again, Mr. Konig really confirmed just

 8  the confusion that exists here.

 9          And I said, you know, really kind of posing

10  plaintiff's construction to him:

11          "Question:  You would agree that clicking on a

12  document is a positive response to a query?

13          "Answer:  Not necessarily.  As I said, I think

14  clicking on a query, clicking on any page is a strong

15  indicator that you might like the content of the page, but

16  it might not be.  It is not the only factor.  Like I said,

17  you might click on something because it looks interesting,

18  and then you realize it's not what you were thinking, and

19  you go back to the original search results page."

20          I mean this is really the ambiguity here.  The

21  plaintiff is saying that there is some objective basis, but

22  the objective basis they're pointing to is not objective at

23  all.

24          THE COURT:  But objective doesn't mean perfect.

25  I mean you are just saying he is not going to always get it

1    right, but that doesn't make it insolubly ambiguous.

2              MR. PERLSON:  Well, I think this is a notion of

3    the problem here.  Plaintiff was highlighting it in their

4    brief and I don't recall whether he said it in argument.

5    But in the brief, he pointed to Mr. Konig's testimony that

6    the subjective notion of the actual user interest is not

7    important, but the claims says you are determining whether

8    documents are of interest or not of interest to the user.

9              Now, there could have been a different way that

10   you could have drafted that to say something different, to

11   say looking at, you know, indicia of user or tracking how

12   many times a user clicked or doing something specific, but

13   they didn't do that.  They said that this is what you need

14   to do.  Well, how can you do that?

15             And, basically, plaintiff is saying you don't

16   even need to do that.  They're saying the subjective notion

17   of the end user is irrelevant.  So, basically, we're

18   presented with a situation where we have a term in which

19   you are determining the user interest in a document and

20   plaintiff is saying it's definite because you don't need to

21   determine the user interest at all because whether the user

22   is interested in the document is irrelevant.

23             Well, that is completely contrary to the plain

24   meaning of the phrase, and it's basically we're just kind

25   of going in one big circle.  And someone who is trying to

1   practice the patent and trying to figure out whether what

2   I'm doing is determining whether a document is of interest

3   or not is not going to be able to know what they're doing is

4   determining interest or not.  I mean because, you know,

5   someone may say, gees, I'm tracking how often somebody

6   clicks on something but I know by doing that, I can't

7   determine whether a document is of interest to the user for

8   the reasons that Mr. Konig admitted.  Am I infringing?

9   They're saying yes, but that is not what the claim says at

10  all.

11          And then the positive examples don't give you

12  real positive examples of determining user interest.  There

13  could be any number of examples where that could come up

14  with, so you have this problem of somebody trying to design

15  a system that does not infringe and they wouldn't be able to

16  do it.

17          This is really the notion of what indefiniteness

18  is trying to solve.  We don't want to be in a situation

19  where somebody can't design a system and know whether or not

20  it infringes or not.  And we would submit, Your Honor, it

21  gets us right --

22          THE COURT:  If a patent claim says analyzing the

23  monitor data to determine if documents are interesting, made

24  no reference to the user, just said they're interesting,

25  would that be at least -- would you at least grant that that

 1    is more problematic?

 2              MR. PERLSON:  I guess it is.  I don't know that

 3    it's that much more because I think basically what the

 4    patent is saying is determining whether documents are

 5    interesting to the user.  I mean that is what it is saying.

 6    There is really no difference between what it is saying.

 7    You are determining documents of interest to the user.

 8              THE COURT:  What if it said, analyze monitor

 9    data to determine if the documents are aesthetically

10    pleasing?

11              MR. PERLSON:  I think that is the Datamize

12    example, and I would certainly submit that that is

13    indefinite.  I don't think that Datamize set out, set the

14    floor as to what the worst possible construction could be

15    and things could be, you know, worse than others, but I mean

16    that's the point.  To take your interesting example, I would

17    submit that that is really no different than what is going

18    on here.

19              THE COURT:  Do I necessarily have to reach this

20    issue in the context of claim construction?

21              MR. PERLSON:  Is there a case that I can point

22    you to that says you absolutely must do it right now?  I

23    don't know that I can cite you a case that says you

24    absolutely must need to do it right now.  I can certainly

25    cite you a case, and we did in our brief, that says that

1    it's absolutely appropriate to do it right now.

2              THE COURT:  And why should I do it now?

3              MR. PERLSON:  Well, because we're here, we made

4    the arguments, and it's been fully submitted; and, you know,

5    we should get some closure to determine what it is that, you

6    know, we're going to have this claim going forward.

7              And, in fact, I think -- can you pull up 26?

8              THE COURT:  And let me tell you where we are.  I

9    think you have 15 minutes left altogether and plaintiffs

10   have reserved 14 minutes.

11             MR. PERLSON:  Okay.

12             No, that's not it.  Okay.  Well, let me go real

13   quick then to the order of steps.

14             Can you go to the first slide?

15             So it's not really clear what plaintiff -- we

16   laid these out in the briefs, and I don't need to go through

17   this all again.  It's in slide 102.

18             And what this does, it walks through each of the

19   claims -- I mean each of the elements of claim 1, and the

20   next slide does the same thing for one of the claims of the

21   '276 patent.  And it talks about how you are using what is

22   referred to in the prior claim and the next claim.

23             So, for example, you are estimating a

24   probability of (e) and you are using that in (f).

25             You are transparently monitoring in (a) and you

1    are using those transparently monitored in (b).

2              You are estimating parameters in (c) and you are

3    using those parameters in (e).

4              I mean the whole claim has, there is an order to

5    it.  And I really haven't heard in briefs or here today why

6    that isn't the case.  And, you know, the E-Pass case -- this

7    is 105, slide 105 -- says when most of the steps of the

8    method claim refer to the completed results of the prior

9    step, they have to be performed in order.

10             And I really don't think there can be any

11   legitimate dispute that is the case here.  The plaintiff,

12   they seem to be making some argument about a cycle in that

13   we're somehow creating some sort of noninfringement argument

14   or something.

15             But, you know, it's not our construction that

16   requires that each step occur for each iteration of a

17   proposed cycle.  This is a method claim.  So every one of

18   these claims, (a) through (g), needs to be performed.  Of

19   course.  That is, our construction is not providing that.

20             Now, if you do 1(a), (b), (c), (d) and (e)

21   and then you do (d) 100 times and then you do (e), (f), (g),

22   we're not saying that you are somehow out.  You are practicing

23   all of the elements.  And to the extent that that is what

24   their concern is, that is not what we're saying, and I can't

25   imagine how that can possibly be, our construction could be

1    interpreted in that way, and this notion of claims being

2    performed in order and constructions being done for that is

3    quite common.

4         And, really, I think the antecedent basis is

5    really somewhat of the same issue.  Here, we have a user.

6    There is "the" user and there is an "a" user and every

7    single one of these is the same; and it doesn't make any

8    sense, you know, if it's not as we construe it.

9         There is user-specific data files, and then you

10   talk about what you do with the user-specific data files.

11   There is a learning machine, and you talk about what you do

12   with the learning machine.  It has to be the same learning

13   machine.  And if it is not -- and this is slide 109 -- then

14   there is not antecedent basis.

15        Again, this is something it really doesn't seem

16   like something we should be fighting over.  The plaintiff

17   says the claim is clear on its face.  I'm not sure clear as

18   to what.  They never told us.  In fact, as to all of these

19   terms listed on 109, they never suggested a meaning contrary

20   to what we've said.

21        So at least as to these terms, there can't be a

22   legitimate dispute.  And we would submit under 0_{2}Micro, that

23   this is a dispute that should be resolved so that plaintiff

24   -- and I don't know what they're going to do with it, but

25   so they can't come in later and come up with something that

1    is inconsistent with this under what they view as their

2    yet-unstated clear interpretation.

3          Now, they do address two terms in their

4    arguments.  They talk about the probability but,

5    curiously -- and this is at slide 111 -- they actually admit

6    that the estimated probability of step f refers back to the

7    estimated probability of P(u/d) of step e.  But I mean that

8    is what our construction is.

9          Instead, they come up with some argument about

10   how there is, there are multiple probabilities, one for each

11   unseen document.  But, again, this is not inconsistent with

12   what we were saying.  Yes.  There is one probability for

13   each unseen document.  When we're talking about the

14   probability, we're talking about the same probability.  That

15   is what the claim says.

16         And document d, the document must refer to the

17   same document.  You know, here, the response is the unseen

18   document d introduced in step e represents a subset of

19   document d.

20         Now, they said I don't know what that means.  We

21   said in our brief we don't know what that means.  They never

22   told you what that means, and we would submit that doesn't

23   make any sense at all for unseen document d to be a subset

24   of document d.  There is nothing in the spec that would

25   suggest that such a peculiar reading, and there is nothing

1    in the plain reading of the claims that would suggest that.

2                In fact, it wouldn't even make -- it wouldn't

3    make any sense at all if it was.  First of all, why use

4    document d for both?  And if you remember, your Honor, it

5    was, the claims actually previously said a document d and

6    then they put in the unseen document d, and I think to the

7    extent that there is kind of two a documents or a unseen

8    document in the claim, it's really by virtue of the fact

9    that somebody messed up when they were amending it and they

10   didn't conform it.

11               But clearly under their construction, if the

12   document is not the same, then the document in step 1(d) is

13   the same at the document in step 1(e).

14               And then there are all sorts of other documents

15   in the dependent claims, and we listed them on slide 114.

16   So which document are those?  We would submit that that

17   would be clear.

18               And, Your Honor, we'll rest on our papers with

19   presenting and save some additional time for rebuttal.

20               THE COURT:  Before you sit, going back to order

21   of steps real quick, you mean your construction to allow for

22   repetition of any particular step in a single cycle as I

23   understand it but you wouldn't allow for one to go back, to

24   go backwards.  They have to go in the fixed order in which

25   the steps are listed.

 1          MR. PERLSON:  I think that is right.  Maybe if I

 2   could show you here.

 3          THE COURT:  Yes.

 4          MR. PERLSON:  Claim 1(a), let's say, in the

 5   '276.  You know, you could do (a) and you could do (b) and

 6   for some reason you want to do (b) five times, okay?  And

 7   then you do (c) and (d), (e), (f), and then (g) and use (g)

 8   five times.  That's fine.  And I don't think our claim

 9   precludes that, but you can't do (g) before you do (a) and

10   you can't do (e) before you do (b).  I mean it just doesn't

11   make any sense.  That is really all we're trying to get at.

12          THE COURT:  You can't do any later in the

13   alphabet letter in the step before you do the earlier ones.

14          MR. PERLSON:  Right, in order.  And, you know,

15   again, it's a method claim so you would have to point to

16   something somebody is doing.  So, you know, there may be,

17   the method may be performed many times, I suppose, but when

18   we're talking about the instance of a particular method and

19   when it's being performed, it has to be performed in the

20   order.

21          THE COURT:  Okay.  Thank you.

22          All right.  I think that leaves you about eight

23   minutes.

24          I'll hear from the plaintiff.  As I said, you

25   have up to 14 minutes.

```
 1                    MR. NELSON:  Can we have a short break before

 2   rebuttal?

 3                    THE COURT:  That's fine.  We'll take a 10-minute

 4   break.

 5                    MR. NELSON:  Appreciate it.  Thank you.

 6                    (Brief recess taken.)

 7                    THE COURT:  We'll hear plaintiff's 14 minutes,

 8   or up to 14 minutes.

 9                    MR. NELSON:  Thank you, your Honor.  I

10   apologize.  I'll probably use all of it.

11                    THE COURT:  That's fine.

12                    MR. NELSON:  Can I have slide 55, please.

13                    And so defendant started his presentation by

14   talking about the present invention language, so that is

15   where I will start the rebuttal, and they cited the case

16   that they cited in the supplemental authority.  And that

17   case is nothing new.  It's basically building on what the

18   law was.  What the law was in this area is that you look at

19   the specification in its entirety and determine whether the

20   present invention language is limiting or not.

21                    And this is, 56 is the detailed description of

22   the patent where it says, anyone of ordinary skill in the

23   art would appreciate that many variations and alterations of

24   the following details are within the scope of the invention.

25   Accordingly, the preferred embodiment of the invention is
```

1    set forth.

2              The present invention referred to as Personal

3    Web.

4              When you read the whole spec, it's clear the

5    Personal Web is an embodiment here.

6              Another example is slide 57.  While a specific

7    embodiment of the learning machine is discussed below, it is

8    to be understood any model that is a learning machine is

9    within the scope of the present invention.

10             The present invention consists of.  And then it

11   goes again.  It's another embodiment, your Honor.

12             And so when the patent is talking about this

13   Personal Web embodiment that they basically start their

14   argument with, it is just that, it's an embodiment, and the

15   law is clear that you are not supposed to read limitations

16   from the embodiment even if it's only a single embodiment

17   into the claim language.

18             THE COURT:  That wasn't the same true in Akamai,

19   though?  If it was a preferred embodiment that the discussions

20   occurred under the sections of the patent referring to the

21   preferred embodiment?

22             MR. NELSON:  Yes, your Honor.  That language

23   was certainly in Akamai, but I think the difference is

24   in Akamai, when they looked at the entirety of the

25   specification, they concluded in this case it should be

1    limiting.

2              Here, I think when you look at the entirety of

3    the specification in this case, it's clear that it's outside

4    of the Akamai situation.

5              THE COURT:  When I look to the entirety of the

6    specification here, will I find any other model or even

7    another preferred embodiment described other than the one

8    that you have just highlighted?

9              MR. NELSON:  Yes.  Your Honor, you will find

10   several other models or preferred embodiments or more

11   preferred embodiments of different pieces of this.  The

12   figure 2 of the patent describes essentially what is in the

13   '040, claim 1.

14             Other examples are figure 19 which generally

15   describes what is in claim 1 of '276.  The patent talks

16   about initialization and gives several ways that is done.

17   It talks about updating and analyzing.  I believe it gives

18   multiple sort of pieces of that.

19             So I'm not sure that you could call the figure 2

20   thing Personal Web the only embodiment.  And there certainly

21   is a lot of teaching about what the user model is and how

22   it's initialized and stuff in the Personal Web embodiment.

23             And that sort of takes me to my second point

24   here is the difference again between the specific versus

25   unique language.  And counsel had a slide up there.  I

1    believe it was 16.  I'm not quite sure.

2              That doesn't work.

3              So where they had a circle and they had user

4    model, and then a single model essentially that was our

5    construction, and then their construction was one person

6    referring to each model.

7              And what defendant's counsel sort of ignored

8    about all of that is the specific to the user language.  And

9    this is all about the term parameters in PUM's view, and

10   although the defendant tried to make it seem like there

11   wasn't a big difference, in PUM's view, there is a huge

12   difference.

13             Defendant equates parameters and variables when

14   they talked about figure 4, but the result of defendant's

15   construction is if parameters are the actual, the words and

16   things like that, each user would have a separate model made

17   up of hundreds of thousands of words and all these other

18   things.  That is not what our view is that the claims

19   contemplate.  The claims contemplate that certainly that

20   could happen, but you could also have a model where you take

21   the function that I had up with the funnel slide, where you

22   track, you track six things.

23             That could be a model that is specific to one

24   user.  It could also be a model that is specific to a

25   hundred users or a thousand users because the specificness

1     or the specificity -- I'm not sure if specificness is a

2     word -- but that comes from the parameters that define it,

3     and the claims don't talk about the generic model.  They

4     talk about the model that is specific to the user and the

5     learning machine that is specific to the user, and that

6     language contemplates that you could have -- let's say you

7     have a hundred different variables.  Each of those variables

8     are given a value.  That value is their parameter.  Those

9     values are different for each person.  Therefore, the model

10    is specific to that person.

11              That is really the heart of the dispute.  And

12    it's all about the parameters term.

13              THE COURT:  But if those numbers, the parameters

14    were coincidently the same for two people, in your view, is

15    the model still specific to the user?

16              MR. NELSON:  Yes, absolutely.  The model is

17    still specific to the user because it's defined by the user.

18    And the user-specific learning machine is specific to the

19    user.

20              THE COURT:  And I heard Mr. Perlson agree with

21    that and also agree they're not trying to preclude you from

22    having the same variables.  You know, we all like sports, we

23    all like cars.  They're not trying to require you to have

24    different variables for each user.  So I'm left wondering

25    where the dispute is here.

1           MR. NELSON:  Well, I don't think that counsel

2    agrees with that statement.  Counsel views the parameters as

3    the variables and the specificness is a group of variables

4    -- How much are you interested in sports?  Do you like cars?

5    -- all of those things as the parameters, and that is what

6    makes it specific.

7           And under that interpretation, you would have a

8    model that has variable 1 to 100 for one user, variable 1

9    through 200 for the next one, variable 1,000 through 1,050

10   for the next one.  That would all be different.

11          In our view, that is a different situation where

12   you had a situation where you had a model that had 100

13   generic (a) (b) plus (a) (b) (c) (d) (e) times (x).  That is

14   a function.  That is a template for a function.  Learning

15   machine.

16          When that model is made specific to a user by

17   being instantiated with the user's parameters that is

18   tracked in the user specific -- comes from the user-specific

19   data files -- there we go -- and is tracked by the system.

20   That, I think that is the difference.  I don't think they

21   would agree that a model that was a single model that had

22   differing parameters being variables for different people

23   necessarily would or would not be within the claims.

24          THE COURT:  You agree that probability has to be

25   a number; correct?

1             MR. NELSON:  Yes.  That takes me to another

2    point here.  And I want to mention some inventor testimony

3    as well here because they're only citing portions of it, and

4    I will give you a copy of all of the rebuttal slides which

5    have sort of counter cites to inventor testimony to what

6    they put up.  I don't think that it's necessarily that

7    relevant but I want to give a complete picture.

8             But back to probability.

9             THE COURT:  Okay.

10            MR. NELSON:  So we do agree it's about math.

11   They're reading something into our definition of

12   approximating likelihood or belief.  They're reading

13   something in there that we didn't intend to be there.  We

14   certainly agree that probability is about half.

15            The difference between that definition is that

16   Google is trying to limit probability to a very specific

17   type of map, and that is a percentage chance calculation,

18   whereas probability in the Bayesian sense isn't limited to a

19   particular type of map.  It could be a percentage chance.

20   It normally is not.  It normally is expressed as some sort

21   of a numerical value that basically reflects a degree of

22   belief of likelihood.

23            I mean we could, to deal with their issue about,

24   that ours isn't about math at all, we could talk about, you

25   know, numerically approximating a degree of belief or

1    likelihood, something to that effect might work.

2             The dispute here isn't that we don't think it's

3    about math and they do, it's that they try to limit it to a

4    specific type of math.

5             Can I get slide 223?

6             And this is what Mr. Konig said.

7             "Question:  When you say probabilities, what do

8    you mean?

9             "Answer:  Again, it's an estimate of degree of

10   interest of a phenomenon you don't have absolute knowledge

11   of."

12            "Estimating degrees that something will happen."

13            Next slide.

14            And then posterior probability, he uses sort of

15   the same language here.  And this is 223 and 224.

16            Let's go to user real quick.  Can I get Konig

17   slide 13?  I'm sorry.  Konig slide 213.

18            Now, counsel said that Mr. Konig said a user is

19   a human being.  Well, this is what Mr. Konig actually said.

20            "Question:  And when you say 'for a specific

21   user,' what does that mean?

22            "Answer:  User in the sense of there is a human

23   being operating a machine, and there's represented to the

24   website or the Internet by some sort of electronic

25   identifier or tag.

1          "Question:  So the user is a human being in your

2     sentence?

3          "Answer:  Again, my whole sentence was a user is

4     a human being operating a computer and is identified in our

5     current electronic world by a tag of identifiers to a

6     computer."

7          Slide 84, please.  84.

8          And you asked counsel about if there is any

9     information in the specification about whether a user was a

10    representative or not.  Well, this is one example that we

11    put up.  There is also -- and I'll just give you some figure

12    numbers.  Figure 6A of the patent has, the user in that

13    context, the name Bob being represented in there.  Figure 14

14    is a buffer that was shown before that is associated with

15    the user.  It doesn't actually have the moniker there but

16    it's clear from the text that it's associated with a user,

17    again, being some electronic representation of the person.

18         Let's go to slide 71.

19         This is one of the definitions.  One of the

20    things that they cited about our definitions was this

21    language from the prosecution history.  That our definitions

22    aren't consistent with that.  On slide 72 here, it puts up

23    the respective parties definitions in light of the

24    prosecution history.  And our definitions do follow what

25    the statements are in the prosecution history.  That there

1    are three limitations and the deterministic relationship.

2              Let's go to slide 204, please.

3              And so there has been a lot of talk about what

4    the user model was here, and that it had to be specific to a

5    user.  Mr. Konig was asked a whole variety of hypotheticals

6    about what if you had two users typing every other word on a

7    computer or something like that, and it didn't go away?  And

8    they didn't step away from the computer.  Is that one user

9    or two?  Or if you have -- I think another one was where

10   they had six people and there are three computers and two of

11   them are using each computer.  Is that, would that be a user

12   model specific to the user or not?

13             And that context, it goes back a little bit to

14   the dispute as to what a user is as well.  But in the next

15   set of slides, 204 through 210 here, what he ultimately says

16   is the system isn't perfect, but you can have a situation

17   where you have a user model specific to a user based on the

18   user being a person or representative tag or identifier

19   where you have, the most extreme example might be two people

20   typing every other letter of a search query or something,

21   and if that is how that group choose to use the computer,

22   the model that is created based on the tag or identifier

23   using the parameters that were specific to that two-headed

24   person typing would still be a model specific to the user.

25             And Mr. Konig was clear on that.  The entirety

1    of that testimony is here in slides 209 to 210.

2              I think this is the conclusion.

3              "So it would be different than if the computer

4    didn't know anything about them, but it will be the impact

5    of both of their action will affect the personalization."

6              "So in the theoretical sense that for whatever

7    reason, they're doing random stuff that the computer cannot

8    differentiate, if each one of them is typing one character

9    and going away or something, then the position would be to

10   the position of them as a group."

11             Counsel made a point about the hats argument we

12   made, and that it wasn't applicable.  Well, the hats are

13   applicable to initializing the user model, so the

14   initializing the user model, they are the user model for

15   that point in time.  And so they definitely are applicable

16   the argument that plaintiff is making here.

17             Let's go -- I don't remember the slide but the

18   defendant had a slide up that said "program," and then it

19   was their software implementation argument, and it was an

20   extrinsic evidence cite.  And what that cite, what the

21   entirety of that text says, it said learning machine/program,

22   usually represented in software.  It didn't say it had to

23   be.  It said usually represented in software.

24             And we're not saying that it couldn't be one,

25   but our model and function language that comes from the

1    specification, and, as counsel pointed out, is used

2    throughout the specification, is much more clear as to what

3    a user model -- what a learning machine actually is.

4            Counsel gave an example also on user-specific

5    data files in the comprising language.  That I think the

6    example was something if you had a pizza comprising

7    pepperonis and sausages or whatever it was.

8            Well, that is using comprising up here in the

9    preamble sense.  That is not what the case, what the

10   Haemonetics case that we cited teaches and that is not what

11   the situation is here.

12           Taking counsel's example a little further.

13   Suppose you had a claim that says baking a pizza comprising:

14   forming a dough base, adding a sauce base, and adding a

15   topping base, comprising pepperonis and mushrooms.

16           I think in that sense, the pepperonis and

17   mushrooms are defined by the claims, and that is the

18   argument we're making here, and that is where their example

19   breaks down.

20           I don't know if I'm out of time yet or not.

21           THE COURT:  You have got about two more minutes,

22   and I'm going to have two questions for you.  But I'll give

23   you the minute and-a-half, and then I'll ask the questions.

24           MR. NELSON:  Can I have slide 215?

25           And so the "files" term and whether or not

1    files should be electronic files.  We don't dispute that

2    electronic -- or document definition, that it needs to be

3    electronic.  What we dispute is the word files.  And they

4    made some -- I'm not sure I remember them all, where they're

5    not trying to read out dynamic generated documents, and that

6    is good.  But they're still defining files by how they're

7    stored, and what are Mr. Konig said, there are places that

8    we talk about tables and other data structures that are not

9    necessarily files.

10           And I think one place, which I won't be able to

11   find in a minute here probably.

12           THE COURT:  Well, you said they would be

13   satisfied with a definition of document to be electronic

14   file which can include text or any type of media.  So what

15   is the problem with that?

16           MR. NELSON:  Well, I think still it's not clear

17   what their definition of file actually is.  They made some

18   representations but it's still defining a document by how

19   it's stored as opposed to what it is.

20           THE COURT:  All right.  Let me ask you on

21   learning machine, it seemed like there was some movement

22   towards compromise there.  Did you hear any?  Where do you

23   think we are on learning machine?

24           MR. NELSON:  I'm not actually sure, I heard so

25   many things.

```
 1                      THE COURT:  Well, specifically, I understood

 2      Google to be comfortable with modifying improve in their

 3      construction to attempts to improve.

 4                      MR. NELSON:  Yes, and I think we would be fine

 5      with that.

 6                      THE COURT:  And that may have been the only

 7      progress.

 8                      MR. NELSON:  We might with the monitored -- I

 9      need to remember the exact phraseology, but it's the

10      monitored interactions piece.  I mean that was movement

11      toward where we needed to be, but I think, as we showed on

12      one of the slides, that it's clear that the user specific

13      data files which are used to update the user model or to

14      define the user model, that data is used to then obtain the

15      parameters which define the user model.

16                      The data doesn't only come from the monitored

17      user interactions, so if they're willing to go further to

18      include the world knowledge concept and the other concept

19      which is the set of documents associated with the user,

20      there may be may be some room for some improvement there as

21      well.

22                      THE COURT:  I will give you one more minute, if

23      there is anything you wish to add.

24                      MR. NELSON:  Appreciate that, your Honor.

25                      Let me have slide 213.  No, wait.  Let me have
```

1    slide 227, please.

2            This goes to the definiteness argument, and this

3    is what Mr. Konig ultimately says, and the systems aren't

4    perfect but what they're trying to do is inject the

5    subjectivity when the specification teaches to one of

6    ordinary skill in the art how to practice this invention and

7    what would or would not be of interest to the user.

8            And Mr. Konig's ultimate conclusion is the

9    system is making a determination.  And they quoted a piece

10   of it, but it's making the best estimated -- estimated based

11   on the design principle whether the user is interested in

12   the document or not.  He absolutely thought of the user as

13   something else.

14           Of course, these systems are designed to try to

15   take the user interest into account, but from a design

16   perspective and somebody practicing all of the elements of

17   the claim in this case, the spec clearly teaches one of

18   ordinary skill in the art and provides many, many examples

19   of objective evidence of what would or would not be of

20   interest or not of interest document-wise to the user.

21           And then the last point I wanted to make was

22   just on the order of steps issue.

23           You know, figure 19 shows that you can go

24   backwards.  You can, for example, initialize the user

25   model, run a search, retrieve some documents, identify

1    their properties, come up with a probability, present some

2    documents to the user, run another search.  Some of this

3    stuff is being monitored so this step is being done but you

4    wouldn't have to update during any of this time.  You

5    wouldn't have to update the user model again.  You could

6    then run another search, retrieve some documents, and as

7    the system normally updates, whether it's every hour,

8    every minute, every 24 hours every month, in the middle of

9    this process there could be an estimating parameters of

10   user-specific learning machine done based in part on the

11   documents of interest to the user.  So it wouldn't have to

12   go in that order.

13              And I think with that, your Honor, I'll close.

14   And I appreciate it very much, your time and your patience.

15   Thank you.

16              THE COURT:  Thank you.

17              Mr. Perlson, I'll round you up to 10 minutes, if

18   you want it.

19              MR. PERLSON:  Okay.  Thank you very much, your

20   Honor.  Appreciate it.

21              Well, let me first start out with -- let me

22   switch this.  (Operating Elmo.)

23              This is 7.

24              Your Honor, on rebuttal, plaintiff's counsel did

25   address this present invention point, and the one thing he

1   never did rebut is there is no disclosure of a method where

2   there is a user model that is not for each user.  And that

3   is really the point.  And that is why this is the same as

4   Akamai.  In that case, there was no other -- there is no

5   disclosure of.  There was an alphanumeric string that didn't

6   include the object's original URL.  Here, it's user model

7   and each user has to have their own user model, and there is

8   no disclosure of anything else in the spec.  And I really

9   don't think that that is disputed.

10          Whether or not there might be some aspects of

11   the Personal Web embodiment that aren't claimed is a

12   separate issue.  I mean it's not every single, every single

13   word that the person -- or what is described as a Personal

14   Web might not be claimed, but that is an entirely separate

15   issue as to whether the only thing that is described in the

16   spec is that each model -- that each user has their own

17   model.

18          And I wanted to talk about that a little bit

19   because I think it's still really critical to make clear

20   what the distinction is between our position and their

21   position.  And it seems to me that plaintiff explicitly said

22   that in slide 16, that one on the left is what they allow.

23   That each user does not need to have their own user model.

24          And that, again, they never pointed to anything

25   in the spec that would support that.  And they just seemed

1    to not want to have their patent limited to that.  But that

2    is not what it says.  The user model is specific to the

3    user.

4              And they keep on harping on the parameters.  And

5    while, you know, I think it's probably true that by virtue

6    of the fact of the parameters, the user model being specific

7    to the user, that the user model would have parameters and

8    those parameters would, you know, show the user's interest

9    in something or a topic, but it's the user model itself that

10   has to be specific to the user, and that is what the claims

11   say.  And that is the term at issue.  Is the user model

12   itself specific to the user?  Is the learning machine

13   specific to the user?

14             Now, I came up with this little drawing here to

15   show what I think plaintiff is saying.

16             They had said that the user model can have a

17   hundred users or a thousand users and that parameters from

18   each of those users can make up the user model and it can

19   still be specific to all of them.  Your Honor, that is the

20   group model that we have, on slide 17 we show that, and that

21   is not a user model.

22             This is what they're saying a user model

23   specific to the user is.  They're saying if you have user

24   (a) (b) and (c) and there is parameters as to each of them,

25   and as long as you are using a parameter for (a) and a

1    parameter for (b) and a parameter for (c) that the user

2    model is specific to each of them.

3            But that doesn't make any sense and that is not

4    what the patent describes.  The patent describes (a) gets

5    its own user model, (b) gets its own user model and (c) gets

6    a user model.  The group user model does not become specific

7    to the user merely because it's using data from that user,

8    and that really is the heart of the dispute here.  And we

9    would submit that the plain language of the claims and the

10   spec are entirely consistent and really allow for no other

11   interpretation.

12           There was some discussion of probability, and

13   plaintiff conceded that probability needs to be a number,

14   and there is no limitation.  They explain how their

15   construction accounts for that.  I mean they never explained

16   why the examples that we provided in the slide about how the

17   user may be interested and is probably interested, our

18   beliefs or likelihood.  Those fit within their construction,

19   and that is not what our construction provides.  We submit

20   ours is the one that is consistent with the spec.  It needs

21   to be a number and the number is a percent of the chance,

22   and nothing has been provided to the contrary.

23           They seek to rebut the pizza example.  That

24   example is not as they said, talking about the preamble of

25   the claim.  We used almost identical language to the claim

1    at issue.  I mean the claim talks about estimating

2    parameters of a learning machine wherein the parameters

3    define a user model -- actually, that's the wrong one.  It's

4    (b), 1(b) updating user-specific data files wherein the

5    user-specific data files comprise the monitored user

6    interactions.  The language that we provided was making a

7    pizza wherein the pizza comprises pepperoni and mushrooms.

8    I mean it is exactly the same thing, and there is nothing

9    about the preamble, and that whole example that he came up

10   with has nothing to do with our point.  As a simple matter

11   of grammar, it still needs to be a data file.

12           And I will also note your Honor, your Honor,

13   that while plaintiff took us to task for citing Mr. Konig's

14   testimony, he actually affirmatively cited Mr. Konig's

15   testimony when it served his purposes, and I think he showed

16   slide 215 just a few minutes ago.  So I think that it's fair

17   game for both of us, and it is appropriate to look at.

18           And, finally, I will also note that in the

19   description of user, it's true that I had much back and

20   forthwith Mr. Konig regarding what a user was in his

21   deposition; and, you know, he seemed to be trying to go

22   down plaintiff's line; but when asked the clear question,

23   he answered and he said that a user is a person operating a

24   computer.  That is a clear question and answer that I

25   provided and nothing in his other testimony does that.

1              Nothing further, your Honor.

2              THE COURT:  One question for you.  It's not

3    really directly claim construction, but I think Mr. Nelson

4    showed me some new slides and suggested that he wanted to

5    submit rebuttal slides.  Do you have any objection to me

6    getting a submission after the hearing of slides and I could

7    take your one rebuttal slide?

8              MR. PERLSON.  Yes, I want to make sure that

9    this -- I actually did not draw this.  I had Ms. Roberts.  I

10   sketched it out and it looked nothing even remotely as nice

11   as this.

12             THE COURT:  Do you have the slides here?

13             MS. JACOBS LOUDEN:  We do, your Honor.

14             THE COURT:  I'll take a copy when Google has a

15   chance to prepare it of your rebuttal slide as well.

16             MR. PERLSON:  Okay.  But were all those rebuttal

17   slide used?

18             MS. JACOBS LOUDEN:  Yes, they were up here on

19   the screen.

20             MR. NELSON:  I don't know if every single one

21   was used, your Honor.  There probably are a couple in there

22   that weren't used.

23             THE COURT:  All right.

24             MR. NELSON:  The idea was to, since we didn't

25   know which portions of inventor testimony would be cited,

1  the idea was to try to canvas all of the testimony that he

2  gave --

3           THE COURT:  Okay.

4           MR. NELSON:  -- to present a balanced picture.

5           THE COURT:  You can have a seat.  I'll tell you

6  what we're going to do.

7                Don't forget your slide.

8           MR. PERLSON:  (Holding up slide while sitting

9  down).

10           THE COURT:  So there had been a little bit of

11  movement back and forth, a little bit of shifting of

12  position.  So I do want to give you all a chance to take a

13  few days to meet and confer and get back to me by the end of

14  this week on Friday and just let me know, you know, where we

15  are in terms of which claim terms are in dispute.

16           I don't have high hopes that you are going to

17  find that you have narrowed the disputes much, but I don't

18  think that there is a lot here for me to decide right now,

19  and there may be slightly less on Friday if I give you a few

20  days to meet and confer.  So I want you to get back to me by

21  letters.  You can each submit one, if you wish, on Friday.

22  Let me know at that point what remains in dispute and what

23  are the specific constructions each side is proposing at

24  this time.

25           Also give me whatever additional slides you

1    think I need to see based on what you presented today.  I do

2    also want to get a complete copy of Mr. Konig's deposition

3    testimony with an index to it, so it should be the

4    Min-U-Script form or some form in which I can look things up

5    from an index.

6            And the final thing I would like from you all

7    is put your heads together and see if you can agree on what

8    order in which the Court should address these terms in its

9    opinion.  You all took different tacts from one another in

10   your briefing and different approaches yet again today.

11           I'm not forcing you to agree, but I'd like at

12   least to put some effort in it before I do as to whether or

13   not you can agree on a structure in which I can meaningfully

14   resolve these disputes and give you my explanation for it.

15   So I'll look for whether you have one for two proposals on

16   that in your submissions Friday.

17           Yes, Mr. Perlson.

18           MR. PERLSON:  I have a question on that.  There

19   are some concepts that I think are probably similar on how

20   to group things together.  If there are sort of groups that

21   we can put together, would that be useful, for example, like

22   four or five terms.

23           THE COURT:  I'm going to let you see what

24   progress you can make and it probably goes without saying

25   but even if you reach agreement, I may write it differently,

1   but I would like to see what you come up with, focusing on

2   that so that I maximize the chance of being helpful to you.

3                    Anything further, Mr. Nelson?

4                    MR. NELSON:  No, your Honor.

5                    THE COURT:  No.  And Mr. Perlson, anything?

6                    MR. PERLSON:  Nothing further, your Honor.

7                    THE COURT:  Okay.  Thank you all very much.

8   We'll be in recess.

9                    (Claim construction hearing ends at 1:35 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25